## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                      No. CIV 13-0708 JB/LAM

2121 CELESTE ROAD SW,
ALBUQUERQUE, NEW MEXICO,

       Defendant,

and

JERRY L. PADILLA, III;
JERRY L. PADILLA, JR.; and
CRUZ J. FRAIRE,

       Claimants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Motion for Finding of Contempt and to Compel Production and for Sanctions, filed February 12, 2015 (Doc. 24)("Motion"). The Court held a hearing on April 9, 2015. The primary issues are: (i) whether a party can use a subpoena under rule 45 of the Federal Rules of Civil Procedure to obtain discovery from a party; (ii) whether Claimant Cruz J. Fraire can obtain all information in the Federal Bureau of Investigation's investigative file pertaining to the Los Padillas Gang, Claimant Jerry L. Padilla, III, and Fraire (the "Los Padillas File") by subpoenaing Laura A. Schwartzenberger, an FBI Special Agent; (iii) whether Fraire should have filed a rule 34 motion to compel the Plaintiff United States of America to produce the Los Padillas File instead of the Motion; (iv) whether the Court will order the United States to produce the Los Padillas File; and (v) whether the Court will impose discovery sanctions on the United States for failing to produce the Los Padillas File.

The Court will deny the Motion in part and grant it in part.  First, a party can use a subpoena under rule 45 to obtain discovery from a party.  Second, Fraire cannot obtain the Los Padillas File by subpoenaing Schwartzenberger, because the file is not in her possession, custody, or control.  Third, rather than filing the Motion, Fraire should have filed a rule 34 motion to compel the United States to produce the Los Padillas file.  Fourth, the Court will order the United States to: (i) personally double-check the Los Padillas File to ensure that the United States has produced everything in the file related to Fraire; (ii) produce all of the information in the file created or dated before March 22, 2011; and (iii) produce all of the evidence that the United States intends to introduce at trial to establish that Fraire knew about the drug-trafficking operations at the Property.  Fifth, and finally, the Court will not order any discovery sanctions against the United States for failing to produce the Los Padillas File, because Fraire's request was overly broad and he improperly subpoenaed Schwartzenberger.

## FACTUAL BACKGROUND

The Court takes its facts from the Verified Complaint for Forfeiture In Rem, filed August 1, 2013.  See Doc. 1 ("Complaint").  Beginning in December, 2008, the Los Padillas Drug-Trafficking Organization ("Los Padillas DTO") used a parcel of real estate located at 2121 Celeste Road SW, Albuquerque, New Mexico, 87105 (the "Property"), to facilitate illegal drug trafficking.  Complaint ¶ 6, at 2.  Most members of the Los Padillas DTO are also members of the Los Padillas Gang -- a criminal organization that distributes methamphetamine, heroin, cocaine, and marijuana in the Albuquerque area.  See Complaint ¶ 6, at 2.  Claimant Jerry L. Padilla, Jr. runs the Los Padillas Gang, and his son, Jerry L. Padilla, III, is a Los Padillas Gang member.  See Complaint ¶ 7, at 2.  The Property is located next to a business that Los Padillas

Gang members own and operate.  See Complaint ¶ 7, at 3.  Padilla, III resided at the Property throughout the events that the Complaint alleges.  See Complaint ¶ 7, at 3.

On March 6, 2009, an undercover police officer from the Albuquerque Police Department ("APD") and a confidential human source ("CHS-1") executed a controlled purchase of cocaine from Padilla, Jr.  Complaint ¶ 8, at 3.  Before the purchase, CHS-1 called Padilla, Jr. to discuss purchasing four ounces of cocaine.  See Complaint ¶ 8, at 3.  Padilla, Jr. told CHS-1 that he would prepare the cocaine and call CHS-1 when it was ready.  See Complaint ¶ 8, at 3. Thereafter, Padilla, Jr. called CHS-1 and told CHS-1 that he wanted to meet at the Property.  See Complaint ¶ 8, at 3.  CHS-1 and Padilla, Jr. then changed the meeting location to a gas station near the intersection of Isleta Boulevard and Malpais Road in Albuquerque.  See Complaint ¶ 8, at 3.  CHS-1 and the undercover officer arrived at the gas station, where CHS-1 gave Padilla, Jr. $1,500.00 and promised to pay him an additional $2,000.00; in exchange, Padilla, Jr. received four ounces of cocaine.  See Complaint ¶ 8, at 3

On March 11, 2009, Padilla, Jr. called CHS-1, and said that he could meet CHS-1 in fifteen to twenty minutes at a restaurant near the intersection of Gibson Boulevard and Wilmore Drive in Albuquerque.  See Complaint ¶ 9, at 3.  FBI agents then gave CHS-1 $2,000.00 to pay Padilla, Jr. the balance of the money that CHS-1 owed Padilla from the March 6, 2009, cocaine transaction.  See Complaint ¶ 9, at 3.  When CHS-1 met with Padilla, Jr., CHS-1 gave Padilla, Jr. the money, and Padilla, Jr. "fronted"[1] CHS-1 another four ounces of cocaine.  Complaint ¶ 9, at 3.

---

[1]The Complaint does not explain what "fronted" means, but "fronting" illegal drugs typically means that the buyer received drugs from the seller on credit with the expectation that the buyer would pay for the drugs after reselling them.  E.g., United States v. Combs, 191 F. App'x 319, 321 (5th Cir. 2006)(unpublished)("Thomas was frequently supplied cocaine by another, who 'fronted' cocaine to Thomas, allowing him to pay for the drugs after they were

On March 19, 2009, Padilla, Jr. called CHS-1 to offer CHS-1 four more ounces of cocaine.  See Complaint ¶ 10, at 3.  The two agreed to meet at the Property, where CHS-1 gave Padilla, III $3,500.00 in exchange for four ounces of cocaine.  See Complaint ¶ 10, at 3-4.  While inside the Property, CHS-1 saw a large amount of money and several plastic bags containing similar quantities of cocaine on the kitchen table.  See Complaint ¶ 10, at 4.  On April 17, 2009, CHS-1 and the undercover officer met with Padilla, Jr. to pay him $3,500.00 for the cocaine that CHS-1 received on March 19, 2009.[2]  See Complaint ¶ 10, at 4.  CHS-1 and the undercover officer met Padilla, Jr. inside of the officer's vehicle at the parking lot of a restaurant at 5324 4th Street in Albuquerque.  See Complaint ¶ 10, at 4.

In November, 2009, FBI agents conducted extensive surveillance of the Property and the business next door.  See Complaint ¶ 12, at 4.  The following facts are the agents' observations during the surveillance operation.

On November 9, 2009, at approximately 1:53 p.m., a teal-green vehicle pulled into the Property's driveway.  See Complaint ¶ 14, at 5.  The vehicle left the Property approximately twenty-four minutes later, at 2:17 p.m.  See Complaint ¶ 14, at 5.  At approximately 2:53 p.m., an unknown male drove a tractor in the area around the business that sits next to the Property.  See Complaint ¶ 13, at 4.  At approximately 2:55 p.m., two unknown individuals walked around the tractor, and the tractor pushed a silver car "into the business area."[3]  Complaint ¶ 13, at 4-5.

---

sold."); United States v. Nelson, 165 F.3d 1180, 1182 (8th Cir. 1999)("The affidavit stated that Nelson had fronted cocaine, i.e., supplied the cocaine on credit for later payment . . . .").

[2]The Complaint does not explain why CHS-1 paid Padilla, III $3,500.00 on March 19, 2009, and Padilla, Jr. $3,500.00 on April 17, 2009, for the same four ounces of cocaine that CHS-1 received from Padilla, III on March 19, 2009.

[3]The Complaint does not provide any additional information about what "into the business area" means.  Complaint ¶ 13, at 4-5.

- 4 -

The tractor then dug a hole in the business area around where the silver car was parked previously.  See Complaint ¶ 13, at 5.

On November 9, 2009, at approximately 4:21 p.m., an unknown male was in the Property's backyard.  See Complaint ¶ 13, at 5.  The male opened the gate to the business next to the Property, walked to the tractor, and drove it into the Property's backyard.  See Complaint ¶ 13, at 5.  Another unknown individual closed the gate to the business.  See Complaint ¶ 13, at 5.  At that point, at least three unknown individuals were in the Property's backyard.  See Complaint ¶ 13, at 5.  The tractor then began digging a hole beside a shed on the backyard's eastern side.  See Complaint ¶ 13, at 5.  One of the individuals was operating the tractor; the other two individuals were standing nearby.  See Complaint ¶ 13, at 5.

At approximately 4:34 p.m., the tractor was covering up the hole.  See Complaint ¶ 13, at 5.  By approximately 4:38 p.m., the tractor had completely filled the hole.  See Complaint ¶ 13, at 5.  The tractor then drove to the backyard's northern side and dug another hole there.  See Complaint ¶ 13, at 5.  A second individual appeared to be supervising the digging, and a third individual was walking toward the Property.  See Complaint ¶ 13, at 5.  The tractor filled in the second hole, smoothed the hole's surface with the tractor's bucket, and then rolled over the hole with the tractor's treads.  See Complaint ¶ 13, at 5.  At approximately 4:46 p.m., an individual opened the gate to the business, the tractor drove back into the business area, and the individual operating the tractor entered the Property.  See Complaint ¶ 13, at 5.  At approximately 5:04 p.m., a dark-green or blue sports utility vehicle pulled into the Property's driveway, the Property's garage door opened, and an unknown individual walked to the vehicle.  See Complaint ¶ 14, at 5.  Shortly thereafter, the vehicle drove away from the Property.  See Complaint ¶ 14, at 5.

On November 10, 2009, at approximately 1:44 p.m., a silver car drove up to the gate surrounding the Property and parked outside of the gate.  See Complaint ¶ 14, at 5.  Two unknown males got out of the silver car and walked east to the business' gate.  See Complaint ¶ 14, at 5-6.  Approximately nineteen minutes later, at 2:03 p.m., two individuals were near the fence outside the business -- one of whom was digging.  See Complaint ¶ 14, at 5-6.  A dark-colored sedan then left the Property, and the silver car followed it.  See Complaint ¶ 14, at 6.

On November 24, 2009, at approximately 3:01 p.m., a small, white or gray truck parked next to the business.  See Complaint ¶ 14, at 6.  At least one unknown individual left the truck and walked into the business while two unknown individuals walked into the garage in the business' outer section.  See Complaint ¶ 14, at 6.  At approximately 3:05 p.m., the truck drove away.  See Complaint ¶ 14, at 6.  At approximately 4:00 p.m., a gray sedan and a black sedan pulled into the Property's driveway; the two vehicles drove away approximately fifty-three minutes later.  See Complaint ¶ 14, at 6.

The activities that the FBI agents observed at the business next to the Property did not appear, at any time, to be consistent with the activities of a legitimate business.  See Complaint ¶ 15, at 6.  Specifically, the traffic into and out of the business was not consistent with a legitimate automobile-body or construction business.  See Complaint ¶ 15, at 6.  At no time during the surveillance, which was conducted during normal business hours on weekdays, did any individuals appear to be dropping cars off to have work done on them.  See Complaint ¶ 15, at 6.  Additionally, the business did not appear to have a large amount of equipment or supplies typical of a construction business.  See Complaint ¶ 15, at 6.  Except for unloading what appeared to be plastic piping on one occasion on November 12, 2009, FBI agents did not see any

other equipment or supplies typical of a construction business transported into or out of the business.  See Complaint ¶ 15, at 6.

On December 3, 2009, FBI agents executed a search warrant at the Property and recovered: (i) fourteen cellular telephones; (ii) a video-surveillance system; (iii) a backpack with plastic zip lock bags; (iv) a money-counter machine; (v) packaging material buried in the Property's backyard; (vi) $441,008.00 buried in the backyard; (vii) several heat sealers; and (viii) documentation belonging to Padilla, Jr. and Padilla, III.  See Complaint ¶ 16, at 6-7.  In February, 2011, FBI agents received information about the Property from another confidential human source ("CHS-2").  Complaint ¶ 17, at 7.  CHS-2 told the agents that CHS-2 purchased large quantities of cocaine from the Padillas from approximately March or April, 2009, to approximately September, 2009.  See Complaint ¶ 17, at 7.  CHS-2 said that CHS-2 purchased cocaine every two weeks at the Property from Padilla, Jr. or Padilla, III.  See Complaint ¶ 17, at 7.  CHS-2 explained that one of the Padillas -- usually Padilla, III's younger brother[4] -- would retrieve the cocaine from the yard.  See Complaint ¶ 17, at 7.  CHS-2 said that the individual who obtained the cocaine would leave the Property with a shovel and return with wrapped bricks of cocaine covered in dirt.  See Complaint ¶ 17, at 7.  CHS-2 said that the cocaine was already somewhere on the Property when CHS-2 went to buy it.  See Complaint ¶ 17, at 7.  CHS-2 advised the agents that Padilla, Jr. and Padilla, III obtained approximately ten to twenty kilograms of cocaine, heroin, and methamphetamine every two weeks to sell to others. See Complaint ¶ 17, at 7.  In August, 2009, CHS-2 observed the Padillas[5] cutting heroin in the

---

[4]The Complaint does not provide any further information about Padilla, III's younger brother.

[5]The Complaint does not specify whether "the Padillas" refers to Padilla, Jr. and Padilla, III,  one of those Padillas and another Padilla, or other Padillas altogether.

Property's kitchen.  See Complaint ¶ 17, at 7.  On another occasion, CHS-2 went to the Property and noticed a large amount of vacuum-sealed money.  See Complaint ¶ 17, at 7.

On February 18, 2011, CHS-2 agreed to meet Padilla, III at the Property to pick up approximately three ounces of heroin.  See Complaint ¶ 18, at 7.  FBI agents saw CHS-2 enter the Property and remain inside for several minutes.  See Complaint ¶ 18, at 7.  CHS-2 then met with the agents and gave them a plastic bag containing three smaller bags that each had a hard brown substance inside.  See Complaint ¶ 18, at 7.  The substance field-tested negative for heroin.  See Complaint ¶ 18, at 7-8.  On February 19, 2011, at approximately 9:08 a.m., the agents met with CHS-2 and gave CHS-2 the same substance that CHS-2 had obtained from Padilla, III on the previous day.  See Complaint ¶ 19, at 8.  CHS-2 then met with Padilla, III at the Property.  See Complaint ¶ 19, at 8.  Padilla, III vouched for the substance's quality, but reluctantly allowed CHS-2 to return it.  See Complaint ¶ 19, at 8.

On February 26, 2011, at approximately 10:20 a.m., CHS-2 met with FBI agents to set up a controlled purchase of heroin from Padilla, III.  See Complaint ¶ 20, at 8.  The agents gave CHS-2 $1,500.00 to purchase approximately two ounces of heroin.  See Complaint ¶ 20, at 8.  CHS-2 arrived at the Property at approximately 10:36 a.m., entered the Property for several minutes, and then left.  See Complaint ¶ 20, at 8.  CHS-2 later met with the agents and gave them a brown substance that field-tested positive for heroin.  See Complaint ¶ 20, at 8.  CHS-2 told the agents that CHS-2 had bought the heroin from Padilla, III for $1,500.00 and had promised to pay Padilla, III an additional $200.00 later.  See Complaint ¶ 20, at 8.

On March 16, 2011, at approximately 8:30 p.m., CHS-2 met with FBI agents to make another controlled purchase of heroin from Padilla, III.  See Complaint ¶ 21, at 8.  The agents

gave CHS-2 $2,250.00 to purchase approximately two ounces of heroin and to pay Padilla, III the $200.00 that CHS-2 owed from the previous transaction on February 26, 2011.[6]  See Complaint ¶ 21, at 8-9.  After meeting with Padilla, III, CHS-2 told the agents that Padilla, III initially gave CHS-2 two ounces of heroin, but was concerned that there was a large amount of police activity in the area.  See Complaint ¶ 21, at 9.  According to CHS-2, Padilla, III described two vehicles that he believed the "[f]eds" were driving.  Complaint ¶ 21, at 9.  CHS-2 said that Padilla, III told CHS-2 not to take the heroin and advised CHS-2 to return the following morning.  See Complaint ¶ 21, at 9.  Accordingly, CHS-2 left the Property and returned the $2,250.00 to the agents.  See Complaint ¶ 21, at 9.

On March 17, 2011, at approximately 9:41 a.m., CHS-2 met with FBI agents, who gave CHS-2 the $2,250.00 from the prior evening's aborted drug deal.  See Complaint ¶ 22, at 9.  CHS-2 drove to the Property, parked in front of it, and entered the Property.  See Complaint ¶ 22, at 9.  Shortly thereafter, CHS-2 exited the Property and met with the agents at another location.  See Complaint ¶ 22, at 9.  CHS-2 gave the agents two plastic baggies, which contained heroin that weighed approximately 83.6 grams.  See Complaint ¶ 22, at 9.  CHS-2 informed the agents that Padilla, III gave CHS-2 the heroin in exchange for $2,250.00, but said nothing about the overpayment.  See Complaint ¶ 22, at 9.  CHS-2 also told the agents that CHS-2 had witnessed Padilla, III retrieve the heroin from an area that separates the Property from the business next door.  See Complaint ¶ 22, at 9.  Eleven days later, on March 28, 2011, the FBI executed another search warrant at the Property and recovered $19,777.00, thirteen cellular telephones, and driver's licenses for Padilla, III.  See Complaint

---

[6]The Complaint does not explain why the agents gave CHS-2 an extra $50.00.

¶ 23, at 10.  On May 12, 2011, Padilla, III and Padilla, Jr. pled guilty to cocaine distribution.

See Complaint ¶¶ 24-25, at 10.

## PROCEDURAL BACKGROUND

The United States filed this case on August 1, 2013, asserting that the Property is subject to arrest and forfeiture under 21 U.S.C. § 881(a)(7), because it was used or was intended to be used, in any manner or part, to commit or to facilitate the commission of a violation of the Controlled Substances Act, 21 U.S.C. §§ 801-904, punishable by more than one year in prison. See Complaint ¶ 26, at 10.  The United States asks the Court to: (i) arrest the Property and forfeit it to the United States; (ii) determine the validity and priority of Padilla, Jr's, Padilla, III, and Cruz J. Fraire's claims and any unknown claimants' claims to the Property; (iii) award the United States the costs and expenses of the seizure and this proceeding; and (iv) award the United States any other relief that the Court deems proper.  See Complaint at 12.

Fraire served a rule 34 Request for Production ("RFP") on the United States on December 26, 2014.  Motion at 1.  On January 21, 2015, Fraire served Assistant United States Attorney Joel Myers a notice of deposition and a subpoena duces tecum for Schwartzenberger. See Motion at 1.  The subpoena duces tecum ordered the production of the entire FBI investigative file pertaining to "'Los Padillas' and/or anything involving Jerry Padilla III or Cruz Fraire."  Notice of Deposition of Laura A. Schwartzenberger, filed February 12, 2015 (Doc. 24-1)("Subpoena").  On January 28, 2015, the United States responded to the RFP, but did not produce the file.  See Reply at 3.  Instead, it objected to the request as "overly broad on its face." Reply at 3-4 (internal quotation marks omitted).

At her deposition, Schwartzenberger acknowledged that she received the notice of deposition with the Subpoena, that she reviewed the Subpoena, and that she understood that it

required her to bring the file with her.  See Deposition of Laura A. Schwartzenberger (taken January 27, 2015) at 4:6-23 (Bowles, Schwartzenberger), filed February 12, 2015 (Doc. 24-2)("Schwartzenberger Depo.").  Schwartzenberger also understood that the United States District Court for the District of New Mexico validly issued the Subpoena.  See Schwartzenberger Depo. at 5:8-12 (Bowles, Schwartzenberger).  Schwartzenberger did not bring the file, however, because she "spoke with the AUSA, Joel Myers, and he advised not to bring it," and that "it would be handled in another matter."  Schwartzenberger Depo. at 4:24-5:7 (Bowles, Schwartzenberger).

Between May, 2006 and June, 2010, Schwartzenberger was the case agent for the Los Padillas investigation.  See Schwartzenberger Depo. at 7:19-22 (Bowles, Schwartzenberger); id. at 9:12-14 (Bowles, Schwartzenberger).  Schwartzenberger testified that the Los Padillas File contained "volumes," and included surveillance, "source reporting," and FBI 302s.[7] Schwartzenberger Depo. at 6:20-7:20 (Bowles, Schwartzenberger).  Schwartzenberger testified that the only information in the FBI's possession regarding Fraire's alleged criminal activity was undated "source reporting" from several unidentified individuals.  Schwartzenberger Depo. at 9:21-10:6 (Bowles, Schwartzenberger).  Schwartzenberger conceded that, but for that undated hearsay information, the FBI had no information indicating that Fraire was involved in the criminal activity regarding the attempted forfeiture of the Property.  See Schwartzenberger Depo. at 10:11-13 (Bowles, Schwartzenberger).

---

[7]A "302," otherwise known as an "FD-302," is a form that FBI agents use "to report or summarize the interviews that they conduct."  List of FBI Forms, Wikipedia.org, http://en.wikipedia.org/wiki/List_of_FBI_ forms#FD-302 (last visited May 6, 2015).

1.      **The Motion.**

Fraire filed the Motion on February 12, 2015.  In the Motion, Fraire asks the Court to find the United States in contempt and order the United States to compel the production of the Los Padillas File.  See Motion at 1.  Fraire argues that, after receiving the Subpoena, the United States failed to produce the subpoenaed information, properly object to the Subpoena, or move to quash the Subpoena.  See Motion at 2.  According to Fraire, the United States' course of conduct violates rule 45(d)(2) of the Federal Rules of Civil procedure, is in contempt of the subpoena issued under the Court's authority, and justifies additional sanctions.  See Motion at 4.

Fraire asserts that any sanctions that the Court orders must only be "just" and related to "the claim at issue in the order to provide discovery."  Motion at 4 (quoting Ehrenhause v. Reynolds, 965 F.2d 916, 920 (10th Cir. 1992))(internal quotation marks omitted).  Fraire explains that, to determine if a sanction is appropriate, courts should consider: "(1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; (3) the culpability of the litigant."  Motion at 4 (quoting Ehrenhause v. Reynolds, 965 F.2d at 921)(alterations in Motion omitted)(internal quotation marks omitted).

Fraire also points to rule 37(b) of the Federal Rules of Civil Procedure, which provides an array of sanctions that a court can impose when a party fails to comply with a court order.  See Motion at 4-5.  In addition to his request that the Court hold the United States in contempt, Fraire seeks the following sanctions: (i) compelling production of the Los Padillas File; (ii) a finding that the United States and Schwartzenberger waived any and all objections to such production; (iii) attorney's fees and costs for litigating the Motion; (iv) allowing Fraire's counsel to re-depose Schwartzenberger upon the production of the complete files and materials; and (v) attorney's fees and costs of the additional deposition of Schwartzenberger.  See Motion at 6.

2.     **The Response**.

The United States responded to the Motion on March 1, 2015.   See United States'

Response to Claimant Cruz J. Fraire's Motion for Finding of Contempt and Motion to Compel,

filed March 1, 2015 (Doc. 25)("Response").   In the Response, the United States argues that the

Court cannot compel Schwartzenberger, a non-party witness, to produce the Los Padillas File,

because it is not her property.   See Response at 2.   The United States asserts that, because the

Los Padillas File is the United States' property, a rule 34 RFP is the only proper mechanism for

Fraire to obtain it.   See Response at 3 (citing Cumis Ins. Soc. v. S. Coast Bank, 610 F. Supp. 193,

196-97 (N.D. Ind. 1985)).

The United States asserts that Fraire "seems tacitly aware" of the distinction between

these rules as he initially sought the Los Padillas File through an RFP that he served on the

United States before serving the Subpoena on Schwartzenberger.   Response at 3.   According to

the United States, rather than waiting for the United States' response to the RFP, and filing a

motion to compel under rule 34 if the United States objected or failed to respond, Fraire

improperly subpoenaed Schwartzenberger and then "doubled-down on his bad bet" by

improperly filing a motion to compel a response to the subpoena under rule 45.   Response at 3-4.

The United States argues that Fraire "should not be permitted to circumvent Rule 34 by

requesting from a witness what should be requested from a party."   Response at 4 (citing

Fastener Corp. v. Spotnails, Inc., 43 F.R.D. 204, 207 (N.D. Ill. 1967)).   The United States points

out that it responded to the RFP on January 28, 2015, and, because Fraire failed to timely file a

motion to compel a response to the RFP, he accepted the United States' objection to it.   See

Response at 4 (citing D.N.M.LR-Civ. 26.6).   The United States concludes: "Claimant has chosen

the incorrect discovery mechanism and through his failure to timely seek a motion to compel the

RFP, claimant has accepted the United States' objection to the RFP and his instant relief should be denied in its entirety."  Response at 4.

### 3.   **The Reply**.

Fraire replied to the Response on March 12, 2015.  See Claimant Cruz J. Fraire's Reply to Plaintiff's Response to His Motion for Finding of Contempt and to Compel Production and For Sanctions, filed March 12, 2015 (Doc. 26)("Reply").  Fraire asserts that the Los Padillas File is discoverable through either a rule 34 RFP or a rule 45 subpoena.  See Reply at 4.  Fraire contends that he properly served a rule 34 RFP on the United States.  See Reply at 4.  Fraire notes that, when documents otherwise subject to a rule 34 RFP are within a non-party's possession, custody, or control, the party seeking those documents may subpoena the non-party to produce them.  See Reply at 4.  Fraire contends that, accordingly, he "covered all of his bases" by issuing a subpoena to Schwartzenberger to bring the Los Padillas File to her deposition. Reply at 4.

Fraire points out that courts have held that a party may seek government records through a subpoena regardless whether the government or its employee is a party to the case.  See Reply at 4 (citing EPA v. General Electric, Inc., 197 F.3d 592 (2d Cir. 1999)(reversing district court's order to quash a Rule 45 subpoena directed at the EPA, a party to the litigation); Ghandi v. Police Dep't of Detroit, 74 F.R.D. 115 (E.D. Mich. 1977)(denying non-party FBI's motion to quash a Rule 45 subpoena); Cumis Ins. Soc. v. S. Coast Bank, 610 F. Supp. at 196-97  (denying non-party United States Attorney's motion to squash a subpoena seeking FBI files in his "possession, custody, or control")).  According to Fraire, only one discovery device would be improper to use to obtain the Los Padillas File: serving a rule 34 RFP upon the non-party FBI. See Reply at 4-5.  Fraire asserts that he "made no such mistake."  Reply at 5.

Fraire argues that whether the Los Padillas File is the United States' property is irrelevant to whether his discovery requests were proper.  <u>See</u> Reply at 5.  Fraire says that, because the Los Padillas File is the United States' property, it is discoverable under rule 34.  <u>See</u> Reply at 5. Fraire further argues that, because the file is in Schwartzberger's "possession, custody, or control," it is also subject to subpoena under rule 45.  Reply at 5.  Fraire asserts that, when he chose to use both discovery mechanisms, he did not choose "one proper [and] one improper" method, as the United States' contends, but instead chose two proper methods to obtain the Los Padillas File.  Reply at 5.

Fraire next points out that the three cases, which the United States cites, do not support its position.  <u>See</u> Reply at 5-6.  Fraire says that the United States cites <u>Fastener Corp. v. Spotnails, Inc.</u>, for the proposition that a "'claimant should not be permitted to circumvent Rule 34 by requesting from a witness what should be requested from a party.'"  Reply at 6 (quoting Response at 4).  Fraire argues that the Honorable Alexander J. Napoli, United States District Judge for the Northern District of Illinois, "made no such ruling" in <u>Fastener Corp. v. Spotnails, Inc</u>.  Reply at 6.  Fraire asserts that the rule 45 subpoena in that case was directed to a party, and Judge Napoli hinted that such a procedure was proper.  <u>See</u> Reply at 6 (citing <u>Fastener Corp. v. Spotnails, Inc.</u>, 43 F.R.D. at 206 ("When a subpoena <i>duces tecum</i> is directed to a party, the requirement of good cause, contained in Rule 34, is read into the request under Rule 45.")). According to Fraire, Judge Napoli quashed the subpoena "only because the parties had not personally consulted, as required by local rule, prior to filing a motion pursuant to federal rules of discovery."  Reply at 6.

Fraire argues that the United States' reliance on <u>Hasbro, Inc. v. Serafino</u> for the proposition that "'the discovery of documents from parties is not accomplished pursuant to Rule

45, but rather pursuant to Rule 34,'" is also "off-base."   Reply at 6 (quoting Response at 3).

Fraire concedes that, in <u>Hasbro, Inc. v. Serafino</u>, the Honorable Kenneth P. Neiman, United

States Magistrate Judge for the District of Massachusetts, voiced a "lukewarm preference for

such a choice of discovery mechanisms," when he said that, "'at least one commentator indicates

that if documents are available from a party, it has been thought preferable to have them obtained

pursuant to Rule 34 rather than subpoenaing them from a non-party witness pursuant to Rule

45.'"   Reply at 6 (quoting <u>Hasbro, Inc. v. Serafino</u>, 168 F.R.D. at 100)(brackets omitted).   Fraire

points out, however, that Judge Neiman quashed the motion to compel, because the parties failed

to follow local rules requiring them to confer before filing discovery motions.   <u>See</u> Reply at 6.

According to Fraire, Judge Neiman said that the parties' failure to confer made "'it difficult, if

not impossible, for the Court to rule at that time on the substance of the motion to compel,

however meritorious.'"   Reply at 6 (quoting <u>Hasbro, Inc. v. Serafino</u>, 168 F.R.D. at 101).   Fraire

argues that Judge Neiman's denial of the motion to compel without prejudice hints that the

motion's reliance on rule 45 rather than rule 34 was immaterial.   <u>See</u> Reply at 6.

Fraire asserts that the United States' reliance on <u>Cumis Insurance Society, Inc. v.</u>

<u>South-Coast Bank</u>, for the proposition that the "FBI investigative file was a record of the United

States -- a party -- subject to Fed. R. Civ. P. 34'" is misplaced for three reasons.   Reply at 7

(quoting Response at 4).   First, Fraire asserts that the United States was not a party to that case.

<u>See</u> Reply at 7.   Second, Fraire says that, although the United States was not a party to that case,

the Honorable Allen J. Sharp, then-Chief Judge of the United States District Court for the

Northern District of Indiana, denied the United States' motion to quash and ordered the United

States to produce the requested documents.   <u>See</u> Reply at 7.   Fraire contends that, third, Judge

Sharp "relied on Rule 34 as the appropriate discovery mechanism because in 1985, when <u>Cumis</u>

was decided, Rule 34 **was** the appropriate discovery mechanism."   Reply at 7 (emphasis in original).   According to Fraire, rule 34, as it read in 1985, provided that, "'[t]his rule does not preclude an independent action against a person not a party for production of documents and things . . . .'"   Reply at 7 (quoting Cumis Ins. Soc., Inc. v. S.-Coast Bank, 610 F. Supp. at 196 n.2)(alterations in Reply but not in source).

Fraire explains that, in 1991, rule 34(c) was amended to read substantially the same as it does today.   See Reply at 7.   Fraire contends that, the 1991 amendment

> reflect[ed] the change effected by revision of Rule 45 to provide for subpoenas to compel non-parties to produce documents . . . .   The deletion of the text of the former paragraph [was] not intended to preclude an independent action for production of documents or things or for permission to enter upon land, but such actions may no longer be necessary in light of this revision.

Reply at 7 (quoting Fed. R. Civ. P. 34 advisory committee's note to 1991 amendment) (alterations in Reply but not in source).   Fraire argues that "the discovery mechanism approved of by Cumis was the then-appropriate mechanism, which has since been supplanted by a Rule 45 subpoena *duces tecum*."   Reply at 7-8.   Fraire contends that, consequently, Cumis Ins. Soc., Inc. v. S.-Coast Bank suggests that a rule 45 subpoena can appropriately be used to subpoena an FBI file within a non-party deponent's custody or control.   See Reply at 8.

Fraire says that the United States neither objected to nor attempted to quash the Subpoena.   See Reply at 8.   Fraire argues that producing the Los Padillas File would not have been unduly burdensome and that it would not have disclosed any privileged information about any ongoing investigations.   See Reply at 8.   Fraire argues that, consequently, even if the United Sates had tried to quash the Subpoena, it would have had no grounds to do so.   See Reply at 8. Finally, Fraire says that, if necessary, the Court should construe the Motion as an objection to the

United States' objections to the rule 34 RFP that was properly filed within twenty-one days as D.N.M.LR-Civ. 26.6 requires.  See Reply at 8.

### 4.    The April 9, 2015, Hearing.

The Court held a hearing on the Motion on April 9, 2015.  See Transcript of Hearing (taken April 9, 2015)("Tr.").[8]  The Court began the hearing by saying that, although it wanted to double-check its previous opinions, it did not think that rule 45 applies to parties, because it mentions persons and the rest of the discovery rules talk about parties.  See Tr. at 3:1-5 (Court). The Court said that, accordingly, it was inclined not to enforce the subpoena served on Schwartzenberger, but that it thought that the Motion had preserved Fraire's stance on the United States' objection.  See Tr. at 3:5-6 (Court).  Upon the Court's questioning, the United States clarified that Fraire owned the Property; Padilla, III was the Property's sole tenant; and Padilla, Jr. was not living there at all.  See Tr. at 4:12-23 (Myers).  The Court asked the United States why it is reluctant to turn over the Los Padillas File, and the United States responded that Fraire's request is too broad, because it includes information about the FBI's ongoing investigation of the Los Padillas gang, Padilla, III, and Padilla, Jr.  See Tr. at 5:9-19 (Myers). The United States said that this information is irrelevant in this case.  See Tr. at 5:13-14 (Myers). The United States also said that, although it had not personally reviewed the file, FBI agents have said that they produced everything in the file that is related to or mentions Fraire.  See Tr. at 5:19-6:13 (Court, Myers).

Fraire said that he was trying to figure out what evidence the United States will use to prove that he either personally participated in or was aware of illegal activities at the Property. See Tr. at 14:16-22 (Gorence); id. at 15:14-19 (Gorence); id. at 15:22-16:3 (Gorence).  Fraire

---

[8]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may have slightly different page and/or line numbers.

said that, if the United States would produce all of the information in the file created or dated before March 22, 2011, and stipulate that it had produced all of the evidence relating to him that the United States intended to use at trial, he would accept not receiving the rest of the information in the file.  See Tr. at 16:17-18:3 (Court, Gorence).  After a brief discussion with the Court, the United States agreed to: (i) double-check the Los Padillas File personally to ensure that it had produced everything in the file related to Fraire; (ii) produce all information in the file created or dated before March 22, 2011 -- the date of the filing of the second indictment of Padilla, III; and (iii) produce the evidence that the United States will introduce at trial to establish that Fraire knew about the drug-trafficking operations at the Property.  See Tr. at 7:20-18:6 (Court, Gorence, Myers); id. at 21:9-14 (Court, Myers).  The United States also said that it was not planning on calling any confidential informants as witnesses at trial and had already provided a "very exhaustive list of the people who [the United States was] potentially going to call as witnesses."  Tr. at 18:12-21 (Myers).

## RELEVANT LAW REGARDING DISCOVERY

Rule 34 of the Federal Rules of Civil Procedure governs discovery requests for documents.  See Fed. R. Civ. P. 34.  Rule 34(a) states:

A party may serve on any other party a request within the scope of Rule 26(b):

   **(1)**   to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items in the responding party's possession, custody, or control:

   **(A)**   any designated documents or electronically stored information -- including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations -- stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form; or

> **(B)**     any designated tangible things; or
>
> **(2)**     to permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

Fed. R. Civ. P. 34(a).   Rule 26(b)(1) explains that the proper scope of discovery is "any nonprivileged matter that is relevant to any party's claim or defense."   Fed. R. Civ. P. 26(b)(1). Information sought is relevant "if the discovery appears reasonably calculated to lead to discovery of admissible evidence."   Fed. R. Civ. P. 26(b)(1).   Federal courts have held that the scope of discovery under rule 26 is broad.   See Gomez v. Martin Marrietta Corp., 50 F.3d 1511, 1520 (10th Cir. 1995); Sanchez v. Matta, 229 F.R.D. 649, 654 (D.N.M. 2004)(Browning, J.)("The federal courts have held that the scope of discovery should be broadly and liberally construed to achieve the full disclosure of all potentially relevant information.").   The federal discovery rules reflect the courts' and Congress' recognition that "mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation."   Hickman v. Taylor, 329 U.S. 495, 507 (1947).   As a result of this policy, rule 26 "contemplates discovery into any matter that bears on or that reasonably could lead to other matter that could bear on any issue that is or may be raised in a case."   Anaya v. CBS Broad., Inc., 251 F.R.D. 645, 649-50 (D.N.M. 2007)(Browning, J.)(internal quotations marks omitted).

A district court is not, however, "required to permit plaintiff to engage in a 'fishing expedition' in the hope of supporting his claim."   McGee v. Hayes, 43 F. App'x 214, 217 (10th Cir. 2002)(unpublished).[9]   "'Discovery . . . is not intended to be a fishing expedition, but rather is

---

[9]McGee v. Hayes is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.   See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").   The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . .   However, if

meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support.'"   Rivera v. DJO, LLC, No. CIV 11-1119 JB/RHS, 2012 WL 3860744, at *1 (D.N.M. Aug. 27, 2012)(Browning, J.)(quoting Tottenham v. Trans World Gaming Corp., No. CIV 00-7697 WK, 2002 WL 1967023, at *2 (S.D.N.Y. June 21, 2002)(Knapp, J.)).  See Hardrick v. Legal Servs. Corp., 96 F.R.D. 617, 618 (D.D.C. 1983)(noting that courts do, and should, remain concerned about "fishing expeditions, discovery abuse and inordinate expense involved in overbroad and far-ranging discovery requests")(internal quotation marks omitted).   "[B]road discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant."   Gomez v. Martin Marietta Corp., 50 F.3d at 1520 (internal quotation marks omitted).

Courts have recognized that, while it is true that relevancy in discovery is broader than that required for admissibility at trial, "the object of inquiry must have some evidentiary value before an order to compel disclosure of otherwise inadmissible material will issue."   Zenith Elecs. Corp. v. Exzec, Inc., No. CIV 93-5041 BMM, 1998 WL 9181, at *2 (N.D. Ill. Jan. 5, 1998).  Courts have also recognized that "[t]he legal tenet that relevancy in the discovery context is broader than in the context of admissibility should not be misapplied so as to allow fishing expeditions in discovery."   Zenith Elecs. Corp. v. Exzec, Inc., 1998 WL 9181, at *2 (internal quotation marks omitted).

Rule 26(b)(1) was amended in 2000.  Before the 2000 amendments, rule 26(b)(1) defined the scope of discovery as follows:

---

an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."   United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).   The Court finds that McGee v. Hayes has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending actions, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.   The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1)(1996).  The 2000 amendments made the following changes, shown here in redline form with the deleted language stricken and the added material underlined:

> Parties may obtain discovery regarding any matter, not privileged, that ~~which~~ is relevant to ~~the subject matter involved in the pending actions, whether it relates to~~ the claim or defense of ~~the party seeking discovery or to the claim or defense of~~ any ~~other~~ party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.  <u>For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant</u> ~~The~~ information ~~sought~~ need not be admissible at the trial if discovery the ~~information sought~~ appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1).  Putting aside the changes to the last sentence -- which the advisory committee's notes make clear was a housekeeping amendment to clarify that inadmissible evidence must still be relevant to be discoverable -- the 2000 amendments have two effects: (i) they narrow the substantive scope of discovery in the first sentence; and (ii) they inject courts into the process in the entirely new second sentence.

> In 1978, the Committee published for comment a proposed amendment, suggested by the Section of Litigation of the American Bar Association, to refine the scope of discovery by deleting the "subject matter" language.  This proposal was withdrawn, and the Committee has since then made other changes in the discovery rules to address concerns about overbroad discovery.  Concerns about costs and delay of discovery have persisted nonetheless, and other bar groups have repeatedly renewed similar proposals for amendment to this subdivision to delete the "subject matter" language.  Nearly one-third of the lawyers surveyed in 1997 by the Federal Judicial Center endorsed narrowing the scope of discovery as a means of reducing litigation expense without interfering with fair case resolutions.  <u>Discovery and Disclosure Practice</u>, <u>supra</u>, at 44-45 (1997).  The Committee has heard that in some instances, particularly cases involving large

quantities of discovery, parties seek to justify discovery requests that sweep far beyond the claims and defenses of the parties on the ground that they nevertheless have a bearing on the "subject matter" involved in the action.

The amendments proposed for subdivision (b)(1) include one element of these earlier proposals but also differ from these proposals in significant ways. The similarity is that the amendments describe the scope of party-controlled discovery in terms of matter relevant to the claim or defense of any party. The court, however, retains authority to order discovery of any matter relevant to the subject matter involved in the action for good cause. The amendment is designed to involve the court more actively in regulating the breadth of sweeping or contentious discovery. The Committee has been informed repeatedly by lawyers that involvement of the court in managing discovery is an important method of controlling problems of inappropriately broad discovery. Increasing the availability of judicial officers to resolve discovery disputes and increasing court management of discovery were both strongly endorsed by the attorneys surveyed by the Federal Judicial Center. See Discovery and Disclosure Practice, supra, at 44. Under the amended provisions, if there is an objection that discovery goes beyond material relevant to the parties' claims or defenses, the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action. The good-cause standard warranting broader discovery is meant to be flexible.

**The Committee intends that the parties and the court focus on the actual claims and defenses involved in the action. The dividing line between information relevant to the claims and defenses and that relevant only to the subject matter of the action cannot be defined with precision. A variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action. For example, other incidents of the same type, or involving the same product, could be properly discoverable under the revised standard. Information about organizational arrangements or filing systems of a party could be discoverable if likely to yield or lead to the discovery of admissible information. Similarly, information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses, might be properly discoverable. In each instance, the determination whether such information is discoverable because it is relevant to the claims or defenses depends on the circumstances of the pending action.**

The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings. In general, it is hoped that reasonable lawyers can cooperate to manage discovery without the need for judicial intervention. When judicial intervention is invoked, the actual scope of

discovery should be determined according to the reasonable needs of the action. The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested.

The amendments also modify the provision regarding discovery of information not admissible in evidence.  As added in 1946, this sentence was designed to make clear that otherwise relevant material could not be withheld because it was hearsay or otherwise inadmissible.  The Committee was concerned that the "reasonably calculated to lead to the discovery of admissible evidence" standard set forth in this sentence might swallow any other limitation on the scope of discovery.  Accordingly, this sentence has been amended to clarify that information must be relevant to be discoverable, even though inadmissible, and that discovery of such material is permitted if reasonably calculated to lead to the discovery of admissible evidence.  As used here, "relevant" means within the scope of discovery as defined in this subdivision, and it would include information relevant to the subject matter involved in the action if the court has ordered discovery to that limit based on a showing of good cause.

Finally, a sentence has been added calling attention to the limitations of subdivision (b)(2)(i), (ii), and (iii).  These limitations apply to discovery that is otherwise within the scope of subdivision (b)(1).  The Committee has been told repeatedly that courts have not implemented these limitations with the vigor that was contemplated.  See 8 Federal Practice & Procedure § 2008.1 at 121.  This otherwise redundant cross-reference has been added to emphasize the need for active judicial use of subdivision (b)(2) to control excessive discovery.  Cf. Crawford-El v. Britton, 118 S. Ct. 1584, 1597 (1998)(quoting Rule 26(b)(2)(iii) and stating that "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly").

Fed. R. Civ. P. 26 advisory committee's notes (emphasis added).

One gets the impression from reading the advisory committee's notes that the amendment was not intended to exclude a delineable swath of material so much as it is intended to send a signal to district judges to become more hands-on in the process of regulating -- mostly limiting -- discovery on relevance grounds alone.  The "two effects" of the 2000 amendments might, thus, be only one effect: directing district judges to roll up their sleeves and manage discovery, and to do so on the basis of relevance.  The change in substantive scope from "subject matter," to "claim or defense," would, therefore, seem to exist more to "add teeth" to the relevance standard

than to effectuate a substantive narrowing.  It is not surprising that Congress would want to increase judicial presence: "relevance" is a wide-open concept even in the context of trial, <u>see</u> Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."), and it is often said that relevance for discovery is an even broader concept.  One might then say that old rule 26(b)(1)'s relevant discovery provision was toothless.  It is likewise unsurprising that the rulemakers are unable to articulate precise language narrowing the substantive scope of discovery: no single general rule can adequately take into account the infinite number of possible permutations of different claims, defenses, parties, attorneys, resources of parties and attorneys, information asymmetries, amounts in controversy, availabilities of information by other means, etc.  The determination requires the individualized judgment of someone on the scene, and that presence is what the rulemakers wanted when they: (i) encouraged district judges to take a firmer grasp on the scope of discovery; and (ii) put their thumbs on the scale in favor of narrower discovery in the rule's definition of the scope of discovery.

Of course, courts should also seek to give substantive content to amendments.  Read literally, the rule does not permit parties to discover information relevant only to the claim or defense of another party; they must use discovery only to investigate their own claims and defenses.  More problematically, however, the rule may prevent using the Federal Rules' compulsory discovery process to obtain "background" information not specifically relevant to any one claim or defense -- <u>e.g.</u>, a plaintiff naming a pharmaceutical company as a defendant and then using discovery to educate itself generally about medicine, biochemistry, and the drug industry by using the defendant's expertise.

In In re Cooper Tire & Rubber Co., 568 F.3d 1180 (10th Cir. 2009), the Tenth Circuit clarified that the 2000 Amendments to rule 26 "implemented a two-tiered discovery process; the first tier being attorney-managed discovery of information relevant to any claim or defense of a party, and the second being court-managed discovery that can include information relevant to the subject matter of the action." 568 F.3d at 1188. The Tenth Circuit further stated that,

> when a party objects that discovery goes beyond that relevant to the claims or defenses, "the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action." This good-cause standard is intended to be flexible. When the district court does intervene in discovery, it has discretion in determining what the scope of discovery should be. "[T]he actual scope of discovery should be determined according to the reasonable needs of the action. The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested."

568 F.3d at 1188-89 (quoting the advisory committee's notes to the 2000 amendments to Fed. R. Civ. P. 26(b)(1))(citations omitted)(footnote omitted)(alteration in original).

## LAW REGARDING MOTIONS TO COMPEL

Rule 37 provides enforcement mechanisms for rule 34. According to rule 37, if a party does not respond to an interrogatory or to a request for production, the party requesting the discovery may move the Court to compel the opposing party to respond. See Fed. R. Civ. P. 37(a)(2)(B). Accord Lewis v. Goldberry, No. CIV 11-0283 JB/ACT, 2012 WL 681800, at *4 (D.N.M. Feb. 27, 2012)(Browning, J.). Rule 37(a) provides:

> On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery. The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action.

Fed. R. Civ. P. 37(a). Under rule 37(a)(4), "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4).

If a party refuses to turn over documents through proper discovery, a defendant should move to compel production pursuant to rule 37.  See Lane v. Page, 727 F. Supp. 2d 1214, 1236 n.15 (D.N.M. 2010)(Browning, J.).

## LAW REGARDING RULE 45

"Discovery of non-parties must be conducted by subpoena pursuant to Fed. R. Civ. P. 45."  Myers v. Andzel, No. CIV 06-14420 RWS, 2007 WL 3256879, at *1 (S.D.N.Y. 2007)(Sweet, J.).  See, e.g., Highland Tank & Mfg. Co. v. PS Int'l, Inc., 227 F.R.D. 374, 379 (W.D. Pa. 2005)(Gibson, J.)("Rule 45 is the only discovery method whereby information may be obtained from a nonparty to the suit."); Blazek v. Capital Recovery Assocs., Inc., 222 F.R.D. 360, 361 (E.D. Wisc. 2004)(Adelman, J.)("[A]ny person may be required to produce documents and any property may be inspected. . . .  If the person is not a party to the litigation, the party seeking such discovery must utilize a subpoena to compel such discovery.").  Accordingly, courts have denied motions to compel non-parties to produce information where the moving party did not first attempt to subpoena the information that it sought to compel.  In Harco National Insurance Co. v. Sleegers Engineering, Inc., No. CIV 06-11314 TLL, 2014 WL 5421237 (E.D. Mich. Oct. 22, 2014), for example, the Honorable Thomas L. Ludington, United States District Judge for the Eastern District of Michigan, denied the plaintiff's motion to compel a former defendant to produce information because the plaintiff had never subpoenaed the information that it sought to compel.  See 2014 WL 5421237, at *4.  Judge Ludington stated:

> By the terms of Rule 45, a party seeking discovery from a non-party must serve that non-party with a subpoena.  Here, there is no evidence that [the plaintiff] served a subpoena on [the former defendant], nor does [the former defendant] make any representations that it did so.  Because [the plaintiff] has not complied with the first step of seeking discovery from a non-party, its motion to compel will be denied.

2014 WL 5421237, at *4.  Cf. Smith v. Fla. Dep't of Corr., 369 F. App'x 36, 38 (11th Cir. 2010)(holding that the district court did not abuse its discretion when it denied the plaintiff's motion to compel a non-party to produce information without having validly served the non-party with a subpoena).

Rule 45 was amended on December 1, 2013 in two significant ways.  First, revised rule 45(a)(2) provides that subpoenas are issued by the court in which the action is pending, rather than by the court where compliance is sought.  Accordingly, the issuing court will always be the trial court and parties no longer have to serve subpoenas from the district in which the information or witnesses sought are located.  See Fed. R. Civ. P. 45(a)(2)(providing that subpoenas "must issue from the court where the action is pending").  In line with the broadened authority that rule 45(a)(2) establishes for the trial court, amended rule 45(b)(2) establishes nationwide service of process -- eliminating the previous discrepancy between federal service of process rules in criminal and civil cases.  See Fed. R. Civ. P. 45(b)(2) (providing for the service of a subpoena "at any place within the United States").

Second, revised rule 45(d)(3) provides that motions to quash or enforce a subpoena can be brought in the district where compliance is required -- i.e., the district in which the subpoena's recipient resides or works -- rather than the issuing court -- i.e., the trial court.  See Fed. R. Civ. P. 45(d)(3).  The new rule 45(f), however, authorizes the enforcement court where compliance is required to transfer a motion to quash or enforce a subpoena back to the trial court that issued the subpoena in two limited instances: (i) if the person subject to the subpoena consents to the transfer; or (ii) "if the court finds exceptional circumstances." Fed. R. Civ. P. 45(f).  The advisory committee notes provide some guidance as to when exceptional circumstances may be found:

> The prime concern should be avoiding burdens on local nonparties subject to subpoenas, and it should not be assumed that the issuing court is in a superior position to resolve subpoena-related motions. In some circumstances, however, transfer may be warranted in order to avoid disrupting the issuing court's management of the underlying litigation, as when that court has already ruled on issues presented by the motion or the same issues are likely to arise in discovery in many districts. Transfer is appropriate only if such interests outweigh the interests of the nonparty served with the subpoena in obtaining local resolution of the motion.

Fed. R. Civ. P. 45 advisory committee's note to the December 1, 2013, amendments.

## ANALYSIS

The Court will deny the Motion in part and grant it in part. First, a party can use a subpoena under rule 45 to obtain discovery from another party. Second, Fraire cannot obtain the Los Padillas File by subpoenaing Schwartzenberger, because the file is not in her possession, custody, or control. Third, rather than filing the Motion, Fraire should have filed a rule 34 motion to compel the United States to produce the Los Padillas File. Fourth, the Court will order the United States to: (i) personally double-check the Los Padillas File to ensure that the United States has produced everything in the file related to Fraire; (ii) produce all of the information in the file created or dated before March 22, 2011; and (iii) produce all of the evidence that the United States intends to introduce at trial to establish that Fraire knew about the drug-trafficking operations at the Property. Fifth, and finally, the Court will not order any discovery sanctions against the United States for failing to produce the Los Padillas File, because Fraire's initial request was overly broad, and because he improperly subpoenaed Schwartzenberger.

## I.    A PARTY CAN USE A RULE 45 SUBPOENA TO OBTAIN DISCOVERY FROM ANOTHER PARTY.

The United States incorrectly suggests that a party cannot obtain information from another party through a rule 45 subpoena, but must instead use a rule 34 RFP. The Tenth Circuit has not decided whether a rule 45 subpoena may properly be served on a party. Among the other

United States Courts of Appeals, only the Second Circuit has addressed the issue, and, even then, did so indirectly, by affirming a district court's holding that a subpoena may be served on another party as long as it is not used to circumvent rule 34 or the other discovery rules.  See First City, Texas-Houston, N.A. v. Rafidain Bank, 197 F.R.D. 250, 255 n.5 (S.D.N.Y. 2000)(Rakoff, J.), aff'd, 281 F.3d 48 (2d Cir. 2002).  The federal district courts are split over the issue.

A minority of district courts hold that a rule 45 subpoena may not be served on a party. See, e.g., Hasbro v. Serafino, 168 F.R.D. at 100; Wirtz v. Local Union 69, 37 F.R.D. 349, 351 (D. Nev. 1965)(Thompson, J.).  Judge Neiman set forth the rationale for this view in Hasbro v. Serafino.  In that case, Judge Neiman explained that rule 45, as well as the advisory committee's notes, are "replete with references to non-parties."  168 F.R.D. 99.  In Judge Neiman's view, the notes to the 1991 amendments presume rule 45's exclusive applicability to non-parties with respect to discovery, because the only references to a responding "party" in rule 45 are in subsection (c)(3), which mentions "an officer of a party."  168 F.R.D. 99 & n.1 (quoting Fed. R. Civ. P. 45(c)(3))(internal quotation marks omitted).  Judge Nieman also pointed to rule 34(c), which, he said, "illuminates the scope of Rule 45 when it directs that 'a person not a party to the action may be compelled to produce documents and things or to submit to an inspection as provided in Rule 45.'"  168 F.R.D. 99 (quoting Fed. R. Civ. P. 34(c)).

A majority of district courts have held, however, that a subpoena may be served on another party so long as it is not used to circumvent rule 34 or the other discovery rules.  See, e.g., Neel v. Mid–Atlantic of Fairfield, LLC, CIV No. 10-405 SAG, 2012 WL 98558, at *1 (D. Md. Jan. 11, 2012)(Gallagher, M.J.); Circle Grp., LLC v. Se. Carpenters Reg'l Council, 836 F. Supp. 2d 1327, 1351 (N.D. Ga. 2011)(Duffey, J.); Abrams v. Ciba Specialty Chems. Corp., 265

F.R.D. 585, 588 (S.D. Ala. 2010)(Bivins, M.J.);  Mortg. Inf. Servs., Inc. v. Kitchens, 210 F.R.D. 562, 564 (W.D.N.C. 2002)(Cacheris, J.); First City, Texas-Houston, N.A. v. Rafidain Bank, 197 F.R.D. at 255 n.5; Badman v. Stark, 139 F.R.D. 601, 603 (M.D. Pa. 1991)(Cimini, M.J.).  The Honorable James C. Cacheris, United States District Judge for the Western District of North Carolina, provided the most comprehensive analysis on this side of the split in Mortgage Information Services, Inc. v. Kitchens, concluding that rule 45 applies to both parties and non-parties, for three reasons.

First, he said that rule 45's text "reveals that there is no express limitation on the type of person who may be subject to the rule, as its language describes the individual upon whom a Rule 45 subpoena may be served simply as a 'person' rather than a 'non-party.'"  210 F.R.D. at 565.  Judge Cacheris explained that the rule's "separate and distinct use of the terms 'person' and 'person who is not a party' . . . clearly demonstrates that the drafters were aware of the effect they would have on the scope of the rule's various provisions."  210 F.R.D. at 565.  Judge Cacheris observed that, although the rulemakers limited who could serve a rule 45 subpoena by stating in subsection (b)(1) that service may only be accomplished by a "person who is not a party" and is over the age of eighteen, they chose not to use similar language in describing those subject to service under subsections (a), (c), (d), and (e) of rule 45. 210 F.R.D. at 565.  In Judge Cacheris' view, "this was a conscious choice, and [shows] that Rule 45, by its terms, was intended to apply to parties and non-parties alike." 210 F.R.D. at 565.

Second, Judge Cacheris disagreed with Judge Neiman's reliance on rule 34(c) in Hasbro v. Serafino to conclude that rule 45 is limited to parties.  See 210 F.R.D. at 565.  Judge Cacheris highlighted the advisory committee's notes to rule 34, which say that the rulemakers included subsection (c) only to "'mak[e] clear that Rule 34 does not preclude independent actions for

discovery against persons not parties.'"  210 F.R.D. at 565 (quoting Fed. R. Civ. P. 34 advisory committee's note)(emphasis in <u>Mortg. Inf. Servs., Inc. v. Kitchens</u> but not in advisory committee's note).  According to Judge Cacheris, rule 34 says nothing about restricting rule 45's scope.  <u>See</u> 210 F.R.D. at 565.  Judge Cacheris thus concluded that, "rather than acting as a limitation on Rule 45, subsection (c) of Rule 34 was included" to ensure that rule 45 "would not be unduly restricted by the language contained in subsections (a) and (b) of Rule 34."  210 F.R.D. at 565.  Third, and finally, Judge Cacheris found no internal inconsistencies between rules 34 and 45, because "the two rules serve fundamentally different purposes."  210 F.R.D. at 565 (citing <u>Badman v. Stark</u>, 139 F.R.D. at 603 (noting that "[r]ule 34 is invoked merely to inspect documents prior to trial," whereas "[r]ule 45 is utilized to compel production of documents for use at depositions or the trial")).

The Court will adopt the majority view for two reasons.  First, rule 45's text compels such an interpretation.  The Court agrees with Judge Cacheris that, by identifying the individual who may receive a subpoena as a "person" rather than a "non-party," rule 45's text indicates that it is meant to apply to both parties and non-parties.  Fed. R. Civ. P. 45(a)(1)(A)(iii).  Judge Neiman's observation that rule 45 and the advisory committee's notes are "replete with references to non-parties," 168 F.R.D. 99, actually cuts in favor of the Court's interpretation of rule 45.  That the rulemakers referenced non-parties throughout rule 45 suggests that they purposefully chose "person" in rule 45(a)(1)(A)(iii), because they intended it to have a more expansive meaning than "non-parties" in the other provisions of the rule.  Fed. R. Civ. P. 45(a)(1)(A)(iii).  Perhaps the strongest evidence that the rulemakers intended "person" to include parties and non-parties, however, is found in rule 45(b)(1), which says that "[a]ny person who is at least 18 years old and not a party may serve a subpoena."  Fed. R. Civ. P. 45(b)(1).  If the

rulemakers intended "person" to mean "non-party," they did not need to go through the trouble of limiting "person" in rule 45(b)(1) to someone who is "not a party."  The minority's reading of rule 45 would render the second half of that sentence meaningless.  See Kungys v. United States, 485 U.S. 759, 778 (1988)(stating that it is a "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant").[10]  Accordingly, to give meaning to that entire sentence, "person" must be read as including both parties and non-parties.

Second, the leading treatises unanimously endorse the majority view.  Professors Charles Wright and Arthur Miller's Federal Practice and Procedure points to rule 45(c)(3)(A)(ii), which specifies that a subpoena must be quashed if it "requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person . . . ."  Charles Alan Wright & Arthur R. Miller, 8A Federal Practice and Procedure § 2108 (3d ed. 2004).  Wright and Miller explain that, "[b]y excluding parties served with subpoenas from its protection, this provision seems clearly to contemplate that a subpoena can be served on a party."  Federal Practice and Procedure § 2108.  Likewise, Moore's Federal Practice states that rule 45 "may be used to subpoena any person -- party or nonparty -- to produce books, documents, or tangible things at trial."  James Wm. Moore et al., 7 Moore's Federal Practice § 34.02[5][c] (3d ed. 1997).  Federal Procedure takes the same view.  See 28 Federal Procedure, Lawyers Edition § 65:239 ("[A] request under Fed. R. Civ. P. 34 applies only to parties to the lawsuit, while a subpoena duces tecum under Fed. R. Civ. P. 45

---

[10]The Court has previously stated: "The rules of statutory construction apply to the Federal Rules . . . ."  In re Kubler, No. CIV 11–0048, 2012 WL 394680, at *11 (D.N.M. Jan. 25, 2012)(Browning, J.).   Accord Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168 (1993)(applying the *expressio unius est exclusio alterius* canon when interpreting rule 9(b) of the Federal Rules of Civil Procedure); Hillis v. Heineman, 626 F.3d 1014, 1017-18 (9th Cir. 2010)("This same principle of statutory construction applies to interpreting the Federal Rules of Civil Procedure.").

may be served upon both parties and nonparties." (footnotes omitted)). Professor Steven S. Gensler recognizes that courts are split over the issue, but notes that "a subpoena is the appropriate mechanism to compel another party to appear or to produce specific documents at trial." Steven S. Gensler, Federal Rules of Civil Procedure: Rules and Commentary at 974 (2015). Accordingly, the Court concludes that parties are not limited to rule 34 RFPs to obtain information from other parties.

## II.   FRAIRE CANNOT OBTAIN THE LOS PADILLAS FILE FROM SCHWARTZENBERGER, BECAUSE THE FILE IS NOT IN HER POSSESSION, CUSTODY, OR CONTROL.

The United States contends that the Court cannot compel Schwartzenberger to produce the file, because it does not belong to her, but instead belongs to the United States. Fraire argues that it is irrelevant whether the file is Schwartzenberger's property and asserts that, because the file is in Schwartzberger's "possession, custody, or control," it is subject to subpoena under rule 45. Although Fraire provides the correct standard, he misapplies it to the facts of this case.

As Schwartzenberger has neither possession nor custody of the Los Padillas File, whether Schwartzenberger must disclose the file turns on whether she controls it. A party seeking production of documents bears the burden of establishing the opposing party's control over those documents. See United States v. Intern. Union of Petroleum & Indus. Workers, 870 F.2d 1450, 1452 (9th Cir. 1989). The Court has previously explained that "[n]either legal ownership nor physical possession of [a] document . . . is required for a non-party to control it under rule 45." Simon v. Taylor, No. CIV 12-0096 JB/WPL, 2014 WL 6633917, at *34 (D.N.M. Nov. 18, 2014)(Browning, J.)(internal quotation marks omitted). Instead, courts have broadly construed control as "the legal right, authority, or practical ability to obtain the materials sought upon demand." S.E.C. v. Credit Bancorp, Ltd., 194 F.R.D. 469, 471 (S.D.N.Y. 2000).

Applying this standard, courts have found that corporations control documents in their subsidiaries' hands, clients control case files in their attorneys' hands, and patients control health records in their healthcare providers' hands.  See United States v. Stein, 488 F.Supp.2d 350, 360-62 (S.D.N.Y. 2007).  An employee's or corporation's ability to access the documents in the normal course of business weighs in favor of finding control.  See, e.g., Gerling Int'l Ins. Co. v. Comm'r of Internal Revenue, 839 F.2d 131, 140-41 (3d Cir. 1988)(where "agent-subsidiary can secure documents of the principal-parent to meet its own business needs . . . the courts will not permit the agent-subsidiary to deny control for purposes of discovery"); Camden Iron & Metal v. Marubeni America Corp., 138 F.R.D. 438, 441 (D.N.J. 1991)(including "demonstrated access to documents in the ordinary course of business" in list of factors to be considered in determining control).  Simply put, if a person, corporation, or a person's attorney or agent can pick up a telephone and secure the document, that individual or entity controls it.  See Simon v. Taylor, 2014 WL 6633917, at *34 ("Control is defined as the legal right to obtain documents upon demand.").

Fraire has not established that Schwartzenberger controls the Los Padillas File.  During her deposition, Schwartzenberger states that she did not bring the file with her, because she spoke with Joel Myers and "he advised [her] not to bring it."  Schwartzenberger Depo. at 5:1-4 (Bowles, Schwartzenberger).  Thereafter, the following exchange occurred between Fraire's counsel and Schwartzenberger:

Q.    Now this file that you -- the FBI has, who maintains custody of that if we want to retrieve that file?

A.    It's the Albuquerque Division of the FBI.

Q.    When we sent the subpoena to you, did you let them know that this file had been requested?

A.      Yes, I did.

Q.      And who did you contact?

A.      Lisa Baughman.  She's a paralegal with the Albuquerque Division.

. . . .

Q.      Lisa Baughman would be the person that we would contact to get a copy of this file; is that correct?

A.      I believe so.

Q.      Now, had you wanted to bring that file today or had Mr. Myers said that you could bring it, Lisa Baughman would have given that to you, and you would have brought it, correct?

A.      It would have been run by her, and I probably wouldn't have gotten it directly from her.

Q.      But you would have brought it, either way?  If you had been told to bring the file, you would have brought it today; is that what I understand?

A.      If I would have been told to bring the file, that's correct, yes.

Q.      But you were told to not bring the file is what I understood you to say earlier?

A.      Correct.

Schwartzenberger Depo. at 19:11-20:15 (Bowles, Schwartzenberger).

Unlike a patient's ability to access his or her medical files or a client's ability to access his or her case file, Schwartzenberger does not appear to have the legal right, authority, or practical ability to obtain the Los Padillas File upon demand.  Nor does Schwartzenberger appear to have the ability to access the file in the normal course of business.  Instead, the record suggests that Schwartzenberger has to obtain Mr. Myers' permission and then run her request by Baughman before ultimately obtaining the file from a third individual.   Accordingly,

Schwartzenberger does not have the requisite control over the Los Padillas File to be forced to produce it under a rule 45 subpoena.

When dealing with government files, a certain amount of precaution is needed.  National security or ongoing investigations sometimes need to be protected.  If a party is going to subpoena documents from the government, they need to subpoena the person who has possession, custody, or control over the documents, and not just someone who has access to them.  Otherwise, they risk not having a subpoena that can or should be enforced.

## III.   FRAIRE SHOULD HAVE FILED A RULE 34 MOTION TO COMPEL.

There is no dispute that the United States has possession, custody, or control over the Los Padillas File.  As a result, Fraire could have obtained the information he seeks either through a rule 34 motion to compel, or subpoenaing the United States directly in the first instance and then, if necessary, filing a motion to hold the United States in contempt.  Although Fraire's course of conduct has been less than ideal, he still preserved his response to the United States' objection to the RFP by filing the Motion.

## IV.   THE COURT WILL ORDER THE UNITED STATES TO PERSONALLY DOUBLE-CHECK THE LOS PADILLAS FILE TO ENSURE THAT IT HAS PRODUCED EVERYTHING IN THE FILE RELATED TO FRAIRE, PRODUCE ALL OF THE INFORMATION IN THE FILE CREATED OR DATED BEFORE MARCH 22, 2011, AND PRODUCE ALL OF THE EVIDENCE THAT THE UNITED STATES INTENDS TO INTRODUCE AT TRIAL TO ESTABLISH THAT FRAIRE KNEW ABOUT THE DRUG-TRAFFICKING OPERATIONS AT THE PROPERTY.

Fraire's request for the entire Los Padillas File is overly broad.  At the hearing, the United States promised the Court to: (i) personally double-check the Los Padillas File to ensure that it has produced everything in the file related to Fraire; (ii) produce all of the information in the file created or dated before March 22, 2011; and (iii) produce all of the evidence that the United States intends to introduce at trial to establish that Fraire knew about the drug-trafficking

operations at the Property.  <u>See</u> Tr. at 7:20-18:6 (Court, Gorence, Myers); <u>id.</u> at 21:9-14 (Court,

Myers).  The remainder of the Los Padillas File that the United States has refused to produce

concerns ongoing investigations, and Fraire has not established how that information "is relevant

to any party's claim or defense."  Fed. R. Civ. P. 26(b)(1).  Moreover, Fraire appeared to

concede that the information about ongoing investigations is irrelevant by accepting the Court's

proposed solution at the hearing.  <u>See</u> Tr. at 16:17-18:3 (Court, Gorence).  Accordingly, the

Court will order the United States to: (i) personally double-check the Los Padillas File to ensure

that it has produced everything in the file related to Fraire; (ii) produce all of the information in

the file dated or created before March 22, 2011; and (iii) produce all of the evidence that the

United States intends to introduce at trial to establish that Fraire knew about the drug-trafficking

operations at the Property.

## V.     THE COURT WILL NOT ORDER ANY SANCTIONS AGAINST THE UNITED STATES.

In addition to asking the Court to hold the United States in contempt, Fraire sought the

following sanctions in the Motion and the Reply: (i) compelling production of Los Padillas File;

(ii) a finding that the United States and Schwartzenberger waived any and all objections to such

production; (iii) attorney's fees and costs for litigating the Motion; (iv) allowing Fraire's counsel

to re-depose Schwartzenberger upon the production of the complete files and materials; and

(v) attorney's fees and costs of the additional deposition of Schwartzenberger.  <u>See</u> Motion at 6;

Reply at 9.  Aside from asking the Court to compel the Los Padillas File, however, Fraire did not

pursue any of these sanctions at the hearing and agreed with the Court's proposed solution.  In

any event, even if the parties had not reached an agreement, the Court would not have imposed

any sanctions on the United States, because the Court agrees with the United States that Fraire's

decision to subpoena Schwartzenberger was improper and that Fraire's request for the entire Los Padillas File was overly broad.

IT IS ORDERED that the Motion for Finding of Contempt and to Compel Production and for Sanctions, filed February 12, 2015 (Doc. 24), is denied in part and granted in part.  The Court will order: (i) Assistant United States Attorney Joel Myers to personally double-check the Los Padillas File to ensure that the Plaintiff United States of America has produced everything in the file related to Claimant Cruz J. Fraire; (ii) the United States to produce all of the information in the file created or dated before March 22, 2011; and (iii) the United States to produce all of the evidence that the United States intends to introduce at trial to establish that Fraire knew about the drug-trafficking operations at the Property.  The Court will not hold the United States in contempt or order any other sanctions against the United States.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Joel R. Myers
Stephen R. Kotz
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Jason Bowles
Bowles Law Firm
Albuquerque, New Mexico

--and--

- 39 -

Robert J. Gorence
Gorence & Oliveros, P.C.
Albuquerque, New Mexico

*Attorneys for Claimant Cruz J. Fraire*