# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                 No. CIV 13-0708 JB/LAM

2121 CELESTE ROAD SW,
ALBUQUERQUE, NEW MEXICO,

MORE PARTICULARLY DESCRIBED AS:
TR A LAND DIV LAND OF JERRY &
JENNIE PADILLA (REPLAT TR 52-A
MRGCD MAP 57) CONT 0.449 AC M/L

       Defendant,

and

JERRY L. PADILLA, III;
JERRY L. PADILLA, JR.; AND
CRUZ J. FRAIRE,

       Claimants.

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on: (i) Claimant Cruz J. Fraire's Motion for Summary Judgment, filed July 29, 2015 (Doc. 43)("Fraire MSJ"); and (ii) the United States' Motion for Summary Judgment and Memorandum Brief in Support, filed November 11, 2015 (Doc. 57)("United States MSJ"). The Court held hearings on November 2, 2015, January 5, 2016, and February 16, 2016, and a pre-trial conference on January 20, 2016. The primary issues are: (i) whether a genuine issue of material fact exists whether Claimant Cruz J. Fraire

---

[1]The Court issued an Order, filed March 11, 2016 (Doc. 71)("Order"), denying Claimant Cruz J. Fraire's Motion for Summary Judgment, filed July 29, 2015 (Doc. 43), stating that the Court would "at a later date issue a Memorandum Opinion more fully detailing its rationale for this decision." Order at 1 n.1. This Memorandum Opinion and Order is the promised opinion.

qualifies as an "owner" of 2121 Celeste Road, SW, Albuquerque, New Mexico ("2121 Celeste") for purposes of the innocent owner defense under § 983(d)(1) of the Civil Asset Forfeiture Act ("CAFRA"); (ii) whether a genuine issue of material fact exists whether Fraire qualifies as "innocent" under the CAFRA; (iii) whether the forfeiture of 2121 Celeste would violate the Excessive Fines Clause of the Eighth Amendment to the Constitution of the United States of America; and (iv) whether the delays in this case violate Fraire's due-process rights under the Fifth Amendment to the Constitution of the United States.  The Court will deny the Fraire MSJ and grant the United States MSJ.  First, the Court will deny the Fraire MSJ because a genuine issue of material fact exists whether Fraire qualifies as an "owner" of 2121 Celeste under the CAFRA and the United States has produced sufficient evidence that Fraire was aware of or willfully blind to the illegal activity taking place at 2121 Celeste, and that he did not do all that could reasonably be expected under the circumstances to terminate that activity.  Second, the Court will grant the United States MSJ because, although a genuine issue of material fact exists whether Fraire qualifies as an "owner" of 2121 Celeste, no genuine issue of material fact exists whether Fraire qualifies as "innocent" under the CAFRA.  Third, the Court concludes that the forfeiture of 2121 Celeste would not violate the Excessive Fines Clause of the Eighth Amendment.  Fourth, the Court concludes that the delays in this case do not violate Fraire's due-process rights under the Fifth Amendment.

## FACTUAL BACKGROUND

The Court will provide two factual sections.  First, the Court will provide general background information to tell a coherent story and to provide context to this case.  Second, the Court will set forth the undisputed material facts for purposes of deciding the two motions for

summary judgment.  The Court has drafted one undisputed material facts section based on the two motions, and it will rule on both parties' motions for summary judgment in this opinion.

### 1.     **General Background.**

On August 1, 2013, Plaintiff United States of America filed its Verified Complaint for Forfeiture *In Rem*, listing Claimant Cruz J. Fraire as a person "who may claim an interest in Defendant Property."  Verified Complaint for Forfeiture *In Rem* at 2, filed August 1, 2013 (Doc. 1)("Complaint").  On September 17, 2013, Fraire filed his Verified Claim and Statement of Interest (Doc. 10)("Verified Claim and Statement of Interest"), and his Answer to Verified Complaint for Forfeiture In Rem (Doc. 11)("Answer"), in which he asserted his lawful and innocent ownership of 2121 Celeste, and requested judgment in his favor, return of 2121 Celeste, costs, and attorney's fees.  See Answer ¶¶ 2, 5, 7, at 1-2.  Discovery commenced, and both sides served and responded to multiple Requests for Production.  Fraire served interrogatories and deposed the Federal Bureau of Investigation ("FBI") case agent.  See Certificate of Service of First Set of Interrogatories, filed September 25, 2014 (Doc. 17)("First Certificate of Service"); Certificate of Service of Second Set of Interrogatories, filed May 20, 2015 (Doc. 36)("Second Certificate of Service").

### 2.     **Undisputed Material Facts.**

The Court divides its undisputed material facts into three sections.  The Court will first describe Fraire's relationship with 2121 Celeste before the December 3, 2009, and March 28, 2011, FBI raids.  Second, the Court will describe the use of 2121 Celeste beginning in December 2008, by members of the Los Padillas gang for drug trafficking.  Third, the Court will describe the two FBI raids and Fraire's actions with respect to 2121 Celeste thereafter.  The Court reminds the parties that at the January 5, 2016, hearing, the parties agreed to the Court writing

one set of facts, drawn from all of the summary judgment motions, responses, and replies.  See

Transcript of Hearing at 53:10-58:5 (taken January 5, 2016)(Court, Gorence, Meyers)("Jan. 5th

Tr.").[2]

> **a.   Fraire's Relationship with 2121 Celeste Before the December 3, 2009, and March 28, 2011, FBI Raids.**

Fraire purchased the undeveloped 2121 Celeste in 1993 as an investment.  See United

States' Response to Claimant's Motion for Summary Judgment at 3, filed November 16, 2015

(Doc. 58)("United States Response")(setting forth this fact); Claimant Cruz J. Fraire's Reply in

Support of his Motion for Summary Judgment at 3, filed December 10, 2015 (Doc. 61)("Fraire

Reply")(admitting this fact).  Fraire has never resided at 2121 Celeste and he has never indicated

to anyone else that he wanted to reside at 2121 Celeste.  See United States MSJ ¶ 6, at 4 (setting

forth this fact); Claimant Cruz J. Fraire's Response to United States' Motion for Summary

Judgment and Memorandum Brief in Support ¶ 6, at 3, filed December 10, 2015 (Doc.

60)("Fraire Response")(admitting in part this fact).[3]  Fraire started to build a structure on the

---

[2]The Court's citations to the transcript of the January 5, 2016 hearing, the February 17, 2016 hearing, and the January 20, 2016 pre-trial conference refer to the court reporter's original, unedited versions.  Any final transcript may contain slightly different page and/or line numbers.

[3]The United States asks the Court to find undisputed that: "Fraire has never resided at Defendant Property.  Nor has he indicated a desire to do so."  United States MSJ ¶ 6, at 4.  In support of this factual assertion, the United States cites to the following exchange during the deposition of Jerry L. Padilla, III:

> Q:  But has he never indicated to you that he wanted to go back and reside at 2121 Celeste?
>
> A: No, he hasn't.

Padilla, III Deposition at 78:21-23.  Fraire does not dispute that Fraire has never resided at 2121 Celeste, but maintains that "[i]t is disputed that Mr. Fraire has never indicated a desire to live at the Defendant Property."  Fraire Response ¶ 6, at 3.  In support of his assertion that a dispute

land.  <u>See</u> United States Response at 3 (setting forth this fact); Fraire Reply at 3 (admitting this

fact).  Fraire was subsequently arrested and convicted of Conspiracy under 21 U.S.C. § 846, <u>see</u>

United States Response at 3 (setting forth this fact); Fraire Reply at 3 (not disputing this fact),

and was incarcerated from 1996 to 2005, <u>see</u> United States MSJ ¶ 8, at 4 (setting forth this fact);

Fraire Response ¶ 8, at 4 (admitting this fact).  At that time, 2121 Celeste "did not have

plumbing, cabinets, toilets, or lighting."  United States Response ¶ 1, at 3 (setting forth this fact).

---

exists whether Fraire has indicated a desire to live at 2121 Celeste, Fraire cites to the following
exchange from the deposition of Cruz J. Fraire:

> Q: So the idea was, you know, to have a lot at the Menaul one, but what about
> 2121 Celeste?
>
> A: At one point I was going to live in it.  But I never finished the home.

Deposition of Cruz J. Fraire at 86:6-10 (taken September 30, 2015), filed December 10, 2015
(attached as exhibit A to Doc. 60 and Exhibit 3 to Doc. 57)("Fraire Deposition").  The Court will
modify the United States' factual assertion slightly to state Fraire has never resided at the
Defendant Property and he has never indicated <u>to anyone else</u> that he wanted to reside at the
Defendant Property.  The deposition testimony that the United States cites supports the factual
assertion that Fraire has never indicated <u>to anyone else</u> that he wanted to reside at 2121 Celeste.
Fraire does not submit evidence "specifically controverting" this factual assertion, but rather,
provides evidence that Fraire at one point thought or planned to live at 2121 Celeste.  Evidence
of Fraire's thoughts or mental plans, however, does not specifically controvert that he never
indicated to anyone else that he wanted to reside at 2121 Celeste.  The Court therefore deems it
undisputed that Fraire has never resided at 2121 Celeste and he has never indicated to anyone
else that he wanted to reside at 2121 Celeste.

The United States also asks the Court to find undisputed that "Fraire exercised no
dominion and control over Defendant Property."  United States MSJ ¶ 7, at 4.  As the Court
explains in its analysis, the Court concludes that this is a question that should proceed to the jury.
The Court will explain in its analysis why Fraire's admission that he "did not exercise dominion
or control over property that [he] owned" is not legally dispositive with respect to the question
whether he was a mere nominee who exercised no dominion or control over 2121 Celeste.  <u>See</u>
Claimant Cruz J. Fraire's Responses to United States First Set of Requests for Production of
Documents at 6, filed November 16, 2015 (Attached as Exhibit 1 to Doc. 58)("Response to
Request for Production No. 17"); Claimant Cruz J. Fraire's Responses to United States First Set
of Requests for Production of Documents at 7, filed November 16, 2015 (Attached as Exhibit 2
to Doc. 58)("Response to Request for Production No. 18").

See Fraire Reply ¶, at 2-4 (not disputing this fact).[4]  Fraire also did not maintain insurance for

2121 Celeste because it was unfinished.  See United States MSJ ¶ 11, at 4 (setting forth in part

this fact); Fraire Response ¶ 11, at 4 (admitting this fact).[5]  2121 Celeste had no appliances, and

it was left vacant and vandalized for about four years.[6]  See United States Response at 3-4

(setting forth these facts); Fraire Reply at 3-4 (not disputing these facts).

From on or about 2007, Claimant Jerry L. Padilla, III began to reside at 2121 Celeste. See

United States MSJ ¶ 10, at 4 (setting forth this fact); Fraire Response ¶ 10, at 4 (admitting this

fact).  Prior to Padilla, III residing at 2121 Celeste, the house was uninhabitable because Fraire

had not finished building it when he went to prison.  See United States MSJ ¶ 9, at 4 (setting

---

[4]Neither Fraire's Reply nor his Response specifically controverts that 2121 Celeste "did not have plumbing, cabinets, toilets, or lighting" at the time that he was sent to prison in 1996. United States Response ¶ 1, at 3.  Accordingly, this fact is deemed undisputed.

[5]The United States asks the Court to find that "Fraire did not maintain insurance for Defendant Property."  United States MSJ ¶ 11, at 4.  In his Response, Fraire does not dispute that Fraire did not maintain insurance for 2121 Celeste, but adds: "Mr. Fraire cites the home being unfinished as the reason for it being uninsured."  Response ¶ 11, at 4.  In its Reply, the United States does not dispute Fraire's factual assertion that 2121 Celeste was uninsured because it was unfinished as D.N.M.LR-Civ. 56.1(b) requires.  Accordingly, the Court deems it undisputed that Fraire did not maintain insurance for 2121 Celeste because it was unfinished.  See D.N.M.LR-Civ. 56.1(b)("The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection.").  The Court, therefore, deems paragraph E of the Response undisputed.  See D.N.M.LR-Civ. 56.1(b)("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[6]In his Reply to the United States' Response, Fraire "does not dispute that the Defendant Property was left vacant."  Fraire Reply at 3.  Fraire adds, however, that, "the record is devoid of any indication of an intention on the part of Mr. Fraire to abandon the Defendant property." Fraire Reply at 3.  According to Fraire, he purchased 2121 Celeste in 1993 for $25,000.00 or $30,000.00, and at that time it was just a vacant lot with a bunch of trees and no structure on it. See Fraire Reply at 3.  These statements do not, however, specifically controvert the United States' assertion that the property was left vacant when Fraire went to prison in 1996.  Further, Fraire does not dispute that 2121 Celeste was vandalized for four years while he was in prison. See Fraire Reply at 3-4.  As described in footnote 7, the Court will address, if necessary, whether 2121 Celeste was "abandoned" in its analysis.

forth in part this fact); Fraire Response ¶ 9, at 4 (admitting this fact).[7]   While Fraire was

incarcerated, many of the bills for 2121 Celeste were in arrears.  See United States MSJ ¶ 12, at 4

(setting forth this fact); Fraire Response ¶ 12, at 4 (admitting this fact).[8]   While Fraire was

_____

[7]The United States asks the Court to find undisputed that "Prior to Jerry L. Padilla III residing at Defendant Property, it was abandoned and uninhabitable."  United States MSJ ¶ 9, at 4.  Fraire admits that 2121 Celeste was uninhabitable when Fraire went to prison, and adds that the reason it was uninhabitable because "he had not finished building the home."  Fraire Response ¶ 9, at 4.  See Fraire Reply at 3 ("it was uninhabitable because it was an unfinished structure that was in the process of being built.").   The United States does not dispute this additional factual assertion in its Reply, therefore this fact is deemed admitted.  See D.N.M.LR-Civ. 56.1(b)("The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection.").  The Court, therefore, deems paragraph E of the Response undisputed.  See D.N.M.LR-Civ. 56.1(b)("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

The parties, however, remain in dispute whether 2121 Celeste was "abandoned" when Fraire went to prison 1996.  On the one hand, the United States asserts that before Padilla, III "resid[ed] at Defendant Property, it was 'abandoned.'"  United States MSJ ¶ 9, at 4.  Fraire counters that: "Abandonment is a legal conclusion.  Mr. Fraire disputes that the Defendant Property was 'abandoned.'"  Fraire Response ¶ 9, at 4.  The Court agrees with Fraire that "abandoned" has a precise legal meaning.  The Supreme Court of New Mexico has explained, for example, that under New Mexico real property law:

> Where the testimony tends to the establishment of facts from which the inference of abandonment or want of abandonment may be drawn, then the jury, and not the court, must determine the facts, and draw the inference from the testimony offered.  Abandonment is a question of act, as well as intent, and it is also said that it is a question of mixed law and fact.  A party's own testimony that he had not intended to abandon is not conclusive upon the jury.  The intention to abandon must be determined by the jury from all the facts and circumstances in the case.

Lockhart v. Wills, 1897-NMSC-027, ¶ 7, 50 P. 318, 320 (citations omitted).  While the Court cannot say that Fraire "abandoned" 2121 Celeste, he certainly could not personally do anything with it while he was in prison.

[8]Fraire does not specifically controvert this statement, but asserts:

> The citation to Mr. Padilla's deposition that the United States provides as evidence that bills were in arrears for the Defendant Property says only "Q. And you made up all of those payments?  A. Yeah, I made them up."  Mr. Fraire, in his deposition, stated that the Waste Management bill went into arrears while he was

incarcerated, the property taxes for 2121 Celeste were in arrears.[9]  See United States MSJ ¶ 13, at 4 (setting forth this fact); Fraire Response ¶ 13, at 4 (admitting this fact).  Padilla, III paid the property taxes for most of the years he resided at 2121 Celeste.  See United States MSJ ¶ 14, at 4 (setting forth this fact); Fraire Response ¶ 14, at 4 (admitting this fact).[10]  While Fraire was in prison, Padilla, III completely renovated 2121 Celeste at his own expense, but the renovations were done as part of the agreement between Mr. Padilla and Mr. Fraire in lieu of rent payments.  See United States MSJ ¶ 15, at 5 (setting forth this fact in part); Fraire Response ¶ 15, at 5 (admitting this fact).[11]  Padilla, III did not consult with Fraire before making repairs.  See United

_____

incarcerated, and he paid it when he was released.  The United States' Exhibit 4 does not contain a reference to back bills except taxes.

Fraire Response ¶ 12, at 4.  These statements, however, do not specifically controvert the United States' assertion that many of the bills for 2121 Celeste were in arrears.

[9]In his Response, Fraire concedes: "that back taxes were owed but does not remember how far behind they were.  Mr. Fraire stated in deposition that he was sure he was making the tax payments on the Defendant Property while he was in prison."  Fraire Response ¶ 13, at 4.  Neither of these statements, however, specifically controverts the United States' assertion that property taxes for 2121 Celeste were in arrears.  See United States MSJ ¶ 13, at 4.

[10]While the United States contends that Padilla, III paid the property taxes for all of the years he resided at 2121 Celeste, see United States MSJ ¶ 14, at 4, Fraire asserts that he "paid the taxes for two of the years between 2005 and the present,"  Fraire Response ¶ 14, at 4-5.  A factual dispute therefore exists whether Fraire paid the property taxes for 2121 Celeste for two years between 2005 and the present.  In Fraire's Reply to the United States' Response to the Fraire MSJ, he asserts that at some point he "instructed his mother to pay the taxes on the Defendant Property."  Fraire Reply at 3.  That statement, however, does not specifically controvert the United States' assertion that Padilla, III paid the taxes for most of the years he resided at 2121 Celeste.

[11]Fraire agrees that "it is undisputed that Mr. Padilla renovated the Defendant Property at his own expense."  Fraire Response ¶ 15, at 5.  Fraire adds, however, that "the renovations were done as part of the agreement between Mr. Padilla and Mr. Fraire in lieu of rent payments."  Fraire Response ¶ 15, at 5.  The United States does not dispute Fraire's added factual assertion in its Reply as D.N.M.LR-Civ. 56.1(b) requires.  The Court therefore deems it undisputed that "the

States MSJ ¶ 16, at 5 (setting forth this fact); Fraire Response ¶ 16, at 5 (admitting this fact).

Fraire did not pay for the repairs to 2121 Celeste, but in consideration for the repairs, Fraire did

not charge Padilla, III rent.  See United States MSJ ¶ 17, at 5 (setting forth this fact); Fraire

Response ¶ 17, at 5 (admitting this fact).[12]

     Other than when Padilla, III was incarcerated, he has been residing at 2121 Celeste.  See

United States MSJ ¶ 18, at 5 (setting forth this fact); Fraire Response ¶ 18, at 5 (admitting this

fact).  Padilla, III did not pay regular rent to Fraire to stay at 2121 Celeste, but pursuant to the

agreement Padilla, III agreed he would serve as caretaker, make repairs, and pay all bills

associated with 2121 Celeste in exchange for being allowed to live there.  See United States MSJ

¶ 19, at 5 (setting forth this fact in part); Fraire Response ¶ 19, at 5 (admitting this fact).[13]  There

was no written rental or other tenancy agreement between Fraire and Padilla, III, but the terms of

---

renovations were done as part of the agreement between Mr. Padilla and Mr. Fraire in lieu of rent
payments."

    [12]Fraire admits that "[i]t is undisputed that Mr. Fraire did not pay for the repairs to the
property."  Fraire Response ¶ 17, at 5.  Fraire adds, however, that "in consideration for the
repairs, Mr. Fraire did not charge Mr. Padilla rent."  Fraire Response ¶ 15, at 5.  The United
States does not dispute Fraire's added factual assertion in its Reply as D.N.M.LR-Civ. 56.1(b)
requires.  Accordingly, the Court deems it undisputed that "Fraire did not pay for the repairs to
the Defendant Property, but in consideration for the repairs, Fraire did not charge Padilla, III
rent."

    [13]Fraire concedes that Padilla, III "did not pay regular rent at the Defendant Property."
Fraire Response ¶ 19, at 5.  Fraire adds, however: "Pursuant to the agreement Padilla agreed he
would serve as caretaker, make repairs, and pay all bills associated with the Defendant Property
in exchange for being allowed to live there.  Additionally, Mr. Padilla has made some rent
payments."  Fraire Response ¶ 19, at 5 (citations omitted).  The United States does not dispute
Fraire's added factual assertion that "[p]ursuant to the agreement Padilla agreed he would serve
as caretaker, make repairs, and pay all bills associated with the Defendant Property in exchange
for being allowed to live there" in its Reply as D.N.M.LR-Civ. 56.1(b) requires.  Accordingly,
the Court deems this added factual assertion undisputed.

the agreement were clear.[14]  See United States MSJ ¶ 20, at 5 (setting forth this fact); Fraire

Response ¶ 20, at 5 (admitting this fact).  Fraire rarely visited 2121 Celeste.  See United States

MSJ ¶ 21, at 5 (setting forth this fact); Fraire Response ¶ 21, at 5 (admitting this fact).

>           **b.**           **The Los Padillas Gang's Use of 2121 Celeste for Drug Trafficking.**

2121 Celeste was "the situs for on-going cocaine and heroin transactions."  United States

MSJ at 9 (setting forth this fact).  See Declaration of Special Agent Carlos Zamora at 1-4

(executed November 16, 2015), filed November 16, 2015 (Doc. 57-7)("Zamora Decl.").[15]  "On

March 19, 2009, Jerry L. Padilla, Jr. used Defendant Property for purpose of selling four (4)

ounces of cocaine."  United States MSJ ¶ 1, at 3 (setting forth this fact).  See Fraire Response ¶

1, at 2 (not disputing this fact).  "On December 3, 2009, the FBI executed a search warrant at

Defendant Property."  United States MSJ ¶ 2, at 3 (setting forth this fact).  See Fraire Response ¶

2, at 2 (not disputing this fact).  "Items recovered during the execution [of] that warrant included:

---

[14]Fraire admits that "[i]t is undisputed that there was no written rental or tenancy agreement between Mr. Padilla or Mr. Fraire," but adds that "the terms of the agreement were clear."  Fraire Response ¶ 19, at 5.  The United States does not dispute Fraire's added factual assertion that "the terms of the agreement were clear" in its Reply as D.N.M.LR-Civ. 56.1(b) requires.  Accordingly, the Court deems it undisputed that "there was no written rental or other tenancy agreement between Fraire and Padilla III, but the terms of the agreement were clear."

[15]With respect to this factual assertion, Fraire responds:

> Mr. Fraire does not have personal knowledge regarding the United States' claims that the property bears a substantial connection to illegal activity.  It is the United States' burden to prove a substantial connection.

Fraire Response at 7.  Fraire's response does not "specifically controvert" this fact by producing evidence creating a genuine fact issue.  In any event, the Court has examined the Zamora Decl. and concludes that it supports the factual assertion that 2121 Celeste was "the situs for on-going cocaine and heroin transactions."  Zamora Decl. at 1-4.   This fact is therefore deemed undisputed.  The Court will analyze whether the United States has met its burden of proving that 2121 Celeste bears a substantial connection to illegal activity in its analysis.

14 cell phones; a video surveillance system; a backpack with plastic ziplock bags; a money counter machine; packaging material buried outside in the backyard; $441,008 United States currency buried outside in the backyard; several heat sealers; and documentation belonging to both Padilla, Jr. and Padilla III."  United States MSJ ¶ 2, at 3 (setting forth this fact).  See Fraire Response ¶ 2, at 2 (not disputing this fact).  "On February 26, 2011, Defendant Property was used to sell two (2) ounces of heroin."  United States MSJ ¶ 3, at 3 (setting forth this fact).  See Fraire Response ¶ 3, at 2 (not disputing this fact).  "On March 17, 2011, Defendant Property was used to sell approximately 83.6 grams of heroin."  United States MSJ ¶ 4, at 3 (setting forth this fact).  See Fraire Response ¶ 4, at 3 (not disputing this fact).  "On March 28, 2011, FBI executed another federal search warrant at Defendant Property."  United States MSJ ¶ 5, at 3 (setting forth this fact).  See Fraire Response ¶ 5, at 3 (not disputing this fact).  "Items recovered during that search of Defendant Property included: $19,777 in U.S. currency; 13 cell phones; and driver licenses for Padilla III."  United States MSJ ¶ 5, at 3 (setting forth this fact).  As a result of this conduct, Padilla, III, and Padilla, Jr. both entered into plea agreements.  See United States MSJ at 9 (setting forth this fact); Plea Agreement, filed November 16, 2015 (Doc. 57-8)("Padilla, Jr. Plea Agreement"); Plea Agreement, filed November 16, 2015 (Doc. 57-9)("Padilla, III Plea Agreement in CR. No. 09-3598"); Plea Agreement, filed November 16, 2015 (Doc. 57-10)("Padilla, III Plea Agreement in CR. No. 11-0667").[16]  In Padilla, III, and Padilla, Jr.'s plea

---

[16]With respect to this factual assertion, Fraire again responds:

Mr. Fraire does not have personal knowledge regarding the United States' claims that the property bears a substantial connection to illegal activity.  It is the United States' burden to prove a substantial connection.

Fraire Response at 7.  Fraire's response does not "specifically controvert" this fact.  In any evident, the Court has examined the three plea agreements, which evidence that Padilla, III and

agreements, "each admitted that cocaine was sold out of Defendant Property."  United States MSJ at 9 (setting forth this fact).  See Padilla, Jr. Plea Agreement ¶ 7, at 3; Padilla, III Plea Agreement in CR. No. 09-3598 ¶ 6, at 3.[17]  Padilla, III also admitted that heroin was sold out of 2121 Celeste.  See United States MSJ at 9 (setting forth this fact); Padilla, III Plea Agreement in CR. No. 11-0667 ¶ 6, at 3.[18]

    c.        **The December 3, 2009, and March 28, 2011, FBI Raids.**

On December 3, 2009, the FBI executed a search warrant at 2121 Celeste.  See United States MSJ ¶ 22 (setting forth this fact); Fraire Response ¶ 22, at 6 (not disputing this fact).  Fraire "was immediately aware of the December 3, 2009, FBI raid at 2121 Celeste Rd., because he saw it live on the news."  United States MSJ ¶ 22, at 5 (setting forth this fact).  See Fraire Response ¶ 22, at 6 (admitting in part this fact).[19]  Padilla, III, and Padilla, Jr. were both taken

---

Padilla, Jr. in fact entered into plea agreements due to the criminal conduct that occurred at 2121 Celeste.  This fact is therefore deemed undisputed.  The Court will analyze whether the United States has met its burden of proving that 2121 Celeste bears a substantial connection to illegal activity in its analysis.

    [17]The Court incorporates its analysis from footnote 16.  The Court has examined the three plea agreements.  In the Padilla, Jr. Plea Agreement and the Padilla, III Plea Agreement in CR. No. 09-3598, Padilla, III, and Padilla, Jr. admit that cocaine was sold out of 2121 Celeste.  See Padilla, Jr. Plea Agreement ¶ 7, at 3; Padilla, III Plea Agreement in CR. No. 09-3598 ¶ 6, at 3.  Fraire has not produced any evidence to the contrary.  Accordingly, the Court deems this fact undisputed.

    [18]The Court incorporates its analysis from footnote 16.  The Court has examined the Padilla, III Plea Agreement in CR. No. 11-0667, in which Padilla, III admits that heroin was sold out of 2121 Celeste.  See Padilla, III Plea Agreement in CR. No. 11-0667 ¶ 6, at 3.  Fraire has not produced any evidence to the contrary.  Accordingly, the Court deems this fact undisputed.

    [19]The United States asks the Court to find undisputed that "Fraire was immediately aware of the FBI search of the Defendant Property because he had seen it live on the news."  United States MSJ ¶ 22, at 5.  In support of its assertion that "Fraire was immediately aware of the FBI search of the Defendant Property because he had seen it live on the news," the United States cites to the following exchange during the Fraire Deposition:

_____

Q. Other than what you saw on the news, have you ever heard of any drug trafficking occurring at 2121 Celeste?

**A. No.**

Q. But seeing the news, what did you learn when you saw the news?
**A. They were at the house over there, that the agents were at the house over there.  Whatever they showed on the news.  They showed the picture on the news.**

Q. Were you aware what they got arrested for?

**A. I really didn't care.  That's none of my business.**

Q. Were you aware, though, what they got arrested for after --

**A. I'm still not aware.  That's not my business.**

. . . .

Q. So when did you actually see the news about Jerry and Jerry being arrested and your house on television?

**A. I don't know the exact day.  Just whatever day.  I watch channel 7.  I'd have to look and see when they broadcasted.**

Q. Did you see it live?

**A. According to them, it was live.  Somebody said they seen the pictures, and in the evening they had the pictures.**

Q. So it was your impression it was about at the time that it was happening?

**A. I think so.**

Fraire Deposition at 136, 150 (emphasis in original).

Fraire concedes that "[i]t is undisputed that Mr. Fraire saw a news story on television about a police search of the Defendant property."  Fraire Response ¶ 22, at 6.  Fraire contends, however, that, "Mr. Fraire's deposition testimony does not go so far as to say that he was 'immediately aware of the search on December 3, 2009' because Mr. Fraire does not remember the date of the story."  Fraire Response ¶ 22, at 6.  In support of his argument, Fraire cites to the same exchange from the Fraire Deposition that the United States cites to on page 136.  He also cites to the following exchange:

_____

Q. Were you aware that on March 9, 2009, two kilograms of cocaine were sold out of that house?

**A. I seen something on the news.**

Q. What?

**A. I seen something on the news.**

. . . .

**A. Was I aware, no.  I wasn't aware that there was any of that going on over there.**

Q. You said you saw something on the news?  What did you mean by that?

**A. I don't know if it was that incident.  I seen something on the news that had went on over there.**

Q. What did you see on the news?

**A. Pictures of Jerry and the house.**

Q. When did you see that?

**A. Whatever date it came on the news.**

Q. So contemporaneous to when the news story was?

**A. Excuse me?**

Q. You saw it as it happened?  Whenever it was on the news, you saw it at that point?

**A. Yes.**

Fraire Deposition at 133-34, 136 (emphasis in original).  The Court concludes that the deposition testimony cited by the parties establishes that Fraire "was immediately aware of the FBI search of the Defendant Property because he had seen it live on the news."  Even if Fraire does not remember the date of the story, the above exchange demonstrates that he was watching the news story live as the events of March 9, 2009 unfolded.  The Court therefore deems it undisputed that Fraire "was immediately aware of the FBI search of the Defendant Property because he had seen it live on the news."  The Court concludes, however, that this evidence does not support the

- 14 -

United States' factual assertion that Fraire "further testified that he saw several subsequent reports about the search."  United States MSJ ¶ 22, at 5

Finally, the parties remain in dispute whether Fraire and Padilla, III discussed the December 3, 2009, FBI raid.  The United States asserts in the United States MSJ: "Padilla III and Fraire discussed the December 3, 2009 search warrant.  Fraire was upset and warned Padilla III about his behavior."  United States MSJ ¶ 23, at 5.  In support of this factual assertion, the United States first cites to the following exchange during the Padilla, III Deposition:

Q. What was the conversation about?

**A. I just told him that I'd -- you know, I'd fix everything, and get everything back to where it needed to be.**

Q. Did he express any concerns?

**A. I think at the time he was pretty upset.**

Q. At you?

**A. Yeah.**

Q. Why?

**A. Because of the mess.**

Q. What did he say to you?

**A. I don't recall.**

Q. So why did you --

**A. I just sensed the language from him, you know.**

Q. Was he yelling at you?

**A. No.**

Q. Did he say, "I want you out of the house"?

**A. No, he didn't.**

Q. Did he ever --

. . . .

**A. Well, yeah, that's what I'm trying to see -- I mean, it was just his language.  You know, I don't know if he was --**

Q. Language, the way he was speaking, or the words --

**A. The way he was speaking.**

Q. -- he was saying?

**A. Yeah, the way he was speaking, I can't really --**

Q. Did he ever say, "Jerry, you know, it's messed up, I don't want you dealing drugs out of my house," or something to that effect?

**A. Yes, something, yeah, something in that time, yeah, like that, yeah.**

Q. Did he say to you, "Jerry, that's pretty messed up"?

**A. I don't know exactly what he said.  I mean, I just -- like I say, I mean --**

Q. Okay.  Let me finish the question.

**A. Just like with you when we were in court, you know, I could just sense sometimes when you get pissed off or some time -- you know, it's just body language, you know, when you talk to somebody you know, it's just language.**

Padilla, III Deposition at 102, 104 (emphasis in original).  The United States also cites to the following exchange during the Fraire Deposition in support of this factual assertion:

**A. I wasn't even aware of the first one. I wasn't aware of either one.**

Q. On the news one, you were aware of the news --

**A. They didn't say that a warrant was issued.  The news said -- they didn't talk about warrants.**

Q. Fair enough. Were you aware that Jerry was arrested at 2121 Celeste a second time?

**A. Actually, I wasn't, no.**

Q.  Did you ever discuss with him anything prior to -- did you ever discuss what it would be like for him to go to prison prior to him going to prison --

**A No.**

Q. -- after he was arrested the second time?

**A. Before or after, no.**

Q. Are you aware of any other media coverage surrounding the arrest and prosecution of Jerry, III, or Jerry Padilla, Jr.?

**A. No.**

Q. It was just the story on the news?

**A. Yeah. It came on the news a few times, I think. Like within two days or that day. I'm not sure.  I just turned on the TV. I watch the news every night and every day. That's my favorite thing to do.  I'm watching the news, and they're on TV.**

Q. You're on TV?

**A. No, they're on TV.**

Q. But you never asked around why they were on TV?  It's just, not my business?

**A. It is none of my business, correct.**

Q. You care for them?

**A. Correct.**

Q. Because they're family?

**A. Yeah.**

Q. Are you a member of Los Padillas gang?

**A. No.**

Q. Have you ever been a member of Los Padillas gang?

**A. No.**

into federal custody on December 3, 2009.  <u>See</u> Arrest Warrant Returned Executed on 12/3/09 as

to Jerry L. Padilla, Jr., filed December 4, 2009 (Doc. 10 in CR 09-3598)("Padilla, Jr. Arrest

Warrant");  Arrest Warrant Returned Executed on 12/3/09 as to Jerry L. Padilla, III, filed

---

Q. Are you familiar with the Los Padillas gang?

**A. Not really.**

Q. What do you mean by "not really"?

**A. No.**

Q. Is Jerry Padilla, III, a member of the Los Padillas gang?

Fraire Deposition at 156-57 (emphasis in original).

Fraire, on the other hand, states:

Whether or not Mr. Padilla and Mr. Fraire discussed the December 3, 2009 search warrant is disputed, and, if material, requires denial of the United States' Motion. Mr. Padilla testified in his deposition "Yes, something, yeah, something in that time, yeah, like that, yeah," in response to counsel's question, "Did he ever say, 'Jerry, you know, it's messed up, I don't want you dealing drugs out of my house,' or something to that effect?"  Later, Mr. Padilla admitted, "I don't know exactly what he said."  Mr. Fraire states that no such conversation occurred.  Mr. Fraire also states that he did not know why the police were at the property in December of 2009.  Mr. Fraire was unaware of any drug dealing occurring on the property."

Fraire Response ¶ 23, at 6.  In support of his assertion that it is disputed whether or not Padilla, III and Fraire discussed the December 3, 2009 search warrant, Fraire cites to the following exchange during the Fraire Deposition:

Q. Did you ever have any conversation with Jerry, III, and he told you what happened?

**A. No.**

Fraire Deposition at 152:16-18 (emphasis in original).  The Court concludes that a genuine dispute exists whether: "Padilla III and Fraire discussed the December 3, 2009 search warrant. Fraire was upset and warned Padilla III about his behavior."  United States MSJ ¶ 23, at 5.  The Court will address whether this fact is material in its analysis section.

December 4, 2009 (Doc. 8 in CR 09-3598)("Padilla, III Arrest Warrant").  Padilla, III, was

released pre-trial, while Padilla, Jr. was detained pending trial.  See Detention Order Pending

Trial, filed December 10, 2009 (Doc. 15 in CR 09-3598)("Padilla, Jr. Detention Order"); Order

Setting Conditions of Release, filed December 11, 2009 (Doc. 8 in CR 09-3598)("Padilla, III

Conditions of Release").

After the execution of the December 3, 2009, search warrant, Padilla, III paid to replace a

gate at 2121 Celeste because it had suffered significant damage.  See United States MSJ ¶ 24, at

5 (setting forth this fact); Fraire Response ¶ 24, at 6 (not disputing this fact).  Fraire never came

by to inspect whether or not Padilla, III made repairs to 2121 Celeste.  See United States MSJ ¶

25, at 6 (setting forth this fact); Response ¶ 25, at 6-7 (not disputing this fact).[20]  Fraire did not

---

[20]The United States asks the Court to find undisputed that "[a]lthough Fraire was aware
of the severe damage caused by the Defendant Property during the December 3, 2009 search,
Fraire never came by to inspect whether or not Padilla III made repairs to the Defendant
Property."  United States MSJ ¶ 25, at 6.  Fraire does not specifically controvert that "Fraire
never came by to inspect whether or not Padilla III made repairs to the Defendant Property," but
disputes that Fraire was "aware of the severe damage caused by the Defendant Property during
the December 3, 2009 search," explaining:

> Whether or not Mr. Fraire was aware of the severe damage caused to the
> Defendant Property during the December 3, 2009 search is disputed, and, if
> material, requires denial of the United States' Motion.  The citation given by the
> United States says nothing about Mr. Fraire's awareness of the damage.  Mr.
> Fraire testified "No, I didn't see no damage.  I passed by a few days later, and I
> didn't see no damages.  I mean, as far as I know, I don't think there was any
> damages done."  [Fraire Deposition] at 152:19-153:1.  When he was asked if he
> had a conversation with Mr. Padilla about him making repairs to the Defendant
> Property after the police caused the damage, Mr. Padilla said 'no.'"  [Fraire
> Deposition] at 153:12-16.  Mr. Fraire does not dispute that he did not inspect
> repairs of which he was not aware.

Fraire Response ¶ 25, at 6-7 (emphasis added).  In support of its factual assertion, the United
States cites to the following exchange during the Padilla, III Deposition:

seek to evict Padilla III from 2121 Celeste following the execution of the December 3, 2009, FBI

search warrant.  <u>See</u> United States MSJ ¶ 26, at 6 (setting forth this fact); Fraire Response ¶ 26,

at 7 (admitting this fact).  "Fraire never asked anyone why the police executed a search warrant

---

> Q. Okay.  Did he ever come by to inspect it either prior to you fixing it or once you had fixed it?
>
> **A. Prior -- I don't believe he didn't prior; but afterwards, he did.**
>
> Q. To look at what you had done or he just happened to be by after you had fixed everything?
>
> **A. Just happened to be by after.  Just stopped by, just took a look.**
>
> Q. But not for the purpose to see whether you kept your word?
>
> **A. No, because I've been -- you know, I've always been pretty much -- when I say I'm going to take care of stuff with the house, I take care of it, you know, like --**

Padilla, III Deposition at 106:3-17 (emphasis in original).  In Response, Fraire cites to the Fraire Deposition, in which Fraire testified:

> Q. Did Jerry, III, ever talk to you about making repairs to all the damage that was done at your house as a result of the police being there in December 2009.
>
> **A. No, I didn't see no damage.  I passed by a few days later, and I didn't see no damages.  I mean, as far as I know, I don't think there was any damages done.**
>
> . . . .
>
> Q. Did you have a conversation with Jerry about -- Jerry, III, that is, about him making repairs to 2121 Celeste after the police caused the damage to your property.
>
> **A. No.**

Fraire Deposition at 152:19-153:16 (emphasis in original).  Because the parties have submitted conflicting evidence with respect to whether Fraire was "aware of the severe damage caused by the Defendant Property during the December 3, 2009 search," the Court cannot find that this fact is undisputed.  If necessary, the Court will determine whether this fact is material in its analysis.

at Defendant Property on December 3, 2009." United States MSJ ¶ 27, at 6 (setting forth this fact).  See Fraire Response ¶ 27, at 7 (admitting this fact).  Fraire did not inspect Padilla, III's repairs, see United States MSJ ¶ 25, at 6 (setting forth this fact); Fraire Response ¶ 25, at 7 (admitting this fact), or 2121 Celeste following the execution of the December 3, 2009 search warrant, see United States MSJ ¶ 28, at 6 (setting forth this fact); Fraire Response ¶ 28, at 7 (admitting this fact).  The FBI did not recover any documents belonging to Fraire during the execution of the December 3, 2009, search warrant.  See United States MSJ ¶ 29, at 6 (setting forth this fact); Fraire Response ¶ 29, at 7 (admitting this fact).

The FBI executed a second search warrant on 2121 Celeste on March 28, 2011.   See United States MSJ ¶ 30, at 6 (setting forth this fact); Fraire Response ¶ 30, at 7 (not disputing this fact).  The raid again resulted in damage to 2121 Celeste.  See United States MSJ ¶ 30, at 6 (setting forth this fact); Fraire Response ¶ 30, at 7 (admitting this fact).  Fraire did not pay for the repairs to 2121 Celeste that the March 28, 2011, FBI raid caused.  See United States MSJ ¶ 30, at 6 (setting forth this fact); Fraire Response ¶ 30, at 7 (admitting this fact).  The FBI did not recover any documents belonging to Fraire during the execution of the search warrant on March 28, 2011.  See United States MSJ ¶ 31, at 6 (setting forth this fact); Fraire Response ¶ 31, at 7 (admitting this fact).  "Padilla III did not discuss the March 28, 2011 search warrant with Fraire." United States MSJ ¶ 32, at 6 (setting forth this fact).  See Fraire Response ¶ 32, at 7 (admitting this fact).

## PROCEDURAL BACKGROUND

On August 1, 2013, the United States of America filed its Verified Complaint for Forfeiture In Rem, listing Claimant Cruz J. Fraire as a person "who may claim an interest in Defendant Property."  Complaint at 2.  On September 17, 2013, Fraire filed his Verified Claim

and Statement of Interest, and his Answer, in which he asserted the following affirmative defenses:

> 4.   Claimant alleges that various of his constitutional rights pursuant to the Fourth, Fifth, and Sixth Amendments to the United States Constitution were violated by the Plaintiff and its agents in this matter and that any evidence seized or garnered thereby should be suppressed prior to the trial of this matter.
>
> 5.   Claimant raises the defense of being an "innocent owner."
>
> 6.   Claimant alleges that the arrest and forfeiture of the Defendant to Plaintiff would violate the Eighth Amendment to the United States Constitution.
>
> 7.   Claimant should be awarded attorney fees in this matter pursuant to the Equal Access to Justice Act in that the complaint filed herein is frivolous and without a substantial basis in fact or in law.
>
> 8.   Claimant asks that all issues so triable be tried by a jury.

Answer ¶¶ 4-8, at 2.  Fraire requested judgment in his favor, return of 2121 Celeste, costs, and attorney fees.  See Answer ¶¶ 2, 5, 7, at 1-2.  Discovery commenced, and both sides served and responded to multiple Requests for Production.  Fraire served interrogatories and deposed the Federal Bureau of Investigation case agent.  See First Certificate of Service; Second Certificate of Service.  The United States and Fraire have cross-moved for summary judgment.

## 1.    **The Fraire MSJ.**

Fraire filed his motion for summary judgment on July 29, 2015.  See Fraire MSJ at 1. Fraire first states in support of his motion that: (i) the United States "has presented no evidence to substantiate a claim that Cruz J. Fraire knew of the conduct giving rise to the forfeiture"; and (ii) the United States "has presented no evidence to rebut Claimant Cruz J. Fraire's affirmative defense that he is an innocent owner pursuant to 18 U.S.C."  Fraire MSJ at 1.  Further, Fraire

contends that § 983(c)(1)."  Fraire MSJ at 1.  In the Fraire MSJ, Fraire sets forth the following as

undisputed material facts:

1. Mr. Fraire is the legal owner of the Defendant property.  [Fraire Deposition]
2. Mr. Fraire had no knowledge of the illegal activity that occurred on his property. [Fraire Deposition]
3. Because Mr. Fraire had no knowledge of the illegal activity that occurred on his property, he could not have taken any actions to terminate such use of the property. [Fraire Deposition]

Fraire MSJ at 3.

Fraire then makes two arguments.  See Fraire MSJ at 3-6.  First, Fraire contends that the

Court must grant summary judgment in his favor, because the United States' discovery responses

indicate that it will not offer any admissible evidence at trial.  See Fraire MSJ at 3.  Fraire

describes what a civil forfeiture of property under 21 U.S.C. § 881(a)(7) entails and explains that

the innocent owner defense appears in 18 U.S.C. § 983(d).  See Fraire MSJ at 3-4.  According to

Fraire, the United States' claim is based upon illegal conduct in which Padilla, III, Fraire's

tenant, engaged.  See Fraire MSJ at 4.  Fraire explains:

> The only support for the Government's claim that Mr. Fraire knew about the illegal conduct is found in hearsay declarations in significantly redacted FBI reports and the deposition of Agent Schwartzenberger who testified that the only information in the possession of the FBI regarding criminal activity by Cruz Fraire was undated "source reporting" from several unidentified individuals. [Deposition of Laura A. Schwartzenberger] at 9:21-10:6 [(taken January 27, 2015), filed July 29, 2015 (Doc. 43-2)("Schwartzenberger Deposition")].  Agent Schwartzenberger conceded that, but for that undated hearsay information, the FBI had no information much less any corroboration, that Cruz Fraire was involved in time relevant criminal activity regarding the attempted forfeiture of his house.  [Schwartzenberger Deposition] at 10:11-13.

Fraire MSJ at 4.

Fraire argues that, although Schwartzenberger was subject to a subpoena decus tecum

that required her to bring the entire relevant investigation file, counsel for the United States

instructed her to not bring the file that allegedly contained documentation of the "source reporting." Fraire MSJ at 5. Fraire explains that he filed a Motion for Finding of Contempt and to Compel Production for Sanctions, and that at the hearing on that motion, the Court ordered the United States to:

    (i)            personally double-check the Los Padillas file to ensure that the United States has produced everything in the file related to Fraire;

    (ii)           produce all of the information in the file created or dated before March 22, 2011; and

    (iii)          produce all of the evidence that the United States intends to introduce at trial to establish that Fraire knew about the drug-trafficking operations at the Property.

Fraire MSJ at 5 (quoting Memorandum Opinion and Order, filed May 13, 2015 (Doc. 33)). Fraire states that, on May 20, 2015, he served his Second Set of Interrogatories and Requests for Production on the United States, and the United States' Answers and Responses indicate that the United States "possesses no documents that support the hearsay claims regarding Cruz Fraire in the FBI report and plans to call no witnesses to substantiate the hearsay statements made in the FBI reports." Fraire MSJ at 5. Fraire asserts that, as a result, the United States does not possess any admissible evidence to weigh against Fraire's testimony that he is an innocent owner. See Fraire MSJ at 5. Fraire recognizes that, to avoid a grant of summary judgment, "the nonmoving party need not produce evidence in a form that would be admissible at trial, but the content or substance of the evidence must be admissible." Fraire MSJ at 5 (quoting Thomas v. International Business Machines, 48 F.3d 478, 485 (10th Cir. 1995)). According to Fraire, however, the United States cannot rebut Fraire's innocent owner defense, having produced all evidence the United States intends to introduce at trial pursuant to the Court's order. See Fraire

MSJ at 6.   Accordingly, Fraire argues that the Court should grant summary judgment in his favor.   See Fraire MSJ at 6.

Fraire next asserts that he is entitled to the recovery of attorney fees and costs pursuant to 28 U.S.C. § 2465.   See Fraire MSJ at 6.   Fraire argues that, under 28 U.S.C. § 2465(b)(1), in civil proceedings to forfeit property under any federal law where the claimant prevails, he or she is entitled to reasonable attorney fees and other litigation costs reasonably incurred.   See Fraire MSJ at 6.   Fraire asserts that, here, the United States should have known that it lacked credible, admissible evidence to support its forfeiture action.   See Fraire MSJ at 6.   Fraire therefore argues that, "[a]fter prevailing on this Motion for Summary Judgment, an award of attorney fees and costs is statutorily mandated in this case, and counsel for Mr. Fraire will present their fee petitions to substantiate attorney fees and litigation costs."   Fraire MSJ at 6.   In conclusion, Fraire requests that the Court grant the Fraire MSJ, that 2121 Celeste be restored to Fraire, and that Fraire be awarded attorney fees and costs reasonably incurred, and any other relief the Court deems just and proper.   See Fraire MSJ at 6.

### 2.    The United States Responds to the Fraire MSJ.

The United States filed its Response to the Fraire MSJ on November 16, 2015.   See United States Response at 1.   In its response, the United States argues that Fraire does not dispute that 2121 Celeste was being used to facilitate the sale of illegal drugs, and that it has put forward substantial evidence that "Fraire was neither innocent, nor an 'owner' for purposes of the innocent owner defense."   United States Response at 5.   The United States therefore asks the Court to deny the Fraire MSJ.   See United States Response at 6.   First, the United States asserts that Fraire is not an "owner" of 2121 Celeste.   United States Response at 6.   According to the United States, 18 U.S.C. § 983(d)(6) defines the term "owner" as excluding "a nominee who

exercises no dominion or control over the property." United States Response at 6 (quoting 18 U.S.C. § 983(d)(6)).

The United States points to the following pieces of evidence in support of its argument that Fraire exercised no dominion or control over 2121 Celeste: (i) Fraire admits that he exercised "no dominion and control" over 2121 Celeste; (ii) he did not pay taxes or utilities on 2121 Celeste, nor did he obtain mortgage insurance or, collect rent on those residing there; (iii) while he was incarcerated from 1996 to 2005, he left 2121 Celeste abandoned and uninhabitable; (iv) while Fraire was in prison, Padilla, III completely renovated 2121 Celeste at Padilla, III's own expense; (v) Padilla, III did not consult with Fraire before making repairs and paid for all repairs to the premises, including those arising from the December 3, 2009, and March 28, 2011, FBI raids; (vi) Fraire did not pay for nor inspect any repairs to 2121 Celeste; (vii) Fraire did not charge Padilla, III rent, and there is no evidence of any formal or informal rental or tenancy agreement between the two men; (viii) Padilla, III, not Fraire, paid the taxes; and (ix) even when Fraire was not in prison, he visited 2121 Celeste very infrequently. United States Response at 7-8. The United States also argues that Fraire's lack of connection to 2121 Celeste contrasts starkly with his involvement with another property he owns at 302/303 Menaul. See United States Response at 8. According to the United States, Fraire has renters at 302/303 Menaul, had someone manage the Menaul Property while he was incarcerated, and made repairs to the Menaul property. See United States Response at 8. Based on these facts, the United States asserts that, "[t]he evidence demonstrates that Fraire was not the 'owner' of Defendant Property." United States Response at 8.

Second, the United States argues that Fraire "cannot avail himself of the innocent owner defense because he either knew Defendant Property was used for illegal activity or was willfully

blind to the obvious use of the property for illegal activity."  United States Response at 8.  The

United States asserts that, to prevail on his innocent owner defense, Fraire must show that he: (i)

did not know of the conduct giving rise to forfeiture; or (ii) upon learning of the conduct giving

rise to the forfeiture, he did all that reasonably could be expected under the circumstances to

terminate such use of the property.  See United States Response at 9 (citing 18 U.S.C. §

983(d)(2)(A)(i) and (ii)).  The United States contends that Fraire admits that he took no action to

terminate the use of 2121 Celeste for illegal activity and that "[t]here is substantial evidence that

Fraire knew of evidence suggesting a high probability of the use Defendant Property for illegal

activity."  United States Response at 9.  The United States explains:

> The FBI conducted the first of two search warrants at Defendant Property
> on December 3, 2009.  Fraire was immediately aware of the police activity at
> Defendant Property as he had seen it live on the news.  And he had seen the news
> coverage related to this several times on subsequent occasions.  Padilla III and
> Fraire discussed the search warrant.  Fraire was upset.  He warned Padilla III
> about his behavior.
>
> The December 3rd search warrant created quite a spectacle at Defendant
> Property.  At least one helicopter was in the area.  A backhoe was used to dig up
> portions of Defendant Property.  It was a well-publicized event.  This substantial
> evidence of Claimant Fraire's knowledge of the 2009 search warrant creates a
> reasonable inference that he was aware that Defendant Property was being used
> for illegal purposes.  Yet Fraire took no action -- and this complete lack of
> reasonable efforts to halt the illegal activity on the premises necessarily defeats
> his motion for summary judgment by rendering the innocent owner defense
> unavailable.

United States Response at 10.

The United States next argues that, even if Fraire did not know of the illegal use of 2121

Celeste, there is evidence that he was willfully blind to the fact.  See United States Response at

10.  According to the United States, it is undisputed that 2121 Celeste was used on multiple

occasions to facilitate the Los Padillas gang's drug trafficking activities, and that Padilla, III --

the current long-time tenant of 2121 Celeste -- was involved in at least two illegal drug transactions at 2121 Celeste in March 2009 and February 2011.  See United States Response at 11.  The United States further argues that it is undisputed that the "FBI executed federal search warrants at Defendant Property on December 3, 2009 and again on March 28, 2011."  United States Response at 11.  The United States asserts that, during the December, 2009, search, FBI agents discovered over $400,000.00 in drug proceeds on 2121 Celeste and that Fraire learned about these events, which were highly public and on the news.  See United States Response at 11.  For these reasons, the United States maintains that Fraire cannot avail himself of the innocent owner defense.  See United States Response at 12.

### 3.  **Fraire's Reply.**

Fraire replied on December 10, 2015.  See Fraire Reply at 1.  Fraire begins by outlining his overarching arguments.  See Fraire Reply at 1-2.  First, Fraire contends that there is no genuine issue of material fact whether he is the owner of 2121 Celeste for the purposes of 18 U.S.C. § 983(d)(6), because the record demonstrates that he is not a nominee and has not abandoned the property.  See Fraire Reply at 1.  Second, Fraire asserts that there is no genuine issue of material fact whether he is an innocent owner of 2121 Celeste, because "nothing in the United States' Response shows that Fraire was aware of the illegal activity occurring on the property and was not willfully blind to the activity."  Fraire Reply at 2.  Fraire further argues on this second point that, "[i]n the alternative, Mr. Fraire did all he could reasonably have done under the circumstances and based on the knowledge he had, to stop the illegal activity."  Fraire Reply at 2.

Fraire next replies to the United States' disputed facts.  See Fraire Reply at 2-4.  Fraire takes issue with the United States' citation of two of his Responses to Requests for Production

that state that he did not exercise dominion and control over 2121 Celeste once it was rented. See Fraire Reply at 2. Fraire contends that, while perhaps a poor choice of words, these statements were "made in the context of explaining that Mr. Fraire did not have additional photographs, documents, or things to produce because a family member was in physical possession of the property pursuant to an agreement with Mr. Fraire." Fraire Reply at 2-3. Fraire states that the existence of that agreement is undisputed, and that "having that agreement in place amounts to some dominion and control, which is all that is required by 18 U.S.C. § 983(d)(6)." Fraire Reply at 3 (citing United States v. One 1990 Beechcraft, 1900 Twin Engine Turbo-Prop Aircraft, 619 F.3d 1275, 1278 (11th Cir. 2010)). Fraire goes on to address the United States' other purported disputed material facts.[21] See Fraire Reply at 2-4.

Fraire then advances his first argument on the merits, asserting that Fraire is the owner of 2121 Celeste, and not, as the United States contends, a mere nominee who exercises no dominion and control over the property. See Fraire Reply at 5. Fraire maintains that he is an owner for two reasons: (i) he is not a nominee; and (ii) the record shows he exercised dominion and control over 2121 Celeste. See Fraire Reply at 5. On point one, Fraire argues that the word "nominee" invokes some nominating or transferring action, and that the case law interpreting 18 U.S.C. § 983(d)(6)(B)(iii) suggests that the purpose of this provision is to prevent "people engaged in illegal activities [attempting] to disguise their interest in property by placing title in someone else's name." Fraire Reply at 5 (quoting United States v. One 1990 Beechcraft, 1900 Twin Engine Turbo-Prop Aircraft, 619 F.3d at 1278). According to Fraire, there is no evidence that

----

[21]The Court thoroughly analyzes these facts and any existing factual disputes in this Memorandum Opinion and Order's factual background section.

Padilla, III was involved in Fraire's 1993 purchase of 2121 Celeste, and that Fraire is therefore not a nominee.  See Fraire Reply at 5.

Fraire attacks the United States' argument that, at some point during Fraire's incarceration or while Padilla lived on 2121 Celeste, Fraire abandoned the property.  See Fraire Reply at 5.  Fraire states that, "while no case law addresses whether an owner can become a mere nominee by abandonment and what steps would be required to do so, it may be helpful to look to the elements of abandonment and the elements of adverse possession as a guide to create this species of abandonment."  Fraire Reply at 5-6.  Fraire alleges that, under New Mexico law, "abandoned property is defined as property which the owner has relinquished all right [to] title, claim, and possession," Fraire Reply at 6 (quoting Sanchez v. Meledrez, 934 F. Supp. 2d 1325, 1332 (D.N.M. 2013)(Vázquez, J.)), and that abandonment must be intentional, see Fraire Reply at 6 (citing Baglin v. Cusenier Co., 221 U.S. 580, 589 (1911)).  Fraire contends that he never intended to abandon 2121 Celeste and that his actions do not support a finding of abandonment. See Fraire Reply at 6.  He states that he built a structure on 2121 Celeste until he was incarcerated, that "Mr. Cruz arranged for the taxes to be paid on the Defendant Property while he was incarcerated[,]" and that "Mr. Cruz then arranged with his cousin to live on the Defendant Property as a caretaker and tenant and make improvements to the Defendant Property."  Fraire Reply at 6.

Fraire then explains that 18 U.S.C. § 983(d)(6)(B)(iii) states that the innocent owner defense is unavailable to "a nominee who exercises **no** dominion or control over the property." Fraire Reply at 6 (quoting 18 U.S.C. § 983(d)(6)(B)(iii))(emphasis in Reply).  Fraire argues that the United States Court of Appeals for the Eleventh Circuit has interpreted this language to mean that "any dominion or control that is exercised over the Defendant Property will render this

statutory provision inapplicable."   Fraire Reply at 6-7 (citing United States v. One 1990 Beechcraft, 1900 C Twin Engine Turbo-Prop Aircraft, 619 F.3d at 1278).  Fraire then argues in affect that he exercised some dominion or control over 2121 Celeste when: (i) he purchased it in 1995; (ii) arranged for the payment of taxes on it when he was incarcerated; and (iii) authorized his cousin, Padilla, to move in and serve as caretaker and tenant and begin making improvements.  See Fraire Reply at 7.  Fraire contends that these facts are undisputed and that they demonstrate that 18 U.S.C. § 983(d)(6)(B)(iii) is not applicable in this case.  See Fraire Reply at 7.

Fraire takes issue with the United States' reliance on United States v. Drezov, 2009 WL 9288928 (D. Ariz. Apr. 3, 2009).  See Fraire Reply at 7.  Fraire asserts that an unpublished decision from the District of Arizona is not controlling on the Court and that the facts, in any event, are distinguishable.  See Fraire Reply at 7.  Fraire contends that the other cases that the United States cites support his claim of ownership of 2121 Celeste.  See Fraire Reply at 8.  Fraire states that the circumstances of his acquisition of 2121 Celeste are similar to the facts in United States v. Nova, 404 F.3d 1119 (9th Cir. 2005), where "a daughter was found to be an innocent owner because her father did not pay purchase price for property, was not shown to have arranged for daughter's acquisition of property, and did not occupy property."  Fraire Reply at 8 (citing United States v. Nova, 404 F.3d at 1130).

Fraire states that the United States Court of Appeals for the Eighth Circuit's decision in United States v. One Lincoln Navigator 1998, 328 F.3d 1011, 1014 (8th Cir. 2003), is helpful guidance here.  See Fraire Reply at 8.  Fraire states that, there, the Eighth Circuit was unwilling to disregard payment of the purchase price and title ownership as evidence of ownership, and that here, Fraire paid the purchase price for 2121 Celeste and holds title.  See Fraire Reply at 8.

Fraire also contrasts this case with <u>United States v. Walker</u>, 607 F. Supp. 2d 1138 (S.D. Cal. 2009)(Lorenz, J.), where the claimant was title holder of a truck that her son used and filled with his belongings.  <u>See</u> Fraire Reply at 9.  The claimant could not show that she purchased it, did not pay the insurance or registration, and did not use the vehicle.  <u>See</u> Fraire Reply at 9. According to Fraire, the district court concluded that the claimant was not an owner for forfeiture purposes.  <u>See</u> Fraire Reply at 9.  Fraire contends that, here, he purchased 2121 Celeste, occupied it by building a structure on it, and eventually installed a caretaker on it who would make improvements and pay bills instead of rent.  <u>See</u> Fraire Reply at 9.

Fraire then moves to his second substantive argument, that knowledge of a news story concerning tenant-occupied property does not amount to knowledge sufficient to defeat innocent owner status.  <u>See</u> Fraire Reply at 10.  Fraire states that the United States "overstates the evidence of Mr. Fraire's knowledge, which amounts to the undisputed fact that Mr. Fraire, at some point, saw a television news story concerning the Defendant Property."  Fraire Reply at 10. Fraire also takes issue with the United States' citation to two excerpts from Padilla's deposition, that allegedly contradict Fraire's deposition testimony "to establish that Mr. Fraire had additional knowledge regarding a search warrant and illegal activity."  Fraire Reply at 10.  Fraire contends that, even if true, these statements do not establish that Fraire had actual knowledge of illegal activity taking place at 2121 Celeste.  <u>See</u> Fraire Reply at 10.  He maintains that they merely establish that Fraire knew that a search had been conducted on 2121 Celeste.  <u>See</u> Fraire Reply at 10.  Fraire further asserts that he never had a conversation with Padilla regarding the FBI search of 2121 Celeste, that he never saw any damage to the property, and that he never had a conversation with Padilla about him making repairs following the raid.  <u>See</u> Fraire Reply at 11. Fraire also argues that, when Fraire "was asked why, upon seeing the news, [he did] not ask Mr.

Padilla what happened," Mr. Fraire responded, "If I'm not mistaken, I think they were in jail . . . Well I heard that they had arrested them. . ."  See Fraire Reply at 11 (citing Fraire Deposition at 153:19-25).

Fraire argues that Fraire testified that he did not know of any details surrounding the news story and that he was unaware of any drug trafficking taking place at 2121 Celeste.  See Fraire Reply at 11.  Fraire states that "[n]o case law exists on whether knowledge of a news story concerning one's property equates to knowledge of illegal activity sufficient to trigger the duties described in 18 U.S.C. § 983(d)(2)(A)(ii)."  Fraire Reply at 11.  Fraire contends that, if a property owner's only indication that illegal activity may be taking place on his or her property is a news story, it would be reasonable for the owner to assume that the police had access to the story as well.  See Fraire Reply at 12.  According to Fraire, the police would search the property, and either uncover evidence of wrongdoing and arrest the perpetrators, or uncover no evidence or wrongdoing.  See Fraire Reply at 12.  Fraire argues that requiring property owners to do more than the police to stop illegal activity would be unreasonable and dangerous.  Fraire cites to United States v. Lot Numbered One (1) of Lavaland Annex, 256 F.3d 949 (10th Cir. 2001), for the proposition that "[a] property owner is not required to be a vigilante to stop illegal activity on his or her property."  Fraire Reply at 12.

Fraire then moves to his third substantive argument.  See Fraire Reply at 13.  Fraire explains that, to get the benefit of the innocent owner defense, "lack of knowledge is not enough if it amounts to willful blindness to the illegal activity."  Fraire Reply at 13.  Fraire contends that, under the circumstances, he was not willfully blind to the illegal activity occurring on 2121 Celeste.  See Fraire Reply at 13.  He asserts that: (i) he rarely visited 2121 Celeste and was therefore not there to observe any illegal activity firsthand; (ii) he could not visit 2121 Celeste

between 1996 and 2005, because he was incarcerated; (iii) when he was released from prison, he was unable to visit 2121 Celeste, because of his probation terms; (iv) prior to Padilla going to prison, Fraire had infrequent contact with him; (v) between 2005 and 2011, Fraire saw Padilla approximately once every two or three months; (vi) sometimes he would go two or three months without speaking to Padilla; (vii) when Padilla went to prison, Fraire had no contact with him; and (viii) he did not see Padilla on holidays and did not discuss the upkeep of improvements to the house with Padilla very often.  See Fraire Reply at 13.

Finally, Fraire argues that, even if he had sufficient knowledge of illegal activity at 2121 Celeste, he did all that he could reasonably do to stop the illegal activity in the circumstances. See Fraire Reply at 14.  Fraire contends that, if Fraire admonished Padilla, III in the alleged conversation between them following the FBI search, the Court would need to analyze under 18 U.S.C. § 983(d)(2)(ii) whether this conversation amounted to "doing all that could reasonably be expected under the circumstances to terminate such use of the property."  Fraire Reply at 14. According to Fraire,

> [a] property owner should not be required to take heroic or vigilante measures to rid his or her property of narcotics activity . . .  The question is what measures were reasonable under the particular circumstances confronted by the property owner in question.  Those circumstances may include the owner's reasonable fears and concerns, its degree of familiarity with crime prevention, and its economic resources.

Fraire Reply at 15 (quoting United States v. Lot Numbered One (1) of Lavaland Annex, 256 F.3d at 949).  Regarding the measures that would be reasonable under the particular circumstances of this case, Fraire states:

> Since the case that led to Mr. Fraire's incarceration, Mr. Fraire has carefully avoided all illegal activity. He has not been arrested since his release. He has not engaged in drug dealing.  People have approached him and asked if he can obtain drugs for them, and Mr. Fraire suspects that someone has sent them to

entrap him.  Mr. Fraire believes he was sent to prison because of his association
with his cousins and uncle.  Under these circumstances, i.e. an extreme fear of
being unfairly accused by law enforcement of drug dealing, a poor understanding
of the law, a lack of familiarity with crime prevention, and few economic or
community resources, the stern talking-to by Mr. Fraire was the most reasonable
practicable measure to prevent the activity especially in light of the fact that Mr.
Fraire had no information about what the activity was.

Fraire Reply at 15.

### 4. <u>The Hearing on the Fraire MSJ</u>.

The Court held a hearing on the Fraire MSJ on November 2, 2015.  <u>See</u> Transcript of

Hearing (taken November 2, 2015)("Tr.").  The parties largely stuck to their briefing.  The Court

noted that, since the filing of the Fraire MSJ, the parties had engaged in some discovery and

asked whether something had been learned.  <u>See</u> Tr. at 2:19-3:7 (Court).  The United States

explained that it learned that "Fraire did indeed -- was indeed aware of the activity that occurred

there in March -- or in December of 2009, prior to the arrest of Jerry Padilla."  Tr. at 3:8-13

(Meyers).  According to the United States, the deposition shows that Fraire was "indeed aware of

the activity, the law enforcement activity, that took place at the defendant property prior to when

he stated originally through his motions that he wasn't aware until Jerry, III, was arrested in

March of 2011."  Tr. at 3:20-4:1 (Meyers).  The United States explained that it would file a

response to the Fraire MSJ and subsequently its own motion for summary judgment.  <u>See</u> Tr. at

4:7-14 (Meyers).

Fraire stated that the United States does not dispute that Fraire is the owner and has been

for a long period of time, and so the issues are very narrow.  <u>See</u> Tr. at 7:3-11 (Gorence).  Fraire

further explained that the United States deposed two individuals, Fraire and Jerry Padilla Jr.,

Padilla, III's father.  <u>See</u> Tr. at 7:7-25 (Court, Gorence).  Fraire confirmed that, at his deposition,

he disclosed that he saw something on the news related to the Padillas in December, 2011.  <u>See</u>

Tr. at 7:20-8:8 (Gorence).  Fraire complained that the United States had not yet filed a Response.

See Tr. at 8:17-12:5 (Court, Gorence, Meyers).  The Court asked what was learned from Padilla,

III's deposition.  See Tr. at 12:8-9 (Court).  Fraire asserted that Padilla, III did not tie Fraire's

knowledge to the drug transaction at 2121 Celeste.  See Tr. at 12:14-13:23 (Court, Bowles,

Gorence).  The Court then asked whether the worst evidence for Fraire was him stating that he

saw on the news there were some search warrants executed at 2121 Celeste.  See Tr. at 13:24-

14:4 (Court).  Fraire responded: "And I think the words that Mr. Fraire used were not as strong

as what the Court just said.  But you're right, Your Honor, that is the strongest evidence that I'm

aware of that the Government has, the idea that somebody saw a news clip."  Tr. at 14:11-16

(Gorence).

Fraire basically argues that there is no evidence of Fraire knowing anything before the

December, 2011 search, so the question is whether, once he saw the news clip, it required him to

do something and potentially kick out the tenants.  See Tr. at 14:21-16:4 (Gorence).  Fraire

complained that, if that is the United States' theory, they could have articulated it earlier.  See Tr.

at 15:18-16:4 (Gorence).  Fraire then argued in support of his Motion, sticking to his arguments

from the briefing.  See Tr. at 18:2-22:22 (Gorence).  Fraire emphasized that he is "not contesting

that illegal conduct took place at 2121 Celeste," but maintained that he is entitled to the innocent

owner defense.  See Tr. at 18:16-19:15 (Gorence).  Fraire asserted that the United States' one

piece of evidence about Fraire seeing a news program in December, 2009 does not constitute

"proof of knowledge that his property is being used."  Tr. at 20:8-12 (Gorence).  According to

Fraire, all the United States can show is that, at best, he might have seen a news show, but he

never saw an indictment, and no FBI agent ever talked to him.  See Tr. at 20:20-21:7 (Gorence).

Fraire asserted that "a TV report, that clearly can't constitute, as the statute said, know[ledge] of

the conduct giving rise to the forfeiture."  Tr. at 21:18-20 (Gorence).  Moreover, Fraire expressed frustration with this case pending so long without a response from the United States and that there is nothing on this record that would defeat Fraire's innocent owner's defense.  See Tr. at 21:23-22:22 (Gorence).

The United States then took up argument.  See Tr. at 23:7-12 (Bowles, Court, Meyers).  The United States began by emphasizing that, under the forfeiture statute, the burden falls squarely on the claimant to demonstrate that he or she is an innocent owner.  See Tr. at 23:13-20 (Meyers).  The United States agreed with Fraire that no one here is contesting that illegal conduct took place at 2121 Celeste.  See Tr. at 23:21-24 (Meyers).  According to the United States, it has therefore met its burden under the statute to demonstrate that 2121 Celeste is indeed subject to forfeiture.  See Tr. at 24:5-9 (Meyers).  The United States asserted that the case turns on what Fraire knew, when he knew it, and what, if anything, he did about it.  See Tr. at 24:15-19 (Meyers).  The United States agreed with the Court that the case becomes a resolution of the issue whether Fraire's knowledge about the execution of the search warrants is enough to trigger responsibility on his behalf to take reasonable steps to terminate the activity at 2121 Celeste.  See Tr. at 25:1-24 (Court, Meyers).  The United States maintained that, once Fraire saw the news program, it was a triggering moment, and Fraire could not do nothing.  See Tr. at 25:25-26:7 (Meyers).

The United States conceded that it does not have any evidence that Fraire knew of the activity that triggered the December 2009, search warrant and accompanying indictment.  See Tr. at 28:4-12 (Meyers).  The United States agreed with the Court that Fraire was "innocent up to the point that the Government starts taking away the property or starts limiting the property."  Tr. at 29:2-12 (Court, Meyers).  The Court expressed some skepticism regarding the United States'

argument that, after the United States put its lis pendens on 2121 Celeste, Fraire was still expected to do "all that reasonably could be expected under the circumstances."  Tr. at 29:13-30:15 (Court, Meyers).  The Court stated: "[T]here has got to be a point where we're concerned about the innocence of the owner.  It seemed to me that it might come to an end when the Government starts putting lis pendens on the land."  Tr. at 30:22-31:1 (Court).  The United States maintained that Fraire still did not do everything that would be expected of him to abate the criminal use of the property.  See Tr. at 31:2-21 (Meyers).

The United States also stated that it was concerned about Fraire's statement in his response to the United States' first request for production of documents that "I did not exercise dominion or control over the property that I owned."  Tr. at 33:15-20 (Meyers).  According to the United States, the forfeiture statute itself states that "[a]n owner does not include a nominee who exercises no dominion or control over the property."  Tr. at 34:1-3 (Meyers).  The United States explained that it therefore was not clear whether Fraire was an owner, as the statute contemplates that term, and can assert an innocent owner's defense or make a claim on 2121 Celeste.  See Tr. at 34:3-11 (Meyers).  In sum, the United States stated that it might assert a claim that "whether or not he's an innocent owner -- he's not even an owner as the statute contemplates, in order to make a claim for the property."  Tr. at 34:11-15 (Meyers).  Fraire maintained that he exercised sufficient dominion and control over 2121 Celeste and asserted that seeing the news story was not sufficient knowledge under the statute.  See Tr. at 34:21-40:2 (Gorence).  Fraire asserted that the United States' position would be that "[a] land owner, any apartment owner, anybody owns an apartment, anybody owns a house in the United States of America, [must] kick them out within one day, or if something else happens we're taking your property."  Tr. at 38:12-40:2 (Gorence).

5.      **The United States MSJ.**

The United States moved for summary judgment on November 16, 2015.  See United States MSJ at 1.  The United States first argues that 2121 Celeste is subject to forfeiture.  See United States MSJ at 7.  The United States contends that it has "the burden of proof in a civil forfeiture action to establish by a preponderance of the evidence that the property is subject to forfeiture."  United States MSJ at 7.  According to the United States, "[i]f the government's theory is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the government shall establish that there was a substantial connection between the property and the offense."  United States MSJ at 8.  The United States asserts that there is no genuine dispute that 2121 Celeste was used to facilitate drug trafficking.  See United States MSJ at 9.  The United States further explains:

> The Zamora Declaration establishes that Defendant Property maintained a substantial connection to the drug trafficking because it was the situs for on-going cocaine and heroin transactions.  Further, nearly half a million dollars in dug proceeds was found on it.  The distribution of cocaine and heroin are felonies. 21 U.S.C. section 841(a)(1).  The Zamora declaration is buttressed by both Jerry L. Padilla, Jr. and Jerry L. Padilla III's plea agreements: in their sworn statements in the plea agreements, each admitted that cocaine was sold out of Defendant Property.  *See* [Padilla, Jr. Plea Agreement]; [Padilla, III Plea Agreement in CR. No. 09-3598]; [Padilla, III Plea Agreement in CR. No. 11-0667]; *see also* [Deposition of Jerry L. Padilla, III at 66-67 (taken January 27, 2015), filed November 11, 2015 (attached as exhibit 4 to Doc. 57)("Padilla, III Deposition")].  And Padilla III further admitted that heroin was sold out of Defendant Property and that he maintained drug proceeds at Defendant Property.  *See* [Padilla, III Deposition] at 68-70.
>
> Based on the undisputed facts discussed above, there is no dispute that there was a substantial connection between Defendant Property and the underlying criminal activity.  Consequently, the government is entitled to judgment as a matter of law.  *See United States v. Real Property . . . 3097 S.W. 111th Ave.*, 921 F.2d 1551, 1556 (11th Cir. 1991)(residence forfeited as facilitating property where driveway served as "planned site" of drug deal and was chosen so that deal would take place on familiar territory); *United States v. .30 Acre Tract of Land at 524 Cheek Road*, 425 F. Supp. 2d 704, 708-09

(M.D.N.C. 2006) (residence where drugs were stored and sold on multiple occasions forfeitable as facilitating property).

United States MSJ at 9.

The United States next argues that Fraire is not an innocent owner under 18 U.S.C. § 983(d)(1).  See United States MSJ at 10.  The United States asserts that Fraire carries the burden of demonstrating that he is an innocent owner.  See United States MSJ at 10.  According to the United States, "[i]n attempting to advance an innocent owner defense, Fraire superficially avers that he did not know of the conduct giving rise to forfeiture.  This conclusory and self-serving statement is not sufficient to avoid summary judgment."  United States MSJ at 10 (citing United States v. 16328 South 43rd E. Ave., 275 F.2d 1281, 1285 (10th Cir. 2002)).  The United States maintains that there is substantial evidence set forth in the undisputed facts that Fraire had knowledge of illegal activity at 2121 Celeste: (i) Fraire had immediate notice of the December 3, 2009, search; (ii) on multiple subsequent occasions, he saw further news coverage of the search; and (iii) Padilla, III and Fraire discussed the search warrant, and Fraire expressed displeasure and warned Padilla, III about Padilla, III's behavior.  See United States MSJ at 10-11.

The United States further explains:

> To be sure, Fraire knew of facts suggesting a high probability of the use of Defendant Property for illegal activity.  Actual knowledge of use of property for illegal activity may be proven by inference from circumstantial evidence suggesting high probability of property's involvement with illegal activity; property owner may not turn blind eye toward such evidence and still claim innocent owner status under 18 U.S.C. § 983(d)(2)(A).  *United States v One 1988 Checo Let 410 Turbo Prop Aircraft*, 282 F. Supp. 2d 1379 (S.D. Fla. 2003).  And, though he was clearly on notice from the December 2009 search warrant, Fraire, by his own admission, took no steps to terminate the illegal use of Defendant Property.  And it is undisputed that criminal activity -- as evidenced by at least two additional sales of heroin -- continued unabated at Defendant Property.

United States MSJ at 11.  The United State asserts that the undisputed facts thus demonstrate that Fraire did not, upon learning of the conduct giving rise to forfeiture, do all that reasonably could be expected under the circumstances to terminate such use of the Defendant Property.  See United States MSJ at 11.  Rather, Fraire "did almost nothing to terminate such use, and his lack of action is fatal to his innocent owner defense."  United States MSJ at 11.  The United States therefore asks the Court to enter summary judgment in its favor, because Fraire was both aware of the illegal conduct at the Defendant Property and he did not make reasonable efforts to halt it. See United States MSJ at 12.

**6.     Fraire's Response to the United States MSJ.**

Fraire responded to the United States MSJ on December 10, 2015.  See Fraire Response at 1.  Fraire argues that he does not have personal knowledge regarding the United States' claims that 2121 Celeste bears a substantial connection to illegal activity and that it is the United States' burden to prove a substantial connection.  See Fraire Response at 7.  Fraire next turns to the United States argument that Fraire is not an innocent owner.  See Fraire Response at 8.  Fraire first contends that he was unaware of the illegal activity occurring on 2121 Celeste and that the only knowledge he has ever had concerning such activity stems from him seeing a television news story that reported a police search of 2121 Celeste.  See Fraire Response at 8.  He asserts that it "is undisputed that Mr. Fraire had no actual knowledge of illegal activity occurring on the property before or after he saw the news story, and it is undisputed that Mr. Fraire did not know the specific basis of the news story."  Fraire Response at 8-9.  Fraire then re-states his argument from the Fraire Reply that a landowner should be able to assume that, once the police search the property, either evidence of illegal activity would be found and the perpetrators arrested, thereby abating the illegal activity, or no evidence would be found at all.  See Fraire Response at 9.

Fraire maintains that landowners should not be required to do more than the police to stop illegal activity when the police have the benefit of all the information from their investigation.  See Fraire Response at 9.

Fraire next asserts that a genuine issue of material fact exists whether Padilla, III and Fraire discussed the 2009 search of 2121 Celeste.  See Fraire Response at 9.  Fraire states that the only evidence that the United States has uncovered which contradicts Fraire's affidavit are the two excerpts from Padilla, III's deposition in which he "vaguely remembers a conversation with Mr. Fraire following the execution of the 2009 search warrant."  Fraire Response at 9.  According to Fraire, in his deposition, he was asked if he had ever had any conversation with Padilla, III regarding the search warrant, and Fraire said "no."  Fraire further states:

> He was asked if he ever talked to Mr. Padilla about the damage that was done at the Defendant Property as a result of the police being there in December 2009.  He responded, "No, I didn't see no damage.  I passed by a few days later, and I didn't see no damages.  I mean, as far as I know, I don't think there was any damages done."  [Fraire Deposition] at 152:19-153:1.  When he was asked if he had a conversation with Mr. Padilla about him making repairs to the Defendant Property after the police caused the damage, Mr. Padilla said "no."  [Fraire Deposition] at 153:12-16.  Finally, when he was asked, why, after seeing the news, did Mr. Fraire not ask Mr. Padilla what happened, Mr. Fraire responded, "If I'm not mistaken, I think they were in jail. . . Well, I heard that they had arrested them. . ."  [Fraire Deposition] at 153:19-25.  Mr. Fraire's testimony is detailed and specific, while the testimony of Mr. Padilla ultimately amounts to "I don't know exactly what he said."  [Padilla, III Deposition] at 104.

Fraire Response at 10.  Fraire argues that, if the finder of facts gives more weight to Padilla, III's testimony, it could go toward a finding that Fraire had knowledge of the illegal activity, and if Fraire's testimony is given more weight, Fraire will not be attributed with knowledge.  See Fraire Response at 10.  According to Fraire, this possibly means that a material dispute exists on this issue.  See Fraire Response at 10.

Fraire next argues that, under the circumstances, Fraire was not willfully blind to the illegal activity taking place on 2121 Celeste.  See Fraire Response at 10.  Fraire makes the same arguments he made in his Reply to the United States Response to the Fraire MSJ and attempts to factually distinguish this case from United States v. 16328 South 43rd East Ave., Bixby, Tulsa County, Oklahoma, 275 F.2d at 1284-85.  See Fraire Response at 10-11.  Additionally, Fraire addresses several facts that the United States cites which make the illegal activity in this case obvious: illegal drug transactions involving Padilla, III occurred at 2121 Celeste, and the FBI executed two search warrants on 2121 Celeste in which they recovered paraphernalia and cash. See Fraire Response at 11.  Fraire states that, because Fraire was not at 2121 Celeste to witness these occurrences and because a desire to remain ignorant did not motivate this absence, the knowledge of the activity cannot be imputed to him.  See Fraire Response at 11-12.

Finally, Fraire raises two additional arguments against the forfeiture action.  See Fraire Response at 12.  First, Fraire asserts that the forfeiture action has been pending for an unreasonably long time.  See Fraire Response at 12.  According to Fraire, a notice of lis pendens was recorded on 2121 Celeste on March 15, 2010, but the notice of lis pendens was not served on Fraire as 18 U.S.C. § 983 requires.  See Fraire Response at 12.  Fraire contends that this forfeiture action has been pending for over two years and that more than five years have passed since the notice of lis pendens was recorded.  See Fraire Response at 12.  Fraire insists that this period is an unreasonable amount of time for the forfeiture to be pending and violates Fraire's due-process protections.  See Fraire Response at 12 (citing United States v. Eight Thousand Eight Hundred and Fifty Dollars, 461 U.S. 555 (2005)).  Second, Fraire argues that the forfeiture of 2121 Celeste is constitutionally excessive.  See Fraire Response at 12.  On this second point, Fraire explains:

"The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." United States v. Basurto, __ F. Supp. 3d __, 2015 WL 463571 (D.N.M. 2015)(Browning, J.)(citing United States v. Bajakajian, 524 U.S. 321, 331-32 (1998)). There is no evidence on the record that Mr. Fraire was involved in the illegal activity at the property. Loss of property would be a disproportionate hardship to Mr. Fraire, and Mr. Fraire reserves development of this area of fact should it be necessary.

Fraire Response at 12.

### 7.      The United States' Reply.

The United States replied on December 28, 2015. See United States Reply at 1. The United States makes three principal arguments in its Reply. The United States first argues that, "[e]ven if someone is not a straw or nominee owner, he must take all reasonable steps to terminate the illegal use of his property." United States Reply at 2. The United States explains that the all reasonable steps requirement in § 983(d)(2)(A)(ii) replaced the "consent" prong of the pre-CAFRA innocent owner defense. See United States Reply at 2. According to the United States, "[t]his is not to say that the owner must always evict a tenant, but surely something should be done." United States Reply at 2-3 (citing, e.g., United States v. Real Property at 6810 Ave. L, Houston, TX. 77011, 2012 WL 2785890 (S.D. Tex. July 6, 2012)(Stacy, MJ.). The United States maintains, however, that here, Fraire did nothing and took no steps. See United States Reply at 3. The United States insists: "He even failed to inquire as to the use of the property when he had reason to do so. This non-action is fatal to both his claim of being anything other than a nominee owner and his claim of being an innocent owner." United States Reply at 3.

The United States' second argument attacks Fraire's contention "that the pendency of this action is unreasonable and violated his Due Process protections." United States Reply at 3. The

United States contends that 18 U.S.C. § 985 governs all civil forfeitures of real property commenced on or after August 23, 2000, and the forfeitures must be judicial. See United States Reply at 3.  The United States asserts that § 985 states that the United States must serve the owner with a copy of the complaint and notice of the deadlines for contesting the action.  See United States Reply at 4.  According to the United States, that service is what occurred in this case and that there is no dispute that the United States filed the complaint on August 1, 2013, which is within the applicable statute of limitations.  See United States Reply at 4.  The United States maintains therefore that the action is timely.  See United States Reply at 4.  The United States takes issue with Fraire's assertion "that a notice of lis pendens was required to be served upon him."  United States Reply at 4.  The United States insists that the filing of lis pendens does not offend one's Due Process rights.  See United States Reply at 4.  The United States admits that, "[b]ecause real property cannot be forfeited administratively, a delay in commencing a forfeiture action will bar the forfeiture only if it violates Due Process."  United States Reply at 5 (citing United States v. $131,551.03 Plus Accrued Interest from the Sale of 10 Table Bluff Road, 2010 WL 1135743, *3 (N.D. Cal. Mar. 22, 2010)(Illston, J.)).  According to the United States, however, Fraire "has failed to present any facts to support the notion that his Due Process rights have been violated by a civil action filed well-within the applicable statute of limitations."  United States Reply at 5.

Finally, the United States counters Fraire's assertion that the forfeiture violates the Excessive Fines Clause of the Eighth Amendment to the Constitution of the United States, by stating that, if such a claim exists, it is not ripe.  See United States Reply at 5.  The United States admits:

> The Supreme Court in *Austin v. United States*, 509 U.S. 602 (1993), *Alexander v. United States*, 509 U.S. 544 (1993), and *United States v. Bajakajian*, 524 U.S. 321 (1998), held that facilitation forfeitures, civil or criminal, are subject to a constitutional defense under the Excessive Fines Clause of the Eighth Amendment seeking to mitigate a grossly disproportional forfeiture. This was later codified by Congress.

United States Reply at 5. According to the United States, "[p]ursuant to 18 U.S.C. § 983(g), a claimant may petition the court to determine whether the forfeiture was constitutionally excessive." United States Reply at 5. The United States explains that the Court then makes its determination, comparing the forfeiture to the gravity of the offense giving rise to the forfeiture. See United States Reply at 5. The United States further states that the amount of forfeiture must "bear some relationship to the gravity of the offense that it is designed to punish" and that "[t]he claimant bears the burden of proving the forfeiture is grossly disproportional by a preponderance of the evidence at a hearing conducted by the court." United States Reply at 5. In sum, the United States asserts that, because no forfeiture has occurred here, it is premature to determine whether the forfeiture of 2121 Celeste violates the Excessive Fines Clause. See United States Reply at 6. The United States notes, however, "that the congressionally-authorized fine for the conduct involved in this case is $1,000,000 -- significantly more than the value of Defendant-property." United States Reply at 6 (citing 21 U.S.C. § 841(b)(1)(C)).

### 8.    The Hearing on the United States MSJ.

The Court held a hearing on the United States MSJ on January 5, 2016. The Court first explained to the parties that it was inclined to grant in part and deny in part the Fraire MSJ. See Jan. 5th Tr. at 3:1-5 (Court). The Court explained that, to qualify for the innocent owner defense under 18 U.S.C. § 983(d)(1), the claimant must be both the owner of the property, and he or she must be innocent. See Jan. 5th Tr. at 3:13-16 (Court). The Court indicated that it was inclined to

conclude that evidence points both toward and against a finding that Fraire is an owner within § 983(d)(1)'s meaning, and that it was therefore inclined to deny that portion of the Fraire MSJ asking the Court to conclude that Fraire is an owner under § 983(d)(1).  See Jan. 5th Tr. at 3:17-24 (Court).  The Court stated that it is inclined to conclude, however, that there is no genuine issue of dispute that prohibits the Court from granting that portion of Fraire's motion asking the Court to find that he is innocent within the meaning of § 983(d)(1).  See Jan. 5th Tr. at 3:24-4:3 (Court).

The Court then articulated why it was inclined to deny the portion of the Fraire MSJ asking the Court to find that he is an owner within the meaning of § 983(d)(1).  See Jan. 5th Tr. at 4:4-7 (Court).  The Court explained that the Civil Asset Forfeiture Reform Act of 2005 defines an owner as "a person with an ownership interest in specific property sought to be forfeited, including a leasehold on any mortgage recorded, security interest, or valid assignment of ownership interest."  Jan. 5th Tr. at 4:7-12 (Court).  The Court noted that, while the United States does not contest that Fraire held some kind of ownership interest in 2121 Celeste, under § 983(d)(6)(B)(iii) "owner" does not include "a nominee who exercises no dominion or control over the property."  Jan. 5th Tr. at 4-13-18 (Court).  The Court then explained:

> On the one hand Mr. Fraire points to the following pieces of evidence to support his contention.  He was not a nominee who exercised no dominion or control over 2121 Celeste road.  One he purchased the property in 1995.  Second, he arranged for the payments of taxes on it while he was incarcerated and 3 he authorizes his cousin Mr. Padilla to move in and serve as caretaker and tenant and begin making improvements while he was incarcerated.  On the other hand, the United States points to the following pieces of evidence which it contends show that Mr. Fraire was a mere nominee who exercised no dominion or control over the property.  One Mr. Fraire admitted that he exercised no dominion or control over the property.  Second Mr. Fraire did not pay taxes or utilities on the property obtain mortgage insures or collect rent from residing there and 3 while Mr. Fraire was incarcerated from 1996 to 2005, he left the property abandoned and unhabitable.  Fourth, Mr. Padilla moved into the property, remained there [except]

> during his own incarceration and Mr. Fraire while he was in prison, Mr. Padilla completely renovated the property at his own expense and without first consulting Mr. Fraire.  6 Mr. Padilla made repairs and paid for all repairs to the property including those made after the December [,]2009 and March 28[,] 2011 FBI raid. Mr. Fraire did not pay for nor inspect any repairs to the property.  8 Mr. Fraire did not charge Mr. Padilla Renteria and Mr. Fraire visited the property very infrequently even when not incarcerate.  So in sum the Court is inclined to conclude that there is evidence pointing both towards and against Mr. Fraire as a nominee who exercises no dominion or control over the property and is therefore inclined to deny Mr. Fraire's motion for summary judgment.

Jan. 5th Tr. at 4:18-6:3 (Court).

The Court then proceeded to explain why it is inclined to conclude that there is no genuine issue of dispute that prohibits the Court from granting that portion of the Fraire MSJ asking it to find that he is innocent under § 983(d)(1).  See Jan. 5th Tr. at 6:3-8 (Court).  The Court stated that the forfeiture statute defines innocent owner as one who did not know of the conduct giving rise to the forfeiture, or upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property.  See Jan. 5th Tr. at 6:10-18 (Court).  The Court explained that it was inclined to conclude that, under the undisputed facts, Fraire became aware of the conduct giving rise to forfeiture when he saw news coverage related to an FBI search of 2121 Celeste on December 3, 2009.  See Jan. 5th Tr. at 6:18-22 (Court).  According to the Court, at that point, Fraire was required to do "all that reasonably could be expected under the circumstances to terminate such use of the property."  Jan. 5th Tr. at 6:22-7:1 (Court).  The Court explained that § 983(2)(B) provides further guidance on the meaning of the phrase "all that reasonably could be expected," which the parties had not raised in their briefing:

> [(B)(i)] says for the purpose of this paragraph ways in which a person may show that such person did all that reasonably could be expected may include demonstrating that such person to the extent permitted by law and there is two examples, gave and I emphasize the word may, gave timely notice to an

appropriate law enforcement agency of information that led the person to know the conduct giving rise to a forfeiture would occur or has occurred.  And two in a timely fashion revoke or made a good faith attempt to revoke possession for those engaging in such conduct to use the property or took reasonable actions in consultation with [a] law enforcement agency to discourage or prevent the illegal use of property.

Jan. 5th Tr. at 7:1-20 (Court).  The Court stressed that, in both examples, "you've got law enforcement being notified" and further explained: "And then it says a person is not required by the subparagraph to take steps that the person reasonably believes would be likely to subject any person other than the person whose conduct gave rise to the forfeiture to physical danger."  Jan. 5th Tr. at 7:20-8:1 (Court).

Having considered the examples set forth in the forfeiture statute, the Court explained that, in this case, Fraire could not be expected to have timely notified a law enforcement agency, given that he only came to know of the conduct giving rise to the forfeiture through the FBI's own raid of 2121 Celeste on December 3, 2009.  See Jan. 5th Tr. at 8:1-6 (Court).

Moreover, the easiest way [for] a landlord to terminate conduct giving rise to forfeiture is to con[tact] law enforcement with the hope that they will terminate the illegal conduct and arrest the . . . tenants.  Where law enforcement is already involved in a landlord's tenants [and they] have been taken into federal custody, however, there is no need to notify [] law enforcement.  I can't sort of thin[k] about how that conversation would take place.  Call law enforcement and say I saw that you arrested these people and you were out there yesterday, therefore I'm putting you on notice for some future forfeiture.  I don't know[;] I don't see how that conversation really takes place.  After law enforcement has made arrests there should not be further criminal activity taking place on the property.  It is safe to assume that such activity has been terminated.

Jan. 5th Tr. at 8:6-23 (Court).  The Court noted that it had questions for the parties, including: (i) whether it is correct that, after the 2009 search and arrests, the Padillas were taken into custody, but the Court subsequently released and supervised them pre-trial, subject to various conditions; (ii) whether, at some point after their release, they started selling drugs again out of 2121

Celeste; (iii) why another search was carried out at 2121 Celeste on March 28, 2011; and (iv) whether there is any evidence that Fraire was aware that the Padillas began selling drugs again before the March 28, 2011, FBI raid.  See Jan. 5th Tr. at 8:23-9:18 (Court).

In conclusion, the Court explained that it was inclined to conclude that there is no genuine issue of dispute what prohibits the Court from granting that portion of the Fraire MSJ asking the Court to find that he is innocent under 18 U.S.C. § 983(d)(1).  See Jan. 5th Tr. at 9:18-24 (Court).  The Court stated that, although Fraire had knowledge of the conduct giving rise to the forfeiture beginning on about December 3, 2009, the Court was inclined to conclude that there was nothing else he could have done under the circumstances to terminate 2121 Celeste's illegal use, given that the United States was already aware of the property's illegal use, had conducted a search there, and had taken the Padillas into federal custody.  See Jan. 5th Tr. at 9:25-10:9 (Court).  According to the Court, "[a]t that point the conduct giving rise to the forfeiture of 2121 Celeste Road had been abated."  Jan. 5th Tr. at 9:10-11 (Court).  The Court concluded its analysis how it was inclined to rule by explaining:

> I looked for some cases that are similar to this one and couldn't find it but it seems to me that [the Court must] bring some reason to the phrase reasonably . . . .  Because I think in many situations that's going to be lay people doing this[,] [y]ou've got to bring a little common sense to the analysis and I just can't under these circumstances figure out what more Mr. Fraire could do once the police arrived at the property.  So those are my [thoughts] coming in.  And I haven't thought through exactly what that means to the Government's case but I guess presently upon the motion of the defendant I'm granting in part so that issue of innocence I'm taking out and saying if these are the facts here's what I am inclined to hold as the law which then leave[s] the issue for trial being the one that of whether he's an owner at the time.  So Mr. Kotz, Mr. Meyers [it is] your motion if you wish to argue in support of it.

Jan. 5th Tr. at 10:11-11:4 (Court).

The United States then asked whether what the Court was finding is that, once the police know, doing nothing is as a matter of law sufficient.  See Jan. 5th Tr. at 11:5-10 (Meyers).  The Court asked what it was the United States wanted them to do once the United States knows.  See Jan. 5th Tr. at 11:11-12 (Court).  The United States responded that it was not arguing that Fraire should have evicted Padilla, III, but that looking at § 983(2)(B)(2), the statute discusses consultation with law enforcement.  See Jan. 5th Tr. at 11:18-12:10 (Meyers).  The United States further explained that a mere consultation or inquiry would have been reasonable under the circumstances, but that merely doing nothing, because the police happened to arrive, was not reasonable.  See Jan. 5th Tr. at 12:10-14 (Meyers).  The Court asked the United States for a concrete example.  See Jan. 5th Tr. at 12:15-16 (Court).  The United States stated that, if an owner is sitting at home watching the news and sees that the police have just raided his or her property, the owner should call law enforcement or the tenant to inquire what happened at the property.  See Jan. 5th Tr. at 12:17-13:2 (Meyers).  The Court stated that "[i]t strikes me as very academic" and that it could not imagine what comes from such an inquiry.  Jan. 5th Tr. at 13:3-8 (Court).  The Court observed: "So a man loses his house because he makes the inquiry or doesn't make the inquiry."  Jan. 5th Tr. at 13:3-8 (Court).

The United States argued that, once the tenant returned, Fraire should have at least had a conversation with him and said: "I hope that whatever went on before is not going to happen again . . . ."  Jan. 5th Tr. at 13:16-23 (Meyers).  The Court then asked whether further criminal activity came out of 2121 Celeste.   See Jan. 5th Tr. at 13:24-14:1 (Court).  The United States responded, "Yes in March 2011."  Jan. 5th Tr. at 13:2-3 (Meyers).  The Court asked whether "if they're arrested you still think that that conversation has to take place if they're gone."  Jan. 5th Tr. at 14:3-5 (Court).  The United States responded: "Judge I don't think we have a job if every

time somebody got arrested they stopped doing criminal activity once that arrest took place."
Jan. 5th Tr. at 14:6-8 (Meyers).  The Court again inquired whether, if a landowner observed their
tenants get arrested and taken by the police, and then observed on Channel 7 that their tenants
were arrested for dealing drugs, they would still need to take some action.  See Jan. 5th Tr. at
14:9-13 (Court).  The United States stated that such a landowner needs to at the least have a
conversation with their tenants or law enforcement.  See Jan. 5th Tr. at 14:14-15:8 (Court,
Meyers).  The Court asked specifically what the content of that conversation would be, and the
United States responded:

> Officer Browning, I am the owner of 123 Main Street.  I saw that your
> team just did a search warrant.  I own that house.  Is there anything that I should
> know about the activity that's going on in this house?  Is there anything that I can
> do as the owner to prevent this activity from going forward?  Is my house in
> jeopardy?  Has my house been destroyed?  Who is going to make repairs?  I see
> my house has been run over by a tank and my whole yard has been torn up.  Is
> there anything I need to know about what's been going on there that caused this to
> happen?  There are many things that I think any responsible landowner, if they
> were indeed exercising dominion and control of the property would naturally have
> questions. At that point just mere effort to inquire what caused this tumult of
> activity to take place in the South Valley.

Jan. 5th Tr. at 16:3-19 (Meyers).  The United States explained that it understood the Court's
discomfort, but that this person is not an innocent owner.  See Jan. 5th Tr. at 16:19-20 (Meyers).

> Congress is not going to prevent the actions that are talked about in D one where,
> you know, no property shall be forfeited for an innocent owner if that person truly
> is innocent but if someone sits back and allows this activity to continue unabated
> which is indeed what happened here.   I don't think Congress shared the
> discomfort that the Court has.  Perhaps even the Government might have similar
> discomfort with that.  But the law is it's not saying that you can just sit back, once
> the police have been notified and do nothing.  Otherwise, it would render a lot of
> this statute meaningless, when it talks about reasonable steps that once the police
> are notified you are absolved doing anything.   And that's not at all what the
> statute is saying, Judge.

Jan. 5th Tr. at 16:19-17:11 (Meyers).

The United States expressed concern about a rule establishing that, once the police know of criminal activity, irrespective of the owner's actions, the owner, innocent or not, need not do anything.  See Jan. 5th Tr. at 17:21-18:3 (Meyers).  The Court responded; "[T]hat's not what I'm saying either" and explained that it is not when the police know, but when the landlord learns from the police that the criminal activity is taking place.  See Jan. 5th Tr. at 18:4-9 (Court, Meyers).  The United States asked whether, in that situation, as a matter of law, an owner need not do anything.  See Jan. 5th Tr. at 18:10-11 (Meyers).  The Court explained that it was not saying that when a landlord learns from the police that the criminal activity is taking place, the landlord need not do anything, but it was concerned about requiring the telephone call to the police to be made, and asked how a telephone call makes a landlord any less innocent.  See Jan. 5th Tr. at 18:12-14 (Court).  The Court later asked, "if you've got a Federal Court that's supervising the person, what real steps should a landlord take," and stated that "[w]ouldn't you assume that the Federal Court, the United States probation office is supervising that person there is not drug activity taking place there."  Jan. 5th Tr. at 20:7-10 (Meyers).  The United States explained that it "would love to assume that and no disrespect to this Court or our friends in probation but we know that's not what took place here and we know."  Jan. 5th Tr. at 20:11-14 (Meyers).

Fraire then argued on the United States MSJ and largely stuck to its briefing.  See Jan. 5th Tr. at 23:5-13 (Gorence).  Fraire first addressed the Court's inclination to conclude that there is a genuine issue of material fact for trial whether Fraire is an owner within the meaning of the forfeiture statute.  See Jan. 5th Tr. at 16:19-17:11 (Bowles).  Fraire indicated that, under the statute and the way courts have interpreted it, some dominion and control is sufficient to qualify a claimant as an owner.  See Jan. 5th Tr. at 24:2-25:11 (Bowles).  The Court explained that, if a

claimant can produce any fact indicating dominion and control, it would almost read the phrase "dominion and control" out of the statute.  Jan. 5th Tr. at 25:12-19 (Court).  Fraire agreed, but stated that it is clear that mere possession of title is insufficient.  See Jan. 5th Tr. at 25:20-26:2 (Bowles).  According to Fraire, the words "dominion and control" add something beyond mere title.  See Jan. 5th Tr. at 25:22-26:2 (Bowles).  Fraire then cited various facts from this case indicating that in the 1990s Fraire exercised dominion and control.  See Jan. 5th Tr. at 26:7-27:8 (Meyers).  The Court indicated that it was concerned about ruling as a matter of law that Fraire's improvements in the early 1990s demonstrates that Fraire exercised dominion and control during the relevant time period when Padilla, III was on the property.  See Jan. 5th Tr. at 27:17-28:1 (Court).  The Court explained that there are factors pointing to a finding of dominion and control, but there is also evidence pointing in the other direction.  See Jan. 5th Tr. at 29:2-7 (Court).  Fraire argued that some dominion and control is enough, but the Court explained that "it's like being pregnant; you're either pregnant or not pregnant.  You either exercise dominion and control or you don't."  Jan. 5th Tr. at 30:21-24 (Bowles).

The Court then turned to the issue of innocence under the forfeiture statute.  See Jan. 5th Tr. at 33:18-24 (Court).  The Court asked whether, if it ruled in Fraire's favor on innocence with the analysis it gave, he was prepared to defend it.  See Jan. 5th Tr. at 33:20-23 (Court).  Fraire responded: "We're prepared to defend it and I think the Court is absolutely right."  Jan. 5th Tr. at 25:10-11 (Gorence).  Fraire explained that it did not make sense for a landowner to notify law enforcement when he sees news about a raid at his property on television and that it is clear that law enforcement already had the situation under control.  See Jan. 5th Tr. at 38:15-25 (Gorence).  Fraire further stated that such a rule would mean that a guy would lose his house, because he did not have a conversation.  See Jan. 5th Tr. at 38:15-25 (Gorence).  Fraire also took issue,

however, with the idea that seeing a news story on television constitutes sufficient knowledge to trigger the second step requiring the owner to take reasonable steps under the circumstances to abate the criminal activity.  See Jan. 5th Tr. at 38:25-39:9 (Gorence).  Fraire emphasized his arguments from the briefing, citing various cases from the Tenth Circuit.  See Jan. 5th Tr. at 39:8-48:7 (Court, Gorence).  The Court then asked whether there is any evidence in the record in either motion that Fraire knew the Federal Court was supervising Padilla, III.  See Jan. 5th Tr. at 50:17-19 (Court).  Fraire responded: "No, Your Honor not one way or the other and there was no discussion about that."  Jan. 5th Tr. at 50:20-25 (Gorence).  The Court asked whether there was a written rental agreement, and Fraire responded, "It's oral.  Undisputed agreement, but it's oral." Jan. 5th Tr. at 53:6-9 (Court, Gorence).  The Court asked whether the parties were agreeable with the Court writing one set of facts, and both Fraire and the United States agreed.  See Jan. 5th Tr. at 53:10-58:5 (Court, Gorence, Meyers).

Finally, the Court explained that it had one last question for the United States.  See Jan. 5th Tr. at 59:24-25 (Court).  The Court explained that the United States Court of Appeals for the Eleventh Circuit has held that, under the forfeiture statute, if you exercise some dominion and control, that "some" is enough to qualify as an owner.  See Jan. 5th Tr. at 59:24-60:9 (Court). The Court indicated that that the Eleventh Circuit's position appears to be the position Fraire is taking -- that in exercising some dominion or control, he qualifies as an owner.  See Jan. 5th Tr. at 59:24-60:9 (Court).  The Court stated that it was inclined to take a harder position, and hold that you either exercise dominion and control, or you do not, and that if there is evidence going both ways, that is a question for the jury.  See Jan. 5th Tr. at 59:24-60:9 (Court).  The Court asked whether the United States agrees with the Court's or the Eleventh Circuit's interpretation

of the statute.   See Jan. 5th Tr. at 59:24-60:9 (Court).   The United States and the Court then

engaged in the following exchange:

> MR. MEYERS:  Here I agree with you of course I'm not trying to be glib about
> that I think we look [at] the[] relevant period in place.  And I think we can fine
> tune it and look around the time of the activity we're discussing not that it was
> never owned by this person.  He certainly had to do something in order to acquire
> possession or title of the property.  But as far as with respect to the relevant time
> that triggers the forfeiture in this case, I think it's clear that we can show that
> there was no dominion and control and I believe the Government has done that in
> these pleadings.  It's both ways.  I don't think we need to take as expansive a
> view from time [im]memorial.
>
> THE COURT:  Find what Mr. Bowles is saying if you exercise some dominion or
> control, then the Government is precluded then because the statute says no
> dominion or control.
>
> A.  I understand his argument the same way Judge.
>
> THE COURT:  And you disagree with that.
>
> A.  I do.  But one thing, and the only I thing I would ask, if you have any
> questions with respect to the latest perrying (check) between myself and Mr.
> Gorence with respect to Officer Gasoway, I'd be happy to answer that.  But I
> don't want to devolve and I know the Court is super busy.  So unless you have
> questions about that, I think factually I don't think it's necessary for the Court to
> reach its ruling anyway.  So unless you have questions, I'll sit down.
>
> THE COURT:  Thank you, Mr. Meyers.

Jan. 5th Tr. at 53:10-15 (Court, Meyers).

> The Court concluded by giving its final thoughts on the United States MSJ:

> Well, I think that probably it's not very important what the Government
> had or should do. I think the focus of the statute is what the owner does.  So I
> think the earlier issues about the probation office and what probation can do and
> should do are not particularly [relevant] here.  Assuming that I stay where I am[,]
> it may be a disagreement with the 11 Circuit and it creates I guess a legal issue
> here[;] I do think that either you exercise dominion and control or you don't.  You
> don't exercise some [dominion] . . . and control then therefore get out of the
> statute.  So if I stick with my current construction of the statute I think there is
> evidence that points [to] both sides – [s]o it's a factual issue -- and neither side
> has established either dominion or control or lack of dominion and control so I'm

still inclined to submit that to the jury but I'll give thoughts [to the] arguments that were made today.

As far as the innocent portion of the []983[(2)(A),]  I'm still struggling to think of what a person with the knowledge that Mr. Fraire had could reasonably do[;] I'm certainly not saying that after somebody knows of criminal activity they have an obligation to do nothing because I agree with the Government that would undercut the statute.  But I do think there has to be something reasonable that somebody does before they lose their innocence and lose their home.  I'm just not seeing what could be done here.  I'm reluctant to see that somebody lose their house because they failed to call law enforcement.  I think probably the most fair thing is that probably Mr. Fraire thought the feds had this one under control[;] it [is] hard to think then of what he needed to do.  I'll give it some thought but I'm still inclined to go with the inclinations I gave you at the beginning.  I'll try to get a single opinion [out about] both [of these] motions out as soon as possible . . .

Jan. 5th Tr. at 53:10-15 (Court).

### 9.    The January 20, 2016, Pre-Trial Conference.

The Court held a pre-trial conference on January 20, 2016.  See Transcript of Hearing (taken January 20, 2016)("Jan. 20th Tr.").   The Court stated that it has been working on the cross-motions for summary judgment.   See Jan. 20th Tr. at 2:17-3:12 (Court).   The Court explained that the undisputed facts had not panned out the way that it thought they would based on the arguments, briefing, and attachments, and that it is going to grant the United States MSJ and deny the Fraire MSJ.   See Jan. 20th Tr. at 3:12-18 (Court).   The Court stated that it concludes that there remains a genuine issue of material fact whether Fraire is an owner of 2121 Celeste within the meaning of the forfeiture statute and that it does not think that it can grant summary judgment on either side on that issue.   See Jan. 20th Tr. at 2:17-3:25 (Court).   The Court explained, however, that it is going to conclude as a matter of law that Fraire is not innocent under § 983(2)(A).   See Jan. 20th Tr. at 3:25-4:2 (Court).

The Court explained that it had been toying with the issue of what more a landlord could do where law enforcement is already involved and a landlord has knowledge of the incident.   See

Jan. 20th Tr. at 4:2-6 (Court).  The Court noted that it was under the assumption that Fraire knew that the tenants had been taken into custody and that they were being supervised.  See Jan. 20th Tr. at 4:6-8 (Court).  The Court explained, however, that the record did not establish that fact, and that there is an important gloss on the rule that it had been discussing at the January 5, 2016, hearing.  See Jan. 20th Tr. at 4:8-11 (Court).  The Court stated that the rule it has crafted is that: where law enforcement is already involved and a landlord has knowledge that his or her tenant have been taken into custody, and are being supervised by the federal government, a landlord need not take additional steps to terminate the use of the property to receive the benefit of the innocent-owners defense set forth in § 983(2)(A).  See Jan. 20th Tr. at 4:11-20 (Court).  The Court noted that this incapacitation concept is important, and unless the landlord appears to know that the tenants have been incapacitated in some way and cannot engage in further activity, they still have an obligation to inquire and perhaps remove the people from the property.  See Jan. 20th Tr. at 4:20-5:2 (Court).   The Court explained that Fraire's deposition reflects the following exchange:

Q: But seeing the news, what did you learn when you saw the news?

A: They were at the house over there, that the agents were at the house over there.  Whatever they showed on the news.  They showed the picture on the news.

Q: Were you aware what they got arrested for?

A: I really didn't care. That's none of my business.

Q: Were you aware, though, what they got arrested for after --

A: I'm still not aware.  That's not my business.

Jan. 20th Tr. at 5:2-15 (Court)(quoting Fraire Deposition at 136:8-21).  The Court further stated that, at the January 5, 2016, hearing, the Court asked whether there was any evidence in the

record in either motion that Fraire knew that the federal court was supervising Padilla, and that, Mr. Gorence answered: "No, Your Honor not one way or the other and there was no discussion about that."  Jan. 20th Tr. at 5:15-6:2 (Court).assertion

The Court then stated that it thinks the rule is that, where law enforcement is already involved, and a landlord has knowledge that his or her tenants have been taken into custody and that they are being supervised by the federal government, a landlord need not take additional steps to terminate the use of the property to receive the benefit of the innocent owner's defense set forth in § 983(2)(A).  See Jan. 20th Tr. at 6:2-10 (Court).  The Court explained that, in other words, where a tenant has been incapacitated, a landlord need not contact law enforcement, or evict his or her tenant, to satisfy the requirement that he or she do "all that reasonably could be expected under the circumstances to terminate such use of the property."  Jan. 20th Tr. at 6:11-16 (Court)(quoting 18 U.S.C. § 983(2)(A)).  The Court went on to state that, while Fraire may have been aware of Padilla, III's arrest, he did not know that Padilla, III had been taken into custody and that the federal government was supervising him.  See Jan. 20th Tr. at 7:4-7 (Court).  Fraire was required, the Court explained, at the very least, after seeing the news coverage of the FBI raid, to take some additional steps to learn about Padilla, III's status, and whether he was incapacitated and under federal custody.  See Jan. 20th Tr. at 7:9-13 (Court).  The Court stated that it therefore concludes that, regardless whether Fraire was an "owner" under § 983(d)(1), as a matter of law, Fraire is not "innocent" under § 983(2)(A).  Jan. 20th Tr. at 7:13-18 (Court).  The Court explained that it therefore would grant the United States MSJ.  See Jan. 20th Tr. at 7:18-19 (Court).

The Court then explained that, in the Fraire Response, Fraire raised a couple of additional issues.  See Jan. 20th Tr. at 7:20-22 (Court).  The Court stated that it is looking at Fraire's claims

under the Due Process Clause of the Fifth Amendment to the Constitution of the United States of

America and the Excessive Fines Clause of the Eighth Amendment to the Constitution of the

United States, but that it did not think that they involve any factual issues that need to be tried.

See Jan. 20th Tr. at 7:22-8:4 (Court).   The Court therefore explained that, once it grants the

United States MSJ, which was limited to the innocent-owner defense, that action would likely

bring to a conclusion the triable issues in this case.   See Jan. 20th Tr. at 8:1-4 (Court).   The Court

stated that it was inclined to conclude that the almost three-year delay between the filing of the

lis pendens and the filing of the Complaint was not unreasonably long.   See Jan. 20th Tr. at 8:4-

10 (Court).   The Court observed that, under the Supreme Court of the United States of America's

decision in United States v. $8,850.00, 461 U.S. 555, 564 (1983), it must look to four factors in

assessing the timeliness of the post-seizure filing of a judicial forfeiture action: length of delay,

the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.

See Jan. 20th Tr. at 8:10-15 (Court).   The Court noted that the parties had not analyzed or

discussed these factors in the briefing, but that the Court is inclined to conclude that no prejudice

has been done to Fraire, that the United States' delay resulted from the investigation into the

Padilla Gang and other criminal cases, and that Fraire never pursued an available avenue of relief

suggesting that he desired early judicial resolution of the matter.   See Jan. 20th Tr. at 8:18-24

(Court).   The Court concluded by stating that it would need to spend some additional time on

those legal issues, but that it did not think that they would require a trial.   See Jan. 20th Tr. at

7:18-19 (Court).   The Court further explained:

> I don't see a factual issue.   It seems once I determine on the undisputed facts and
> I've completed the work on the facts it doesn't seem to me that Mr. Fraire can say
> he's an innocent owner.   So I think with that, . . . at least the need for a pretrial
> conference is obviated and I just need to get this opinion out to you, and if I grant
> summary judgment across the board to the United States and overrule these two

last legal objections that seems to me it would be appropriate then to probably
enter final judgment, then let the parties do what he need to do taint.

Jan. 20th Tr. at 9:1-12 (Court).

The United States did not have anything to say following the Court's observations.  See
Jan. 20th Tr. at 21:10-15 (Court, Meyers).  Fraire, however, spent several minutes discussing the
Court's ruling.  See Jan. 20th Tr. at 9:13-21:11 (Court, Gorence).  Fraire first stated that "it will
be obviously an interesting appeal particularly when the Court said it was going the other way
and looked at the facts and I know you've got 33 pages on paper."  Jan. 20th Tr. at 9:14-17
(Gorence).  Mr. Gorence explained that, after the January 5, 2016, hearing, on the United States
MSJ, he and Mr. Bowles consulted with two other lawyers.  See Jan. 20th Tr. at 9:18-21
(Gorence).  Fraire stated he was not there to reargue, but that he wanted to give this thought to
the Court so that it would be part of the briefs for an appeal.  See Jan. 20th Tr. at 9:21-24
(Gorence).

Fraire explained that, when Congress uses the term reasonable, what is reasonable is
subjective under the circumstances.  See Jan. 20th Tr. at 10:14-17 (Gorence).  Fraire explained
that the cases do not analyze the meaning of the word reasonable, but that "the only way that the
word makes sense is that the greater the knowledge you have as a property owner of illegal
activity occurring on the property that you own, the greater the duty, and therefore the more
probably [sic] the steps you have to take to abate illegal conduct."  Jan. 20th Tr. at 10:14-17
(Gorence).  Fraire argued that, in the cases discussed, there was actual knowledge of criminal
conduct occurring, and that this case is an interesting case because the only knowledge is a
television show.  See Jan. 20th Tr. at 10:8-21 (Gorence).  Fraire further stated that, with a news
report, the interesting thing is "what is reasonable with regard to something you see on TV that .

. . he said I didn't pay attention to i[t,] I don't know anything about it[,] I don't know if they were arrested or not." Jan. 20th Tr. at 10:21-11:1 (Gorence).  Fraire argued that this knowledge is different from any case that he has been able to find.  See Jan. 20th Tr. at 11:1-3 (Gorence). Fraire further stated:

> I just want the Court and I'm not arguing with you, but I want to make our record this was going to be because we were talking to [other] lawyers afterwards going through the statute, reasonable is in response to the quantum of knowledge you have.  And when it's actual knowledge, obviously, what is reasonable requires something very different.  This case -- and as I said we've never found one where there is no actual knowledge.  Wasn't there; never saw anything growing; never saw drug transactions.  You see a news report in passing, and then you look and see no damage to the property, and no one ever -- as I said, by the same token, nobody ever contacts you, whether it's law enforcement, they now and this relates to the three year delay.  This was on your property.  So he's left with something you see on TV.  And I would just and I'm looking forward to reading the opinion because it obviously is going up and we have a couple other procedural issues . . . in response to show[ing] no actual facts, obviously nothing on TV is a fact we see things all the time that are completely unfactual.

Jan. 20th Tr. at 11:8-12:5 (Gorence).

Fraire also stated that reasonableness must relate to the quantum of information that you have and that, the greater the information, the more that you have to take affirmative steps to abate criminal conduct.  See Jan. 20th Tr. at 12:9-14 (Gorence).  Fraire explained:

> I want to put this on because we didn't really articulate that last time. . . . [I]t was only I'm not going to name the two other lawyers as we were going through this statute here's the judges concerns and we're kind of post debating out and arguing this, and it's not often that Congress uses a term that's reasonable, absolutely subjective.

Jan. 20th Tr. at 11:1-3 (Gorence).

> I'm sure you know, as I said I anticipate appellate review the way it comes out, because it is factually unlike any other forfeiture case we've been able to find anywhere with this de minimis quantum of knowledge, so what I guess one would have to say is if you were going to cross a room and see a TV show that has your property what does that trigger when there is no other triggering event does one have to rely on that as reliable, the news, you know, and that's I mean, what about

the blogosphere, so now if something gets posted in an anonymous way, media the whole idea what you see someone sends you a Facebook text that puts you on notice without anything else. . . . Well media is now a very different event in America with a far greater context.  Is a Facebook, what's the difference between that and seeing it on TV.  And I'm just throwing this out because these are the issues that we didn't raise before, and I would hope the Court sips it's a project in the works and we can undue all the schedules for pretrial order in a tentative but I'm inviting because I want to make our record that we have argued these as we go up before and I don't know if Mr. Bowles and I are going to do the appeal I think a D.C. law firm will be doing it.  But those are the kind of issues.  And they're bigger because of its novelty.

Jan. 20th Tr. at 14:1-15:14 (Gorence).

Fraire then explained that if summary judgment is granted in the United States' favor, he has raised Eighth Amendment concerns.  See Jan. 20th Tr. at 15:15-21 (Gorence).  Fraire noted that he has distinctly raised the idea that, if one owns a property now worth approximately $400,000.00 is forfeiture proper under the Eighth Amendment for not doing something when you see something on television.  See Jan. 20th Tr. at 15:22-16:3 (Gorence).  Fraire stated that the Court could address those after the opinion, but explained that the Court should hold a hearing on the merits "so the Court would have the value and weigh that in terms of relative culpability."

Jan. 20th Tr. at 15:21-16:11 (Gorence).  Fraire further explained:

So at the end of the opinion even with summary judgment I do think we'll have a hearing on the Eighth Amendment assuming the Court is going the same way I'm not here to reargue I would ask the Court to give a little greater thought given where we were before those are the issues involved and we have a very distinct Eighth Amendment claim unless the Court is going to rule which actually isn't ripe on the facts we need to have a hearing on that we've raised it what's the value then we want to brief that. . . . What I'm asking for is we haven't had the opportunity to put factually in the record what we need to.

Jan. 20th Tr. at 16:15-18:11 (Gorence).

Finally, Fraire argued that, if the Court concludes that he is not an innocent owner, he has to at least be an owner.  See Jan. 20th Tr. at 18:12-17 (Gorence).  Fraire expressed concern about

- 63 -

the possibility that, if the Court were reversed, the parties would have to come back for a full-blown trial on whether Fraire owns 2121 Celeste.  See Jan. 20th Tr. at 18:17-19:7 (Gorence).

Fraire stated, in pertinent parts:

> But it seems to me Your Honor if you're saying he's not an innocent owner the Court is making a finding that he is the owner.  If he's not an owner you don't get to that question as you well articulated last time. . . . And procedurally, if we go up and you are reversed and he's not an innocent owner, I am going to be a little unhappy and have to come back and have to litigate whether he's an owner, when the Court's basically said he is an owner but not innocent.  So I'm asking the Court to address that as well. . . . [I]f the Court were reversed if there is a trial an issue of fact on that in terms of what was in his mind and we look and again we have the benefit of law that wasn't presented to you, reasonableness much like intent is acquit essential jury issue it is always a jury issue.  You can't divine especially on these facts what is reasonable.  Congress uses the term reasonable it invites a factual determination unless this Court can just say on a news program and a single phone call that's end the day.  We posit that Tenth Circuit law says that that really is reserved for a jury when Congress uses that term. . . . [B]ut reasonable, particularly as it relates to the quantum of knowledge is really something reserved for the fact finder. . . . I would ask that the Court not as you said before it's really a two step process.  Unless you're going to address step one, you're only going to step two.  And if you get reversed, we're back for step one.  We're going to say res judicata.  You couldn't be an owner unless you took this up.

Jan. 20th Tr. at 18:21-21:5 (Gorence).

**10.** **The February 16, 2016, Hearing.**

On February 4, 2016, the Court issued an order indicating that it would hold a hearing to determine whether the forfeiture of 2121 Celeste would violate the Eighth Amendment's Excessive Fines Clause.  See Order, filed February 4, 2016 (Doc. 69)("Hearing Order").  The Court stated:

> Under 18 U.S.C. § 983(g), a claimant "may petition the court to determine whether the forfeiture was constitutionally excessive."  18 U.S.C. § 983(g)(1).  "In making this determination, the court shall compare the forfeiture to the gravity of the offense giving rise to the forfeiture."  18 U.S.C. § 983(g)(2).  Section 983(g)(3) further establishes that, "[t]he claimant shall have the burden of establishing that the forfeiture is grossly disproportional by a preponderance of

the evidence at a hearing conducted by the court without a jury." 18 U.S.C. § 983(g)(3). Finally, "[i]f the court finds that the forfeiture is grossly disproportional to the offense it shall reduce or eliminate the forfeiture as necessary to avoid a violation of the Excessive Fines Clause of the Eighth Amendment of the Constitution." 18 U.S.C. § 983(g)(4).

Pursuant to 18 U.S.C. § 983(g)(4), the Court must hold a hearing, without a jury, to determine whether the forfeiture is grossly disproportional under the Eighth Amendment's Excessive Fines Clause. At the hearing, Fraire will have "the burden of establishing that the forfeiture is grossly disproportional by a preponderance of the evidence." 18 U.S.C. § 983(g)(4). The Court would like to draw the parties' attention to the United States Court of Appeals for the Tenth Circuit's decision in United States v. Wagoner County Real Estate, 278 F.3d 1091 (10th Cir. 2002). There, the Tenth Circuit addressed the factors that a court should consider in determining whether a forfeiture is grossly disproportionate under the Eighth Amendment's Excessive Fines Clause under facts similar to the case at issue. The Court will hold such a hearing, pursuant to 18 U.S.C. § 983(g)(4), at the scheduled hearing on Claimant Cruz J. Fraire's Motion to Re-Open Briefing, filed January 21, 2016 (Doc. 66).

Hearing Order at 1-2. Consistent with this order, the Court held a hearing on February 16, 2016. See Transcript of Hearing (taken February 16, 2016)("Feb. 16th Tr."). The parties presented documentary evidence and made argument with respect to Fraire's contention that forfeiture of 2121 Celeste would violate the Excessive Fines Clause of the Eighth Amendment, but neither side presented viva voce evidence. The Court will make factual findings for the purposes of analyzing whether 2121 Celeste's forfeiture would violate the Eighth Amendment in light of the factors that United States v. Bajakajian, 524 U.S 321 (1998), and Wagoner County Real Estate, 278 F.3d at 1091, set forth.

## FACTUAL FINDINGS BASED ON THE FEBRUARY 16, 2016, HEARING, THE DOCUMENTS SUBMITTED TO THE COURT AND THE RECORD

1.    2121 Celeste was the situs for on-going cocaine and heroin transactions between 2009 and 2011 by members of the Los Padillas gang. See Zamora Decl. at 1-4; Padilla, Jr. Plea

Agreement ¶ 7, at 3; Padilla, III Plea Agreement in CR. No. 09-3598 ¶ 6, at 3; Padilla, III Plea Agreement in CR. No. 11-0667 ¶ 6, at 3.

2.      On March 19, 2009, Padilla, Jr. directed a confidential human source to meet with Padilla, III, at 2121 Celeste to consummate the sale of approximately 130 grams, or four ounces, of cocaine.  See Padilla, Jr. Plea Agreement ¶ 7, at 3; Padilla, III Plea Agreement in CR. No. 09-3598 ¶ 6, at 3; Zamora Decl. ¶ 5, at 2.

3.      Padilla, III, and the confidential human source met at 2121 Celeste, and Padilla, III, handed the confidential human source approximately 131 grams of cocaine in exchange for $3,500.00.  See Padilla, Jr. Plea Agreement ¶ 7, at 3; Padilla, III Plea Agreement in CR. No. 09-3598 ¶ 6, at 3; Zamora Decl. ¶ 5, at 2.

4.      On December 3, 2009, the FBI executed a search warrant at 2121 Celeste.  See Zamora Decl. ¶ 5, at 2.

5.      Items recovered during the execution of that warrant on December 3, 2009, included: fourteen cellular telephones; a video surveillance system; a backpack with plastic ziplock bags; a money counter machine; packaging material buried outside in the backyard; $441,008.00 in United States currency buried outside in the backyard; several heat sealers; and documentation belonging to both Padilla, Jr. and Padilla, III.  See Zamora Decl. ¶ 6, at 2-3.

6.      No documents belonging to Fraire were recovered during the execution of the December 3, 2009, search warrant at 2121 Celeste.  See Zamora Decl. ¶ 7, at 3.

7.      Padilla, III, and Padilla, Jr. were both taken into federal custody on December 3, 2009.  See Padilla, Jr. Arrest Warrant at 1; Padilla, III Arrest Warrant at 1.

8.      Padilla, III, was released pre-trial, while Padilla, Jr. was detained pending trial. See Padilla, Jr. Detention Order at 1; Padilla, III Conditions of Release at 1.

9.      Fraire did not seek to evict Padilla III from 2121 Celeste following the execution of the December 3, 2009, FBI search warrant.  See United States MSJ ¶ 26, at 6 (setting forth this fact); Fraire Response ¶ 26, at 7 (admitting this fact).

10.     On February 26, 2011, Padilla, III, sold approximately two ounces of heroin at 2121 Celeste for $1,500.00 to a confidential human source.  See Email Chain Between Jason Bowles and Joel Meyers at 2, admitted as Exhibit B at the February 16, 2016, hearing ("Email Stipulations"); Padilla, III Plea Agreement in CR. No. 11-0667 ¶ 6, at 3; Zamora Decl. ¶ 8, at 3.

11.     The United States has no evidence that Fraire was involved in the February 26, 2011, heroin transaction at 2121 Celeste.  See Email Stipulations at 2.

12.     On March 17, 2011, approximately three ounces or 83.6 grams of heroin were sold to a confidential human source at 2121 Celeste for $2,250.00.  See Email Stipulations at 2; Zamora Decl. ¶ 9, at 3.

13.     On March 28, 2011, the FBI executed another federal search warrant at 2121 Celeste.  See Zamora Decl. ¶ 10, at 4.

14.     Items recovered during the March 18, 2011, search of 2121 Celeste included: $19,777.00 in United States currency; thirteen cellular telephones; and driver licenses for Padilla, III.  See Email Stipulations at 2; Zamora Decl. ¶ 10, at 4.

15.     No documents belonging to Fraire were recovered during the execution of the March 18, 2011, search warrant.  See Zamora Decl. ¶ 11, at 4.

16.     Padilla, III and Padilla, Jr. both entered into plea agreements.  See Padilla, Jr. Plea Agreement at 1; Padilla, III Plea Agreement in CR. No. 09-3598 at 1; Padilla, III Plea Agreement in CR. No. 11-0667 at 1.

- 67 -

17.     In Padilla, III and Padilla, Jr.'s plea agreements, each admitted that cocaine was sold out of 2121 Celeste.  See Padilla, Jr. Plea Agreement ¶ 7, at 3; Padilla, III Plea Agreement in CR. No. 09-3598 ¶ 6, at 3.

18.     Padilla, III also admitted that heroin was sold out of 2121 Celeste.  See Padilla, III Plea Agreement in CR. No. 11-0667 ¶ 6, at 3.

19.     Padilla, Jr. pled guilty to "Counts Two, Three and Four of the Indictment, charging a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), that being Distribution of Cocaine" and also pled guilty to "a Grade A violation of his term of Supervised Release with respect to a cause number 94-CR-618."  Padilla, Jr. Plea Agreement ¶ 3, at 2.

20.     In the Padilla, III Plea Agreement in CR. No. 09-3598, Padilla, III pled guilty to "Count Four of the indictment, charging a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), that being Distribution of Cocaine."  Padilla, III Plea Agreement in CR. No. 09-3598 ¶ 3, at 2.

21.     In the Padilla, III Plea Agreement in CR. No. 11-0667, Padilla, III pled guilty to "the Indictment, charging a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), that being Distribution of Heroin."  Padilla, III Plea Agreement in CR. No. 11-0667 ¶ 3, at 2.

22.     The current value of 2121 Celeste is $268,000.00.  See Appraisal Report of A Single Family Residence at 2121 Celeste Rd SW, Albuquerque, NM 87105 as of 02/08/2016 at 2, admitted as Exhibit A at the February 16, 2016, hearing ("Appraisal Report").

23.     The United States has no evidence that Fraire received a tangible personal benefit in connection with the offense conduct.  See Email Stipulations at 1.

24.     There is no evidence that that Fraire had any role in the drug offenses that took place at 2121 Celeste.  See Feb. 16th Tr. at 40:10-13 (Meyers)("I will concede, as we did in the

stipulation before the Court, there is no evidence that we have to demonstrate that Mr. Fraire had any role in the offense.").

25.     2121 Celeste does not produce any income for Fraire, he does not live there, he does not receive rent payments, and he does not pay anything for its upkeep and maintenance. See Feb. 16th Tr. at 38:20-39:5 (Meyers); United States MSJ ¶¶ 6, 17, 19,  at 4-5; Fraire Response ¶¶ 6, 17, 19, at 3-5.

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case."   Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted).   See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant meets this burden, rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).   See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A

party asserting that a fact . . . is genuinely disputed must support the assertion by . . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)). Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). Rather, there must be sufficient evidence on which the

factfinder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

## LAW REGARDING FORFEITURE UNDER THE CAFRA

Under the CARFA, a claimant can resist forfeiture by proving that they are an innocent owner by a preponderance of the evidence.  See 18 U.S.C. § 983(d)(1).  To succeed on an innocent owner defense, the claimant must prove that they are both an owner, and that they are innocent.  See United States v. Real Property, Including All Improvements Thereon and Appurtenances Thereto, Located at 246 Main Street, Dansville, Livingston Cty., New York, 118 F. Supp. 1310, 1320 (M.D. Fla. July 13, 2015)(Davis, J.).  In order to qualify as an owner, the claimant must have an ownership in the property, 18 U.S.C. § 983(d)(6)(A), and they cannot be "a nominee who exercises no dominion or control over the property,"  18 U.S.C. § 983(d)(6)(B)(iii).  Finally, a claimant must demonstrate that he or she did not know of the conduct giving rise to forfeiture or, upon learning of the conduct, did all that reasonably could be expected under the circumstances to terminate such use of the property.  See 18 U.S.C. § 983(2)(A)(i) and (ii).

### 1.    Legal Standard Governing Civil Asset Forfeiture Actions.

To prevail in an action under 21 U.S.C. § 881(a)(7), the government must prove by a preponderance of the evidence that the property is subject to forfeiture.  See 18 U.S.C. § 983(c)(1) ("In a suit or action brought under any civil forfeiture statute for the civil forfeiture of any property . . . the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture.").  See United States v. $100,348.00 in U.S. Currency, 354 F.3d 1110, 1116 (9th Cir. 2004)(noting that the CAFRA raised the government's burden of proof from probable cause to preponderance of the evidence).  "This standard of proof requires that the government show that it is more likely than not that the

property is subject to forfeiture." United States v. Real Property in Santa Paula, Cal., 763 F.

Supp. 2d 1175, 1184 (C.D. Cal. 2011).

> Where the government's theory of forfeiture is that the property was used to
> commit or to facilitate the commission of a criminal offense, or that it was
> involved in the commission of a criminal offense, the government must establish
> that there is a substantial connection between the property and the criminal
> offense.

United States v. Real Property in Santa Paula, Cal., 763 F. Supp. 2d at 1184 (citing 18 U.S.C. §

983(c)(3)).

### 2.     **The Innocent Owner Defense**.

The CAFRA sets forth the procedures used in all civil forfeitures under federal law unless

the particular forfeiture statute is specifically exempted in 18 U.S.C. § 983(i)(2).  See United

States v. Real Property in Santa Paula, Cal., 763 F. Supp. 2d at 1184.  Section 983(d)(1) provides

the following innocent owner defense to a civil forfeiture: "An innocent owner's interest in

property shall not be forfeited under any civil forfeiture statute."  18 U.S.C. § 983(d)(1).  "The

claimant shall have the burden of proving that the claimant is an innocent owner by a

preponderance of the evidence."   18 U.S.C. § 983(d)(1).   See United States v. One 1990

Beechcraft 1900 C Twin Engine Turbo-Prop Aircraft, 659 F. Supp. 2d at 1267 ("A claimant

relying on this defense . . . has the burden to prove it is an innocent owner by a preponderance of

the evidence."); United States v. $80,180 in U.S. Currency, 303 F.3d 1182, 1184 n.2 (9th Cir.

2002)(explaining that the CAFRA made a number of remedial reforms, including establishing a

comprehensive "innocent owner defense" which 18 U.S.C. § 983(d) sets forth).  In other words,

"[i]n order for a claimant to assert that property should not be forfeited because he is an innocent

owner, the claimant must prove, by a preponderance of the evidence, 18 U.S.C. § 983(d)(1), that

he is both innocent and an owner, 18 U.S.C. § 983(d)(3)(A), (d)(6)."   United States v. Real

Property, Including All Improvements Thereon and Appurtenances Thereto, Located at 246 Main Street, Dansville, Livingston Cty., New York, 118 F. Supp. at 1320.  "Thus, the innocent owner defense is an affirmative defense."  United States v. Assets Described in Attachment A to the Verified Complaint for Forfeiture in Rem, 2010 WL 6593942, at *4 (M.D. Fla. Dec. 2, 2010)(Kelly, M.J.).

### a.    Qualifying as an "Owner" Under the CAFRA.

The CAFRA provides that the term "owner" means a person with "an ownership interest in the specific property sought to be forfeited, including a leasehold, lien, mortgage, recorded security interest, or valid assignment of an ownership interest."  18 U.S.C. § 983(d)(6)(A).  State law defines ownership interests, with "'one important exception,' however."  United States v. 1997 Intern. 9000 Semi Truck VIN: 1HSRUAER8VH409632, 412 F. App'x 118, 122 (10th Cir. 2011)(quoting United States v. One Lincoln Navigator 1998, 328 F.3d at 122).   Section 983(d)(6)(B)(iii) states that the term "owner" "does not include . . . a nominee who exercises no dominion or control over the property."  18 U.S.C. § 983(d)(6)(B)(iii).  See United States v. 1997 Intern. 9000 Semi Truck VIN: 1HSRUAER8VH409632, 412 F. App'x at 122-23 ("Federal law prohibits 'a nominee who exercises no dominion or control over the property' from claiming innocent ownership.").  "Ownership interests are defined by state law, but federal law determines whether a claimant is a nominee who exercises no dominion or control over the property." United States v. Real Property, Including All Improvements Thereon and Appurtenances Thereto, Located at 246 Main Street, Dansville, Livingston Cty., New York, 118 F. Supp. at 1320 (citing United States v. One Lincoln Navigator 1998, 328 F.3d at 1015).  Indeed, "things are often not what they appear to be, especially in the world of drug trafficking."  United States v. One 1990 Beechcraft, 1900 Twin Engine Turbo-Prop Aircraft, 619 F.3d at 1278.  "[T]he very

premise of requiring both an ownership interest and dominion or control is that people engaged in illegal activities often attempt to disguise their interests in property by placing title in someone else's name."  United States v. 1997 Intern. 9000 Semi Truck VIN: 1HSRUAER8VH409632, 412 F. App'x at 123 (quoting United States v. One 1990 Beechcraft, 1900 Twin Engine Turbo-Prop Aircraft, 619 F.3d at 1278).

The CAFRA does not, however, define the meaning of "a nominee who exercises no dominion or control over the property."  18 U.S.C. § 983(d)(6)(B)(iii).  One possibility is that the statute could intend "dominion and control" as something that exists on a sliding scale.  Under that view, one can exercise a small amount of dominion and control or a large amount of dominion and control over a piece of property -- it is a matter of degree.   Under that interpretation, if someone exercises "some" dominion or control, beyond mere title, that would be sufficient to qualify as an owner under the CAFRA.  The Eleventh Circuit largely adopted this approach in United States v. One 1990 Beechcraft, holding that exercising some dominion and control suffices to prove that a claimant is not a mere nominee under the CAFRA.  See 619 F.3d at 1275.  In that case, the appellant appealed a district court decision ordering forfeiture of a Beechcraft airplane, to which appellant held legal title.  See 619 F.3d at 1276.  The United States and the appellant stipulated that the airplane carried cocaine from Venezuela into the United States and was therefore subject to forfeiture.  See 619 F.3d at 1276.  The appellant contested forfeiture, however, on the grounds that it was an innocent owner.  See 619 F.3d at 1276.  After an evidentiary hearing, the district court concluded that the appellant was not an "owner" for § 983(d)(6)'s purposes and was therefore not an innocent owner of the airplane.  619 F.3d at 1277. The question before the Eleventh Circuit was whether the district court erred in finding that the

appellant was a nominee who exercised no dominion or control over the airplane, so as to fall within the exclusion to ownership that § 983(d)(6)(B)(iii) provides.  See 619 F.3d at 1277.

The appellant contended that, because it exercised "some" dominion and control over the plane, it was not a nominee who exercises no dominion and control over the airplane.  619 F.3d at 1277.  The Eleventh Circuit agreed in part, stating that "exercising some dominion or control" suffices to prove that a claimant is an owner under the CAFRA.  619 F.3d at 1278.  The Eleventh Circuit explained:

> Here, the plain language of the statute clearly provides that a claimant must be more than a "nominee who exercises *no* dominion or control," 18 U.S.C. § 983(d)(6)(B)(iii) (emphasis added).  There is no ambiguity in the word or the phrase, and following the statute's plain language does not lead to an absurd result.  There is therefore no reason to disregard the plain language of the statute. [*United States v.*] *Silva*, 443 F.3d [795,] 798 [(11th Cir. 2006)]("[W]e should not interpret a statute in a manner inconsistent with the plain language of the statute, unless doing so would lead to an absurd result." (citation omitted)); *id.* ("If the statute's meaning is plain and unambiguous, there is no need for further inquiry." (citation and quotation omitted)).  Indeed, the plain language is consistent with the purpose, structure, and context of CAFRA, discussed above.  *See Edison v. Douberly*, 604 F.3d 1307, 1310 (11th Cir. 2010)("[W]e do not look at one word or term in isolation but rather look to the entire statute and its context." (citation omitted)).  Thus, we conclude that exercising *some* dominion or control suffices to prove that a claimant is not a mere nominee.  To hold otherwise would be to substitute our judgment for Congress's, thereby weakening the substantive protections Congress set out in the statute.

United States v. One 1990 Beechcraft, 619 F.3d at 1278.  According to the Eleventh Circuit, however, the claimant failed to meet its burden of proving, by a preponderance of the evidence, that it, rather than a third party, exercised any dominion or control over the airplane at all.  See 619 F.3d at 1279.  The Eleventh Circuit therefore affirmed the District Court's decision.  See 619 F.3d at 1279.

The Court has found no Tenth Circuit case interpreting 18 U.S.C. § 983(d)(6)(B)(iii)'s use of the phrase "a nominee who exercises no dominion or control over the property."  The

Court respectfully disagrees with the Eleventh Circuit's interpretation of that phrase in United States v. One 1990 Beechcraft.  To interpret the meaning of "a nominee who exercises no dominion or control over the property," the Court must first determine what it means to exercise "dominion and control" over property.  Indeed, the inverse of "exercising dominion and control" is "exercis[ing] no dominion or control," the phrase that § 983(d)(6)(B)(iii) sets forth.  The New Oxford American Dictionary defines "dominion" as "sovereignty; control," Dominion, New Oxford American Dictionary (3d ed. 2010), and Black's Law Dictionary defines "control" as "to exercise power or influence over," Control, Black's Law Dictionary (9th ed. 2009).  The Court, however, does not think that Congress used the words "dominion" and "control" in § 983(d)(6)(B)(iii), without reference to the common law and their existing meanings.  The phrase "dominion and control" has a long history, and a precise meaning at common law in several areas of law, including property law, tort law, and criminal law.

The tort of conversion requires proof of "dominion and control."  Under New Mexico law, for example, "[c]onversion is the unlawful exercise of dominion and control over property belonging to another in defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made."  In Matter of Yalkut, 2008-NMSC-009, ¶ 25, 176 P.2d 1119, 1126 (emphasis added)(quoting Sec. Pac. Fin. Servs. v. Signfilled Corp., 1998-NMCA-046, ¶ 15, 956 P.2d 837, 842).  Similarly, in criminal law, for drug possession, possession can be actual or constructive.  See, e.g., State v. Amezola, 741 P.2d 1024, 1029 (Wash. App. 1987), rev'd on other grounds in State v. McDonald, 981 P.2d 443 (Wash. 1999).  Like in most states, under Washington law, "[a]ctual possession means that the goods are in the personal custody of the person charged with possession, while constructive possession is established when the person charged with

possession <u>has dominion and control over either the drug, or the premises</u>."   State v. Amezola, 741 P.2d at 1029 (emphasis added)(citations omitted).   W.P.I.C. 50.03 ("Constructive Possession occurs when there is no actual physical possession but there <u>is dominion and control</u> over the substance.")(emphasis added).   Moreover, Washington law describes someone as "hav[ing] dominion and control," not "<u>sufficient</u> dominion and control" or "<u>some</u> dominion or control."   In other words, with respect to constructive possession, the question is whether there is dominion and control over the illegal substance.   The Washington State Pattern Jury Instructions provide additional guidance:

> [In deciding whether the defendant had dominion and control over a substance, you are to consider all the relevant circumstances in the case.  Factors that you may consider, among others, include [whether the defendant had the *[immediate]* ability to take actual possession of the substance,] *[whether the defendant had the capacity to exclude others from possession of the substance,][[and][whether the defendant had dominion and control over the premises where the substance was located]*.  No single one of these factors necessarily controls your decision.]

W.P.I.C. 50.03.   These instructions are consistent with the Washington Court of Appeals' decision in <u>State v. Amezola</u>, where it stated: "[W]e will look at the *totality of the situation* to determine if there is substantial evidence tending to establish circumstances from which the jury can reasonably infer that the defendant had dominion and control of the drugs and thus was in constructive possession of them."   State v. Amezola, 741 P.2d at 1029 (emphasis in original)(quoting <u>State v. Partin</u>, 567 P.2d 1136, 1140 (Wash. 1977)).

While the Court recognizes that "federal law determines whether a claimant is a nominee who exercises no dominion or control over the property,"   <u>United States v. Real Property, Including All Improvements Thereon and Appurtenances Thereto, Located at 246 Main Street, Dansville, Livingston Cty., New York</u>, 118 F. Supp. at 1320 (citing <u>United States v. One Lincoln Navigator 1998</u>, 328 F.3d at 1015), that "dominion and control" is generally an all-or-nothing

determination -- whether made by the judge or the jury -- in other areas of law, gives guidance to the Court in its interpretation of the phrase "a nominee who exercises no dominion or control over the property" under 18 U.S.C. § 983(d)(6)(B)(iii).   Congress got the phrase from somewhere and it likely came from the tort and property law that had used it for a long time. Moreover, the Court does not think that it makes sense to think about "dominion and control" as something that exists on a sliding scale, such that one can exercise either a small amount of dominion and control, or a large amount of dominion and control over a piece of property.  Many courts, such as the Eleventh Circuit in United States v. One 1990 Beechcraft, have largely taken this sliding-scale approach.  There, the Eleventh Circuit stated:

> And although the language used in subsection 983(d0(6)(B)(iii) is '*no* dominion or control over the property,' courts construing and applying this subsection examine the *degree, quality and genuineness* of dominion or control, if any, that a claimant challenged on this ground possesses over the subject property.  If the degree of dominion or control is small, or if it is merely a cover for the control exercised by the true owner, it is tantamount to no dominion or control at all and divests the claimant of the status of owner.

659 F. Supp. 2d at 1268 (emphasis in original).  The Court agrees that it should look at the degree, quality, and genuineness of the claimant's exercise of dominion or control, but concludes that it should then make a determination, based on these indicia, whether the claimant has proven that he or she exercised dominion and control over the property at issue.  Looking at indicia of dominion and control is only useful if one conceives of them as indicia of something -- namely, dominion and control, which either does or does not exist.

Certainly, there are indicia of dominion and control that can be catalogued and analyzed under the totality of the circumstances -- as courts and juries do in the constructive possession context, for example -- but ultimately, a determination must be made -- in light of those indicia -- whether an individual does or does not exercise dominion and control over the property in

question.   The Court concludes that, in analyzing whether a claimant is "a nominee who exercises no dominion or control over the property" under 18 U.S.C. § 983(d)(6)(B)(iii), it must examine the various indicia of dominion and control in the record and determine whether the claimant has proven by a preponderance of the evidence that he or she exercised dominion and control over the property that the United States seeks to forfeit.  See 18 U.S.C. § 983(d)(1) ("The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence.").   The Court thinks that it is an all-or-nothing determination -- you are either dead or alive, pregnant or not pregnant.   This approach is consistent with the United States District Court for the Southern District of Ohio's decision in United States v. Real Property known as 1866 Center Road, Wilmington, 2008 WL 90601 (S.D. Oh. Mar. 31, 2008)(Dlott, J.).   There, the United States moved for summary judgment, seeking forfeiture of the claimants' properties.  See 2008 WL 90601, at *1-2.  One of the claimants contended that pursuant to 18 U.S.C. § 983(d), with respect to the defendant's property, she was an "innocent owner."  2008 WL 90601, at *2.  The district court explained that, to be the property "owner," the claimant "must exercise dominion and control over the property," and she "may not be entitled to the protections of an owner if she does not exercise dominion and control over the property pursuant to § 983(d)(6(B)(ii)."  2008 WL 90601, at *3.  The district court concluded that the claimant was "not an owner under § 983(d)(6)(B)(iii) because she exercised 'no dominion or control' over the property . . ."  2008 WL 90601, at *3-4.  The district court did not use the phrase "sufficient dominion and control," or "some dominion and control," but rather, held that, because the claimant's only basis for claiming ownership was a statutory warranty deed, she was not an innocent owner.  2008 WL 90601, at *3-4.  The district court explained:

Larkin did not reside at the Defendant 1 real property at any time, nor did she pay insurance, utilities, property taxes or other bills related to Defendant 1.  (Doc. 38-15 at 4.)  The sole grounds asserted by Larkin to support a finding that she had dominion or control is that she had right to control disposition of an undivided one-half interest in the property pursuant to the Statutory Warranty Deed.  Larkin does not contend that she ever sought to exercise that theoretical right.  As such, Larkin is at most a nominal titleholder who failed to exercise dominion or control over the property.  She is not an owner for purposes of the statute and cannot rely on the innocent owner defense.

2008 WL 90601, at *4.  That the claimant in <u>United States v. Real Property known as 1866 Center Road, Wilmington</u> held a statutory warranty deed was most certainly an indicia of dominion and control, but in light of the other indicia of dominion or control in the record -- insurance, bills, utilities, and property taxes -- the claimant had not established that she exercised dominion or control.

The Court therefore thinks it makes the most sense, in making the determination whether a claimant exercises "dominion and control," to look at the various indicia of dominion and control, and determine whether the claimant has established that he or she exercised "dominion and control" over the property that the United States seeks to forfeit.  Any exercise of power or control over a piece of real or personal property is an indicia of dominion and control.  The Eleventh Circuit's holding in <u>United States v. One 1990 Beechcraft</u> that "some" dominion and control is sufficient to establish ownership, is tantamount to saying that, if a claimant demonstrates a single indicia of dominion and control, he or she is an owner.  It  makes little sense to say that if a claimant demonstrates a single indicia of dominion and control -- beyond mere title -- he or she is an owner.  Dominion and control is an all or nothing determination -- a claimant either does or does not exercise it.

### b.    Qualifying as an "Innocent Owner" Under the CAFRA.

In addition to establishing that he or she is an owner of the property being forfeited, a claimant must also establish that he or she is innocent.   See United States v. One Lincoln Navigator 1998, 328 F.3d at 1015.  Section 983(d)(2)(A) provides:

> With respect to a property interest in existence at the time the illegal conduct giving rise to forfeiture took place, the term 'innocent owner' means one who -- (i) did not know of the conduct giving rise to forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property.

18 U.S.C. § 983(2)(A)(i) and (ii).

> Thus, in order to establish an innocent owner defense under Section 983(d)(2)(A), for a property interest in existence at the time of the illegal conduct, a claimant must demonstrate by a preponderance of the evidence that it did not know of the conduct or, upon learning of the conduct, reasonably tried to terminate any such use of the property.

United States v. Assets Described in Attachment A to the Verified Complaint for Forfeiture in Rem, 2010 WL 6593942, at *5.

Regarding whether a claimant knew of the conduct giving rise to forfeiture, matters of knowledge and willful avoidance of knowledge are generally questions of fact.  See United States v. Milbrand, 58 F.3d 841, 844 (2d Cir. 1995)(profiling a dispute involving the innocent owner defense).   Court have granted summary judgment, however, where there are no triable issues of fact regarding the claimant's knowledge or willful blindness to the unlawful use of the property.  See United States v. 16328 S. 43rd E. Ave., Bixby, Tulsa, Cty., Okla., 275 F.3d 1281, 1285 (10th Cir. 2002)(affirming entry of summary judgment in favor of the United States in a forfeiture case); Lorillard Tobacco Co., Inc. v. A & E Oil, Inc., 503 F.3d 588, 594 (7th Cir. 2007)(citing United States v. 16328 S. 43rd E. Ave., Bixby, Tulsa, Cty., Okla. and One Parcel of Prop., Located at 755 Forest Rd. in a case under the Lanham Act, 15 U.S.C. § 1501 et seq.,

explaining that, while a party's state of mind is generally a question of fact, a summary judgment court need not "accept denials supported by a mere scintilla of evidence," as where the party's "alleged ignorance amounts to willful blindness, or where the owner's claims of ignorance are 'inconsistent with the uncontested facts,'" and holding that "defendants must do more than baldly deny the reasonable inferences and facts presented by [plaintiff] to avoid the conclusion that they knowingly sold counterfeit cigarettes"); United States v. Real Property 874 Gartel Drive, Walnut, Cal., 79 F.3d 918, 924 (9th Cir. 1996)("We reject the Beltrans' innocent owner defense to this claim because both Isidro and Josefina Beltran obviously knew about, or were willfully blind to, the false statements in the loan application."); One Parcel of Prop., Located at 755 Forest Rd., 985 F.2d 70, 72-73 (2d Cir. 1993); United States v. Real Property in Santa Paula, Cal., 763 F. Supp. 2d at 1189-91 (holding that the defendant's "bare denials" of knowledge, to the extent "inconsistent with uncontested facts," were insufficient to create a genuine issues of fact).

        If the claimant knew about or was willfully blind to the conduct giving rise to forfeiture, he or she must have done "all that reasonably could [have] be[en] expected under the circumstances to terminate such use of the property." 18 U.S.C. § 983(2)(A)(ii). "To satisfy this requirement, the claimant must show that he took 'all reasonable steps to prevent the illicit use of [the] premises once [he] acquire[d] knowledge of that use.'" United States v. Real Property in Santa Paula, Cal., 763 F. Supp. 2d at 1193 (quoting United States v. 16328 S. 43rd E. Ave., Bixby, Tulsa, Cty., Okla., 275 F.3d at 1285). See Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663 (1974)(indicating that it might be unconstitutional to force an uninvolved property owner to forfeit his or her property when the owner "had done all that reasonably could be expected to prevent the proscribed use of his property"); United States v. Property Identified as

1813 15th Street N.W., Washington D.C., 956 F. Supp. 1029 (D.D.C. 1997)("[T]o avoid summary judgment, the claimant must supply evidence to allow a reasonable juror to conclude that, under the circumstances, all reasonable steps were taken to curtail the illegal activity . . . [E]vidence to prove *some* reasonable steps were taken is insufficient to preclude summary judgment.")(emphasis in original).

Section 983(2)(B) provides further guidance on the meaning of the phrase "all that reasonably could be expected":

> **(B)(i)** For the purposes of this paragraph, ways in which a person may show that such person did all that reasonably could be expected may include demonstrating that such person, to the extent permitted by law --
>
> > **(I)** gave timely notice to an appropriate law enforcement agency of information that led the person to know the conduct giving rise to a forfeiture would occur or has occurred; and
> >
> > **(II)** in a timely fashion revoked or made a good faith attempt to revoke permission for those engaging in such conduct to use the property or took reasonable actions in consultation with a law enforcement agency to discourage or prevent the illegal use of the property.
>
> **(ii)** A person is not required by this subparagraph to take steps that the person reasonably believes would be likely to subject any person (other than the person whose conduct gave rise to the forfeiture) to physical danger).

18 U.S.C. § 983(d)(2)(B).

The Tenth Circuit's decision in United States v. 16328 S. 43rd E. Ave., Bixby, Tulsa, Cty., Okla., 275 F.3d at 1285, is instructive with regard to determining whether a claimant has taken all actions "that reasonably could [have] be[en] expected under the circumstances to terminate [illegal] use of the property." 18 U.S.C. § 983(d)(2)(A)(ii). There,

> [p]olice conducted a raid on appellant Ozella Scott's real property on August 28, 1995. During the course of this raid, police caught Ms. Scott's son, Mark Scott, with five marijuana plants that he had pulled from the ground as he fled. They also found two plants still growing on the property. Police executed a search

warrant and found 1.4 pounds of marijuana in a mobile home on the property, along with various firearms.  Police also found two "portable outbuildings" containing lights, insulation, and a total of 37 pots.  Some of the pots contained remnants of marijuana plants.

. . . .

Ms. Scott stated in her deposition that [her daughter-in-law] Laura Scott only made one statement regarding marijuana growth on the property, and that Laura Scott was inebriated and had been fighting with Mark Scott at the time of her statement.  In response to her daughter-in-law's report that Mark Scott was growing drugs on the property, Ms. Scott drove around the property looking for drugs.  She apparently did not investigate any of the buildings or the back of the property.  She then informed her son that she hoped he was not growing drugs on the property "because you know how I feel about it.  I don't want it on my property and I don't even want you using it."  Ms. Scott further stated that she rarely visited the property and never went there during the summer.

United States v. 16328 S. 43rd E. Ave., Bixby, Tulsa, Cty., Okla., 275 F.3d at 1282-83.

The Tenth Circuit concluded that Scott had failed to show she took all reasonable steps to prevent the illegal use of her property and concluded that her innocent owner defense was insufficient as a matter of law.  See 275 F.3d at 1287.  It therefore affirmed the district court's decision to grant the United States' motion for summary judgment, finding no facts that could lead a reasonable jury to believe that Scott was an innocent owner.  See 275 F.3d at 1283-84.  In reaching this conclusion, the Tenth Circuit explained:

In *United States v. Lot Numbered One (1) of the Lavaland Annex,* this court applied a broad definition of consent, under which an owner consents to drug use on her property if she fails "'to take all reasonable steps to prevent illicit use of [the] premises once [she] acquires knowledge of that use.'"  256 F.3d 949, 953-54 (10th Cir. 2001)(quoting 141st St., 911 F.2d at 879).  Although we applied this broad definition in *Lavaland* without explicitly adopting it as the standard of this circuit, we do so now.  In determining what would constitute "reasonable steps" under particular circumstances, we have held that a modified objective standard should be utilized.  *Id.* at 955.  While we rejected a purely subjective test, we acknowledged that a property owner "should not be required to take 'heroic or vigilante measures to rid his or her property of narcotics activity.'"  *Id.* (quoting *United States v. All Right, Title & Interest in Prop. & Premises Known as 710 Main St.*, 753 F. Supp. 121, 125 (S.D.N.Y. 1990)).  Thus, we set out an

objective test with a limited subjective component: "[T]he question is what measures were reasonable under the particular circumstances confronted by the property owner in question.  Those circumstances may include the property owner's reasonable fears and concerns, its degree of familiarity with crime prevention, and its economic resources."  *Lavaland*, 256 F.3d at 955 (citing *710 Main St.*, 753 F. Supp. at 125)(internal citations and quotation marks omitted).

　　　While we reversed and remanded for trial in *Lavaland,* we did so because the record there did not contain facts regarding the reasonableness of potential actions by the property owner.  Also, the district court had heard no argument regarding potential reasonable measures.  We are confronted with very different circumstances here.  The record clearly shows that Ms. Scott did little to deter her son from growing drugs on her land.  She killed one of the marijuana plants with weed killer, confiscated and disposed of the marijuana seeds she had found, and threatened her son with eventual eviction if he did not desist.  However, these steps fall short of what any reasonable land owner would undertake given such knowledge of drug use and cultivation.  For example, she could have given notice to appropriate law enforcement officials, and she could have evicted her son upon the information she received from her daughter-in-law.  At the very least, Ms. Scott could have investigated the property more thoroughly to determine whether marijuana was in fact growing there.  While we understand that Ms. Scott might have had difficulty investigating the property on her own, nothing prevented her from having some third party -- such as the police -- investigate the property for her.  Instead she largely ignored obvious signs that her property was being used to grow marijuana plants.

　　　The fact that the occupant was Ms. Scott's son does not relieve her of her duties as a landowner to take all reasonable steps to keep her property free of illegal activities.  Such a bond certainly does not automatically entitle her to a jury trial on the question of the reasonableness of her actions.  Denying the innocent owner defense to a landowner who failed to investigate thoroughly claims that her son grew drugs on the property, evict her son upon confirmation of those claims, or report such activities to police would be less harsh than what other courts have required of landowners.  *See, e.g., United States v. Two Parcels of Prop. Located at 19 & 25 Castle St.*, 31 F.3d 35, 40 (2d Cir. 1994)(holding that parents who feared drug lord retaliation, notified police, and pressed their children to enter rehabilitation consented as a matter of law to their children's drug activity because they did not search the premises for drugs and did not evict their children); *United States v. Sixty Acres in Etowah County*, 930 F.2d 857, 860-61 (11th Cir. 1991)(holding that a woman did not escape the consequences of consent to husband's illegal acts even though she presented evidence that her husband had beaten his previous wife to death, had beaten her, and owned several guns).

Congress has placed strict duties upon landowners to rid their property of drug activity.  Ms. Scott's decision not to investigate the property thoroughly when all signs indicated that it was being used to grow marijuana, her decision not to alert the police, her decision not to evict her son upon continued evidence of his illegal activities, and her failure to take any comparable steps make it impossible for her to show by a preponderance of the evidence that she took all reasonable steps to prevent the illegal activities from occurring.  Thus, we hold that Ms. Scott cannot show lack of consent.

United States v. 16328 S. 43rd E. Ave., Bixby, Tulsa, Cty., Okla., 275 F.3d at 1285-87 (emphasis added).

The United States District Court for the Central District of California similarly entered summary judgment in the United States' favor on the claimant's innocent owner defense in United States v. Real Property in Santa Paula, Cal., 763 F. Supp. 2d at 1175, because the claimant "failed to take all reasonable steps to ensure that the property was not being used for illegal purposes."  763 F. Supp. 2d at 1195.  In that case, the claimant -- John Griffiths -- owned the defendant property and resided there with his son, Jonathan.  See 763 F. Supp. 2d at 1177.  In concluding that John had failed to take all reasonable steps to ensure that the property was not being used for illegal purposes, the Court analogized to United States v. 16328 S. 43rd E. Ave., Bixby, Tulsa, County, Oklahoma, 275 F.3d at 1285:

Like Ms. Scott, Griffiths was periodically absent from the property.  Also like Ms. Scott, the only action Griffiths took upon discovering Jonathan's indoor growing operation was to direct him to remove the plants Griffiths had observed; Griffiths did not search the house or surrounding land to determine whether there was other marijuana growing activity; nor did he ensure that the plants he observed in Jonathan's room were the entirety of the illegal activity taking place on the property.  Griffiths did not conduct an inspection of the property or undertake any further inquiry despite the fact that he knew Jonathan had previously been convicted of importing "lots of marijuana" from Canada.  Most importantly, Griffiths did not contact law enforcement authorities.  For these reasons, the court concludes that Griffiths failed to take all reasonable steps to ensure that the property was not being used for illegal purposes.  Plaintiff is therefore entitled to have summary judgment entered in its favor on Griffiths' innocent owner defense as a matter of law.

763 F. Supp. 2d at 1194-95.

In <u>Real Property Located at 3846 Nisenan Lane</u>, 2009 WL 2777178 (E.D. Cal. Aug. 28, 2009), the United States District Court for the Eastern District of California likewise entered summary judgment in the United States' favor on the claimant's innocent owner defense:

> Claimant's statements . . . demonstrate that she did not take reasonable steps to terminate the illegal use of the defendant property despite her knowledge.  She stated that the marijuana had been on the property for approximately three months before the March 2006 and that she lived on the premises during that period.  Nevertheless, she admitted that she did nothing during that time to report the presence of substantial quantities of marijuana to law enforcement. . . . Accordingly, in the absence of genuine issues of fact regarding claimant's . . . failure to take reasonable steps to terminate [the illegal] use, the Government is entitled to summary judgment in its favor on the 'innocent owner' defense.

<u>See</u> 2009 WL 2777178, at *5.  Similarly, in <u>United States v. One 1984 Lincoln Continental, CA License No. 2AHG081, VIN 1MRBP98F3EY617464</u>, 1992 WL 232513 (9th Cir. 1992), the United States Court of Appeals Ninth Circuit concluded:

> [T]he district court found that Miller knew that her son had 'a problem before about his car' and did not take 'necessary steps' in order to prevent the use of her vehicle to transport controlled substances. . . . Thus, Miller failed to carry her burden with respect to her claim of innocent ownership.

<u>United States v. One 1984 Lincoln Continental, CA License No. 2AHG081, VIN 1MRBP98F3EY617464</u>, 1992 WL 232513, at *2.

**LAW REGARDING CIVIL FORFEITURES UNDER THE EXCESSIVE FINES CLAUSE OF THE EIGHTH AMENDMENT**

"The Eighth Amendment Excessive Fines Clause applies to civil forfeitures of property used to facilitate drug offenses."  <u>United States v. $63,530 in U.S. Currency</u>, 781 F.3d 949, 957 (10th Cir. 2015)(citing <u>Austin v. United States</u>, 509 U.S. at 622).  "In <u>United States v. Bajakajian</u>, 524 U.S 321 (1998), the Supreme Court formulated the analytical framework for

determining whether a punitive forfeiture is constitutionally excessive." United States v. Wagoner Cty. Real Estate, 278 F.3d at 1091. "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality[.]" United States v. Bajakajian, 524 U.S at 334.  In United States v. Bajakajian, an international traveler failed to declare that he was carrying currency of more than $10,000.00 out of the United States, in violation of the reporting requirements of 31 U.S.C. § 5316(a)(1)(A). See 524 U.S at 324-25.  The United States brought a criminal proceeding against the traveler, and Count Three sought forfeiture of the $357,144.00 it had seized from him at the airport pursuant to 18 U.S.C. § 982(a)(1). See 524 U.S at 325.  The Supreme Court explained that, "[i]f the amount of the forfeiture is grossly disproportional to the gravity of the offense, it is unconstitutional." 524 U.S at 338.  After comparing the gravity of the traveler's offense with the $357,144.00 forfeiture sought, the Supreme Court concluded that the forfeiture was grossly disproportional, because it was "larger than the $5,000 fine imposed by the District Court by many orders of magnitude, and it [bore] no articulable correlation to any injury suffered by the Government." 524 U.S at 339-40.

The Supreme Court examined several factors. See 524 U.S at 337-44.  First, the Supreme Court noted that the crime was solely a reporting offense and that it was permissible for the defendant to transport currency out of the country so long as he reported it. See 524 U.S at 337. Second, the violation was not related to other illegal activities, but rather, "the money was the proceeds of legal activity and was to be used to repay a lawful debt." 524 U.S at 337-38.  The Supreme Court explained: "Whatever his other vices, respondent does not fit into the class of persons for whom the statute was principally designed: He is not a money launderer, a drug trafficker, or a tax evader." 524 U.S at 338.  Third, under the Sentencing Guidelines, the maximum sentence that could have been imposed on the defendant was six months, while the

maximum fine was $5,000.00, which confirmed a minimal level of culpability.  524 U.S at 338.

Finally, the Supreme Court explained that the harm that the defendant caused was minimal.

> Failure to report his currency affected only one party, the Government, and in a relatively minor way.  There was no fraud on the United States, and respondent caused no loss to the public fisc.  Had his crime gone undetected, the Government would have been deprived only of the information that $357,144 had left the country.  The Government and the dissent contend that there is a correlation between the amount forfeited and the harm that the Government would have suffered had the crime gone undetected.  See Brief for United States 30 (forfeiture is "perfectly calibrated"); *post,* at 2041 ("a fine calibrated with this accuracy").  We disagree.  There is no inherent proportionality in such a forfeiture.  It is impossible to conclude, for example, that the harm respondent caused is anywhere near 30 times greater than that caused by a hypothetical drug dealer who willfully fails to report taking $12,000 out of the country in order to purchase drugs.

United States v. Bajakajian, 524 U.S at 339.

The Tenth Circuit later adapted the United States v. Bajakajian standard to circumstances where a claimant was never charged with a federal offense in United States v. Wagoner Cty. Real Estate.  See United States v. Wagoner Cty. Real Estate, 278 F.3d at 1091.  There, the claimant contended, among other things, that the forfeiture of her residence constituted an excessive fine in violation of the Eighth Amendment.  See 278 F.3d at 1099.  The Tenth Circuit reviewed the Supreme Court's decision in United States v. Bajakajian, concluding that "[t]here are significant distinctions between Bajakajian and the present case," including: (i) United States v. Bajakajian involved a criminal forfeiture, which is imposed upon an individual who has committed a specific crime; and (ii) in United States v. Bajakajian the property owner was charged with one specific federal crime, while in the case before the Tenth Circuit, the claimant was never charged with a federal offense.  278 F.3d at 1100-01.  The Tenth Circuit explained that, to adapt the United States v. Bajakajian standard to these circumstances, it must "supplement the factors discussed by the Supreme Court."  278 F.3d at 1101.

As we explained in *United States v. 829 Calle De Madero*, 100 F.3d 734 (10th Cir. 1996), a case decided before *Bajakajian*, a proportionality analysis is "factually intensive," so that a catalog of factors is not "necessarily exclusive." *Id.* at 738 (quotation omitted). Like Ms. Lees, the owner in *829 Calle De Madero* challenged the constitutionality of a residential forfeiture under § 881(a)(7). We stated that

> [i]n evaluating proportionality, courts must compare the severity of the offense with which the property was involved, the harshness of the sanction imposed, and the culpability of the claimant. Relevant factors in assessing the harshness of the sanction include the value of the property forfeited, its function, and any other sanctions imposed upon the claimants by the sovereign seeking forfeiture. Against these factors, the severity of the offense must be evaluated, taking into account the extent of both the claimant's and the property's role in the offense, the nature and scope of the illegal operation at issue, the personal benefit reaped by the claimant, the value of any contraband involved in the offense, and the maximum sanction Congress has authorized for the offense.

*Id.* Thus, in addition to the *Bajakajian* factors, we suggested other considerations: the general use of the forfeited property, any previously imposed federal sanctions, the benefit to the claimant, the value of seized contraband, and the property's connection with the offense. *Bajakajian* in no way undermines the relevance of these factors in a proportionality analysis for a forfeiture proceeding under § 881(a)(7).

278 F.3d at 1101.

Under 18 U.S.C. § 983(g), a claimant "may petition the court to determine whether the forfeiture was constitutionally excessive." 18 U.S.C. § 983(g)(1). "In making this determination, the court shall compare the forfeiture to the gravity of the offense giving rise to the forfeiture." 18 U.S.C. § 983(g)(2) (codifying Austin v. United States, 509 U.S. at 622). Section 983(g)(3) further establishes that "[t]he claimant shall have the burden of establishing that the forfeiture is grossly disproportional by a preponderance of the evidence at a hearing conducted by the court without a jury." 18 U.S.C. § 983(g)(3). Finally, "[i]f the court finds that the forfeiture is grossly disproportional to the offense it shall reduce or eliminate the forfeiture as

necessary to avoid a violation of the Excessive Fines Clause of the Eighth Amendment of the Constitution."   18 U.S.C. § 983(g)(4).   Under Tenth Circuit law, as discussed above, in circumstances where a claimant was never charged with a federal offense, the Court conducts this gross proportionality analysis by considering the factors set forth in <u>United States v. Bajakajian</u>, supplemented by those discussed in <u>United States v. Wagoner County Real Estate</u>.

### LAW REGARDING CIVIL FORFEITURES UNDER THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT

Under certain circumstances, a delay in the forfeiture process can violate a claimant's right to due process under the Fifth Amendment to the Constitution of the United States.   The Supreme Court considers four factors in assessing the timeliness of the post-seizure filing of a judicial forfeiture action: (i) length of delay; (ii) the reason for the delay; (iii) the defendant's assertion of his right, and (iv) prejudice to the defendant.   <u>See</u> <u>United States v. Real Property 355555 Little Mack</u>, 211 F.3d 1271 (2000)(citing <u>United States v. $8,850.00</u>, 461 U.S. 555, 564 (1983)(applying the <u>Barker v. Wingo</u>, 407 U.S. 514 (1972), test -- normally used in the speedy trial context -- to determine whether a delay between the seizure and the initiation of the forfeiture trial violated the Fifth Amendment's Due Process Clause)).   "[N]one of these factors is a necessary or sufficient condition for finding unreasonable delay.   Rather, these elements are guides in balancing the interests of the claimant and the Government to assess whether the basic due process requirement of fairness has been satisfied in a particular case."   <u>United States v. $8,850.00</u>, 461 U.S. at 565.

"In applying the <u>Barker</u> balancing test to this situation, the overarching factor is the length of the delay," which "is to some extent a triggering mechanism."   <u>United States v. $8,850.00</u>, 461 U.S. at 565.   Short delays -- of a month or so -- need less justification, while a

delay of eighteen months is quite significant. See United States v. $8,850.00, 461 U.S. at 565.

Closely related to delay is the reason that the United States provides to justify the delay. See United States v. $8,850.00, 461 U.S. at 565. Where the United States relies on a pending administrative petition for mitigation or remission, and on a pending criminal proceeding to justify the delay in filing civil forfeiture proceedings, these justifications strongly indicate that the reasons for the delay are substantial. See United States v. $8,850.00, 461 U.S. at 567-68. "The third element to be considered in the due process balance is the claimant's assertion of the right to a judicial hearing." United States v. $8,850.00, 461 U.S. at 568.

> A claimant is able to trigger rapid filing of a forfeiture action if he desires it. First, the claimant can file an equitable action seeking an order compelling the filing of the forfeiture action or return of the seized property. Less formally, the claimant could simply request that the Customs Service refer the matter to the United States Attorney. If the claimant believes the initial seizure was improper, he could file a motion under Fed. R. Crim. P. 41(e) for a return of the seized property.

United States v. $8,850.00, 461 U.S. at 569. The last element is whether the delay has prejudiced the claimant. See United States v. $8,850.00, 461 U.S. at 568. "The primary inquiry here is whether the delay has hampered the claimant in presenting a defense on the merits, through, for example, the loss of witnesses or other important evidence. Such prejudice could be a weighty factor indicating that the delay was unreasonable." United States v. $8,850.00, 461 U.S. at 569.

## ANALYSIS

The United States has proved by a preponderance of the evidence that 2121 Celeste is subject to forfeiture under 21 U.S.C. § 881(a)(7), because it was used for drug trafficking. Fraire however, has asserted a number of affirmative defenses to forfeiture, including innocent owner, disproportionate and excessive fines, and undue delay. First, Fraire maintains that he was the

owner of 2121 Celeste, and is entitled as a matter of law to the "innocent owner" defense to forfeiture set forth in 18 U.S.C. § 983(d)(2).  The United States contends that Fraire is neither an owner nor innocent under § 983(d)(2).  Both Fraire and the United States ask the Court to enter summary judgment in their favor on Fraire's innocent owner's defense.   Second, Fraire maintains that forfeiture of 2121 Celeste would violate the Excessive Fines Clause of the Eighth Amendment.  Finally, Fraire asserts that forfeiture of 2121 Celeste would violate his due process rights under the Fifth Amendment.  The Court concludes that there are triable issues of fact whether Fraire was an "owner," but that the United States is entitled to summary judgment on the "innocent" element of Fraire' innocent owner defense.  The Court also concludes that the forfeiture of 2121 Celeste would not violate the Excessive Fines Clause of the Eighth Amendment and that the delays in this case do not violate Fraire's due-process rights under the Fifth Amendment.  The Court therefore denies the Fraire MSJ, and grants the United States MSJ.

## I.   THE UNITED STATES HAS PROVEN BY A PREPONDERANCE OF THE EVIDENCE THAT 2121 CELESTE. IS FORFEITABLE UNDER 21 U.S.C. § 881(a)(7).

Pursuant to federal civil forfeiture law, all real property that is used to commit or to facilitate the commission of a drug-related offense is subject to forfeiture to the United States government.  See 21 U.S.C. § 881(a)(7).  To prevail in an action under 21 U.S.C. § 881(a)(7), the government must prove by a preponderance of the evidence that the property is subject to forfeiture.  See 18 U.S.C. § 983(c)(1) ("In a suit or action brought under any civil forfeiture statute for the civil forfeiture of any property . . . the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture."); United States v. Lot Number 1 of Lavaland Annex, 256 F.3d at 956; United States v. $100,348.00 in U.S. Currency, 354 F.3d at 1116 (noting that the CAFRA raised the government's burden of

proof from probable cause to preponderance of the evidence). "This standard of proof requires that the government show that it is more likely than not that the property is subject to forfeiture." United States v. Real Property in Santa Paula, Cal., 763 F. Supp. 2d at 1184.

> Where the government's theory of forfeiture is that the property was used to commit or to facilitate the commission of a criminal offense, or that it was involved in the commission of a criminal offense, the government must establish that there is <u>a substantial connection between the property and the criminal offense</u>.

United States v. Real Property in Santa Paula, Cal., 763 F. Supp. 2d at 1184 (citing 18 U.S.C. § 983(c)(3))(emphasis added). The Court must examine the aggregate of the facts to determine whether the United States has met its burden. See United States v. $149,422.43, 965 F.2d 868, 875-76 (10th Cir. 1992).

Based on the evidence before the Court, there is no real dispute that 2121 Celeste bore a substantial connection to the offense. The United States has submitted detailed, unrebutted evidence describing how members of the Los Padillas gang used 2121 Celeste for cocaine and heroin transactions between 2009 and 2011. See Zamora Decl. at 1-4; Padilla, Jr. Plea Agreement ¶ 7, at 3; Padilla, III Plea Agreement in CR. No. 09-3598 ¶ 6, at 3; Padilla, III Plea Agreement in CR. No. 11-0667 ¶ 6, at 3. On March 19, 2009, Padilla, Jr. directed a confidential human source to meet with Padilla, III, at 2121 Celeste to consummate the sale of approximately 130 grams, or four ounces, of cocaine. See Padilla, Jr. Plea Agreement ¶ 7, at 3; Padilla, III Plea Agreement in CR. No. 09-3598 ¶ 6, at 3; Zamora Decl. ¶ 5, at 2. Padilla, III and the confidential human source met at 2121 Celeste, and Padilla, III handed the confidential human source approximately 131 grams of cocaine in exchange for $3,500.00. See Padilla, Jr. Plea Agreement ¶ 7, at 3; Padilla, III Plea Agreement in CR. No. 09-3598 ¶ 6, at 3; Zamora Decl. ¶ 5, at 2. On December 3, 2009, the FBI executed a search warrant at 2121 Celeste. See Zamora Decl. ¶ 5, at

2.  Items recovered during the execution of that warrant on December 3, 2009, included: fourteen cellular telephones; a video surveillance system; a backpack with plastic ziplock bags; a money counter machine; packaging material buried outside in the backyard; $441,008.00 in United States currency buried outside in the backyard; several heat sealers; and documentation belonging to both Padilla, Jr. and Padilla, III.  See Zamora Decl. ¶ 6, at 2-3.

Additionally, on February 26, 2011 Padilla, III sold approximately two ounces of heroin at 2121 Celeste for $1,500.00 to a confidential human source.  See Email Stipulations at 2; Padilla, III Plea Agreement in CR. No. 11-0667 ¶ 6, at 3; Zamora Decl. ¶ 8, at 3.  On March 17, 2011, approximately three ounces or 83.6 grams of heroin were sold to a confidential human source at 2121 Celeste for $2,250.00.  See Email Stipulations at 2; Zamora Decl. ¶ 9, at 3.  On March 28, 2011, the FBI executed another federal search warrant at 2121 Celeste.  See Zamora Decl. ¶ 10, at 4.  Items recovered during the March 18, 2011 search of 2121 Celeste included: $19,777.00 in United States currency; thirteen cellular telephones; and driver licenses for Padilla, III.  See Email Stipulations at 2; Zamora Decl. ¶ 10, at 4.  As a result of this conduct, Padilla, III and Padilla, Jr. both entered into plea agreements.  See Padilla, Jr. Plea Agreement at 1; Padilla, III Plea Agreement in CR. No. 09-3598 at 1; Padilla, III Plea Agreement in CR. No. 11-0667 at 1.  In Padilla, III and Padilla, Jr.'s plea agreements, each admitted that cocaine was sold out of 2121 Celeste.  See Padilla, Jr. Plea Agreement ¶ 7, at 3; Padilla, III Plea Agreement in CR. No. 09-3598 ¶ 6, at 3.  Padilla, III, also admitted that heroin was sold out of 2121 Celeste.  See Padilla, III Plea Agreement in CR. No. 11-0667 ¶ 6, at 3.

The Court concludes that this evidence establishes that 2121 Celeste maintained a substantial connection to the drug trafficking because it was the situs for on-going cocaine and heroin transactions between 2009 and 2011 by members of the Los Padillas gang.  See Zamora

Decl. at 1-4; Padilla, Jr. Plea Agreement ¶ 7, at 3; Padilla, III Plea Agreement in CR. No. 09-3598 ¶ 6, at 3; Padilla, III Plea Agreement in CR. No. 11-0667 ¶ 6, at 3.  The United States has met its initial burden of proving by a preponderance of the evidence that 2121 Celeste is subject to forfeiture.  See 18 U.S.C. § 983(c)(1); United States v. Lot Number 1 of Lavaland Annex, 256 F.3d at 956; United States v. $100,348.00 in U.S. Currency, 354 F.3d at 1116.  The Court also notes that Fraire conceded that 2121 Celeste is subject to forfeiture during the February 16, 2016, hearing: "Next, it talks about the claimants role in the offense and this is really what you have to look at.  I mean, I understand we're not here challenging the probable cause.  There clearly was probable cause by virtue of how Mr. Padilla, III, the tenant used the property."  Feb. 16th Tr. at 31:11-16 (Gorence).  Similarly, at the November 2, 2015, hearing, Fraire emphasized that he is "not contesting that illegal conduct took place at 2121 Celeste," but maintained that he is entitled to the innocent owner defense.  See Tr. at 18:16-19:15 (Gorence).

## II.     NEITHER THE UNITED STATES NOR FRAIRE ARE ENTITLED TO SUMMARY JUDGMENT ON THE "OWNER" ELEMENT OF FRAIRE'S INNOCENT OWNER DEFENSE, BUT THE UNITED STATES IS ENTITLED TO SUMMARY JUDGMENT ON THE "INNOCENT" ELEMENT OF FRAIRE'S INNOCENT OWNER DEFENSE.

Once forfeitability is established, the burden shifts to the claimant to prove he or she is an "innocent owner" by a preponderance of the evidence.  See 18 U.S.C. § 983(d)(1).  "In order for a claimant to assert that property should not be forfeited because he is an innocent owner, the claimant must prove, by a preponderance of the evidence, 18 U.S.C. § 983(d)(1), that he is both innocent and an owner, id. § 983(d)(3)(A) and (d)(6)."  United States v. Real Property, Including All Improvements Thereon and Appurtenances Thereto, Located at 246 Main Street, Dansville, Livingston Cty., New York, 118 F. Supp. at 1320 (emphasis added).  The parties dispute both elements of the defense.

A.     THERE ARE TRIABLE ISSUES OF FACT WHETHER FRAIRE IS AN
       "OWNER" WITHIN 18 U.S.C. § 983(d)(1)'S MEANING.

The CAFRA defines "owner" as a person with "an ownership interest in the specific property sought to be forfeited, including a leasehold, lien, mortgage, recorded security interest, or valid assignment of an ownership interest."  18 U.S.C. § 983(d)(6)(A).  State law defines ownership interests, with "'one important exception,' however."  United States v. 1997 Intern. 9000 Semi Truck VIN: 1HSRUAER8VH409632, 412 F. App'x at 122 (quoting United States v. One Lincoln Navigator 1998, 328 F.3d at 122).  Section 983(d)(6)(B)(iii) states that the term "owner" "does not include . . . a nominee who exercises no dominion or control over the property."  18 U.S.C. § 983(d)(6)(B)(iii).  See United States v. 1997 Intern. 9000 Semi Truck VIN: 1HSRUAER8VH409632, 412 F. App'x at 122-23.  "Ownership interests are defined by state law, but federal law determines whether a claimant is a nominee who exercises no dominion or control over the property."  United States v. Real Property, Including All Improvements Thereon and Appurtenances Thereto, Located at 246 Main Street, Dansville, Livingston Cty., New York, 118 F. Supp. at 1320.

The United States does not contest that Fraire has valid legal title to 2121 Celeste, but rather argues that he has no "dominion or control" over the property so as to fall within the exclusion of ownership listed in 18 U.S.C. § 983(d)(6)(B)(iii).  The CAFRA does not, however, define the phrase "a nominee who exercises no dominion or control over the property."  18 U.S.C. § 983(d)(6)(B)(iii).  See United States v. Various Coins, 2013 WL 1183312, at *9 (D. Ore. Mar. 21, 2013).  One possibility is that the statute could intend "dominion and control" as something that exists on a sliding scale.  Under that view, one can exercise a small amount of dominion and control or a large amount of dominion and control over a piece of property -- it is a

matter of degree.  Under that interpretation, if someone exercises "some" dominion or control, beyond mere title, that would be sufficient to qualify as an owner under the CAFRA.  The Eleventh Circuit largely adopted this approach in United States v. One 1990 Beechcraft, holding that exercising some dominion and control suffices to prove that a claimant is not a mere nominee under the CAFRA.  See 619 F.3d at 1275.  As described in this Memorandum Opinion and Order's legal section, the Court has found no Tenth Circuit case interpreting 18 U.S.C. § 983(d)(6)(B)(iii)'s use of the phrase "a nominee who exercises no dominion or control over the property," and respectfully disagrees with the Eleventh Circuit's interpretation of that phrase in United States v. One 1990 Beechcraft.

The Court does not think that Congress used the words "dominion" and "control" in § 983(d)(6)(B)(iii), without reference to the common law and their existing meanings.  The phrase "dominion and control" has a long history, and a precise meaning at common law in several areas of law, including property law, tort law, and criminal law.  While the Court recognizes that "federal law determines whether a claimant is a nominee who exercises no dominion or control over the property,"  United States v. Real Property, Including All Improvements Thereon and Appurtenances Thereto, Located at 246 Main Street, Dansville, Livingston Cty., New York, 118 F. Supp. at 1320 (citing United States v. One Lincoln Navigator 1998, 328 F.3d at 1015), that "dominion and control" is generally an all-or-nothing determination -- whether made by the judge or the jury -- in other areas of law, gives guidance to the Court in its interpretation of the phrase "a nominee who exercises no dominion or control over the property" under 18 U.S.C. § 983(d)(6)(B)(iii).  Congress got the phrase from somewhere and it likely came from the tort and property law that had used it for a long time.  Moreover, the Court does not think that it makes sense to think about "dominion and control" as something that exists on a sliding scale, such that

one can exercise either a small amount of dominion and control, or a large amount of dominion and control over a piece of property.

Moreover, the Court agrees with the Eleventh Circuit that it should look at the degree, quality, and genuineness of the claimant's exercise of dominion or control, but concludes that it should then make a determination, based on these indicia, whether the claimant has proven that he or she exercised dominion and control over the property at issue.  Looking at indicia of dominion and control is only useful if one conceives of them as indicia of something -- namely, dominion and control, which either does or does not exist.  Certainly, there are indicia of dominion and control that can be catalogued and analyzed under the totality of the circumstances -- as courts and juries do in the constructive possession context, for example -- but ultimately, a determination must be made -- in light of those indicia -- whether an individual does or does not exercise dominion and control over the property in question.  The Court concludes that in analyzing whether a claimant is "a nominee who exercises no dominion or control over the property" under 18 U.S.C. § 983(d)(6)(B)(iii), it  must examine the various indicia of dominion and control in the record and determine whether the claimant has proven by a preponderance of the evidence that he or she exercised dominion and control over the property that the United States seeks to forfeit.  See 18 U.S.C. § 983(d)(1) ("The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence.").  The Court thinks that it is an all-or-nothing determination -- you are either dead or alive, pregnant or not pregnant.

In this case, the Court concludes that there are triable issues of fact whether Fraire is an "owner" within 18 U.S.C. § 983(d)(1)'s meaning.  Moreover, the undisputed facts point in both directions.  On the one hand, the following pieces of evidence support Fraire's contention that he

was not a nominee who exercised no dominion or control over 2121 Celeste: (i) Fraire purchased

the undeveloped 2121 Celeste in 1993 as an investment, <u>see</u> United States Response at 3; Fraire

Reply at 3; (ii) Fraire started to build a structure on the land, <u>see</u> United States Response at 3;

Fraire Reply at 3; (iv) Fraire authorized his cousin, Padilla, III, to move into 2121 Celeste while

he was incarcerated, <u>see</u> United States MSJ ¶ 19, at 5; Fraire Response ¶ 19, at 5; (v) Padilla, III

did not pay regular rent to Fraire to stay at 2121 Celeste, but pursuant to the agreement Padilla,

III agreed he would serve as caretaker, make repairs, and pay all bills associated with 2121

Celeste in exchange for being allowed to live there, <u>see</u> United States MSJ ¶ 19, at 5; Fraire

Response ¶ 19, at 5; (vi) there was no written rental or other tenancy agreement between Fraire

and Padilla, III, but the terms of the agreement were clear, <u>see</u> United States MSJ ¶ 20, at 5;

Fraire Response ¶ 20, at 5; (vii) while Padilla, III, completely renovated 2121 Celeste at his own

expense during Fraire's imprisonment, the renovations were done as part of the agreement

between Padilla, III, and Fraire in lieu of rent payments, <u>see</u> United States MSJ ¶ 15, at 5; Fraire

Response ¶ 15, at 5; and (viii) while Fraire did not pay for the repairs that Padilla, III, made to

2121 Celeste, in consideration for the repairs, Fraire did not charge Padilla, III, rent, <u>see</u> United

States MSJ ¶ 17, at 5; Fraire Response ¶ 17, at 5.

On the other hand, the following evidence supports the United States' contention that

Fraire was a nominee who exercised no dominion or control over 2121 Celeste: (i) Fraire

admitted that he exercised "no dominion and control" over the property, <u>see</u> Fraire's Responses

to First Requests for Production at 2;[22] (ii) Fraire has never resided at 2121 Celeste, and he has

---

[22]The United States cites to Fraire's Response to Request for Production No. 17 and Response to Request for Production No. 18 in support of its assertion that Fraire exercised no dominion or control over 2121 Celeste.  <u>See</u> United States MSJ ¶ 7, at 4.  In Fraire's Response to Request for Production No. 17, Fraire stated: "I rented the property to a family member.  I never

never indicated to anyone else that he wanted to reside at 2121 Celeste, see United States MSJ ¶ 6, at 4; Fraire Response ¶ 6, at 3; (iii) Fraire did not maintain insurance for 2121 Celeste; (iv) while Fraire was incarcerated, many of the bills for 2121 Celeste were in arrears, see United States MSJ ¶ 12, at 4; Fraire Response ¶ 12, at 4, the property taxes were in arrears, see United States MSJ ¶ 13, at 4; Fraire Response ¶ 13, at 4, and Padilla, III, paid the property taxes for

_____

sought to have Mr. Padilla evicted.  As such, I did not exercise dominion or control over property that I owned and there are no responsive document to this request."  Response to Request for Production No. 17 at 6 (emphasis added).  Similarly, in Fraire's Response to Request for Production No. 18, Fraire stated: "I rented the property to a family member.  I never sought to have Mr. Padilla evicted.  As such, I did not exercise dominion or control over property that I owned and there are no responsive document to this request."  Response to Request for Production No. 18 at 7 (emphasis added).  The United States cites to this evidence presumably because it believes that Fraire's statement constitutes a judicial admission such that, Fraire, as a matter of law, was a mere nominee who exercised no dominion or control over 2121 Celeste, precluding him from advancing an innocent owner defense under 18 U.S.C. § 983(d)(1).

"A pleading prepared by an attorney is an admission . . . because the attorney presumably speaks for the litigant."  Estate of Gonzales v. AAA Life Ins. Co., 2012 WL 1132332, at *20 (D.N.M. Mar. 28, 2012)(Browning, J.)(quoting Rooms v. SEC, 444 F.3d 1208, 1213 (10th Cir. 2006)).  "Where, however, the party making an ostensible judicial admission explains the error in a subsequent pleading or by amendment, the trial court must accord the explanation due weight."  Smith v. Argent Mortg. Co., 331 F. App'x 549, 556 (10th Cir. 2009)(unpublished).  A response to a request for production, however, is not a "pleading."  Rather, a response to a request for production is more analogous to a response to a request for admission, of which "[a] district court has considerable discretion whether to permit withdrawal or amendment. . ."  Security Ins. Co. of Hartford v. Clovis Ins. Center, Inc., 2006 WL 4109678, at *4 (D.N.M. July 27, 2006)(Browning, J.).  In the Fraire Reply, Fraire explains that, while perhaps a poor choice of words, these statements were "made in the context of explaining that Mr. Fraire did not have additional photographs, documents, or things to produce because a family member was in physical possession of the property pursuant to an agreement with Mr. Fraire."  Fraire Reply at 2-3.  Whether a response to a request for production is more analogous to a pleading or a response to a request for admission, the Court accords Fraire's explanation its due weight, and concludes that Fraire's statement in his Response to Request for Production No. 17 and Response to Request for Production No. 18, while certainly evidence of lack of dominion and control, is not dispositive as a matter of law on the issue whether Fraire is an owner under 18 U.S.C. § 983(d)(1).  As this analysis section reflects, the Court concludes that whether Fraire exercised dominion and control over 2121 Celeste such that he is an owner under the forfeiture statute, is a factual issue for the jury.  Fraire's statement is merely one more piece of evidence supporting the United States' contention that Fraire was a nominee who exercised no dominion or control over 2121 Celeste.  The jury should determine whether Fraire's admission is correct, or whether his new position has merit and force.

most of the years he resided at 2121 Celeste, see United States MSJ ¶ 14, at 4; Fraire Response ¶ 14, at 4; (v) from on or about 2007, Padilla, III, began to reside at 2121 Celeste, see United States MSJ ¶ 10, at 4; Fraire Response ¶ 10, at 4, and other than when Padilla, III, was incarcerated, he has been residing there, see United States MSJ ¶ 18, at 5; Fraire Response ¶ 18, at 5; (vi) before Padilla, III, resided at 2121 Celeste, the house was uninhabitable, because Fraire had not finished building it when he went to prison, see United States MSJ ¶ 9, at 4; Fraire Response ¶ 9, at 4; (vii) when Fraire went to prison, 2121 Celeste had no appliances, and it was left vacant and vandalized for about four years, see United States Response at 3-4; Fraire Reply at 3-4; (vii) while Fraire was in prison, Padilla, III, completely renovated 2121 Celeste at his own expense, see United States MSJ ¶ 15, at 5; Fraire Response ¶ 15, at 5, and Padilla, III, did not consult with Fraire before making repairs, see United States MSJ ¶ 16, at 5; (viii) Fraire did not pay for the repairs to 2121 Celeste and did not charge Padilla, III rent, see United States MSJ ¶ 17, at 5; Fraire Response ¶ 17, at 5; (ix) Fraire rarely visited 2121 Celeste, see United States MSJ ¶ 21, at 5; Fraire Response ¶ 21, at 5; (x) after the execution of the December 3, 2009, search warrant, Padilla, III, paid to replace a gate at 2121 Celeste because it had suffered significant damage, see United States MSJ ¶ 24, at 5; Fraire Response ¶ 24, at 6; (xi) Fraire never came by to inspect whether or not Padilla, III, made repairs to 2121 Celeste, see United States MSJ ¶ 25, at 6; Response ¶ 25, at 6-7; (xii) Fraire did not seek to evict Padilla III, from 2121 Celeste following the execution of the December 3, 2009, FBI search warrant, see United States MSJ ¶ 26, at 6; Fraire Response ¶ 26, at 7; (xiii) Fraire never asked anyone why the police executed a search warrant at 2121 Celeste on December 3, 2009, see United States MSJ ¶ 27, at 6; Fraire Response ¶ 27, at 7; (xiv) Fraire did not inspect Padilla, III's repairs, see United States MSJ ¶ 25, at 6; Fraire Response ¶ 25, at 7, or 2121 Celeste following the execution of the December 3,

2009 search warrant, see United States MSJ ¶ 28, at 6; Fraire Response ¶ 28, at 7; and (xv) Fraire

did not pay for the repairs to 2121 Celeste that the March 28, 2011, FBI raid caused, see United

States MSJ ¶ 30, at 6; Fraire Response ¶ 30, at 7.

In sum, the Court concludes that there is evidence pointing both towards and against a

finding that Fraire exercised dominion and control over 2121 Celeste such that he is an "owner"

within § 983(d)(1)'s meaning.   Because evidence points both toward and against Fraire

exercising dominion and control such that he is an owner, the Court concludes that this is a

factual issue for the jury.  The Court therefore denies the Fraire MSJ on this issue, and concludes

that the United States is not entitled to summary judgment on the grounds that Fraire is not an

"owner" within § 983(d)(1)'s meaning.

### B.   THE COURT CONCLUDES, AS A MATTER OF LAW, THAT FRAIRE IS NOT "INNOCENT" UNDER 18 U.S.C. § 983(d)(1).

In addition to qualifying as an "owner" under the statute, a claimant must also prove that

he or she is "innocent."   United States v. One Lincoln Navigator 1998, 328 F.3d at 1015.

Section 983(d)(2)(A) provides:

> With respect to a property interest in existence at the time the illegal conduct
> giving rise to forfeiture took place, the term 'innocent owner' means one who --
> (i) did not know of the conduct giving rise to forfeiture; or (ii) upon learning of
> the conduct giving rise to the forfeiture, did all that reasonably could be expected
> under the circumstances to terminate such use of the property.

18 U.S.C. § 983(2)(A)(i)-(ii).

> Thus, in order to establish an innocent owner defense under Section 983(d)(2)(A),
> for a property interest in existence at the time of the illegal conduct, a claimant
> must demonstrate by a preponderance of the evidence that it did not know of the
> conduct or, upon learning of the conduct, reasonably tried to terminate any such
> use of the property.

United States v. Assets Described in Attachment A to the Verified Complaint for Forfeiture in Rem, 2010 WL 6593942, at *5 (emphasis added).

"Because the innocent owner defense is an affirmative defense, it is not incumbent upon the government to prove that the owner had knowledge of the illegal activity." United States v. 16328 South 43rd East Ave., Bixby, Tulsa Cty., Okla., 275 F.3d at 1284-85. "Rather, 'it is the claimant's responsibility to prove the *absence* of actual knowledge." United States v. 16328 South 43rd East Ave., Bixby, Tulsa Cty., Okla., 275 F.3d at 1284-85 (emphasis in original). In advancing his innocent owner defense, Fraire contends that he did not know of the conduct giving rise to forfeiture. The Court, however, "is not constrained to accept denials supported by a mere scintilla of evidence." United States v. 16328 South 43rd East Ave., Bixby, Tulsa Cty., Okla., 275 F.3d at 1285 (explaining that to avoid summary judgment on the knowledge prong of the innocent owner defense, the claimant must offer more than bare denials that amount to willful blindness or are inconsistent with the uncontested facts). Here, the record reflects that Fraire "was immediately aware of the December 3, 2009, FBI raid at 2121 Celeste Rd., because he saw it live on the news." United States MSJ ¶ 22, at 5. See Fraire Response ¶ 22, at 6. After the December 3, 2009, raid, Fraire never came by to inspect whether or not Padilla, III made repairs to 2121 Celeste, see United States MSJ ¶ 25, at 6; Response ¶ 25, at 6-7, did not seek to evict Padilla III from 2121 Celeste, see United States MSJ ¶ 26, at 6; Fraire Response ¶ 26, at 7, and never asked anyone why the police executed a search warrant 2121 Celeste on December 3, 2009, see United States MSJ ¶ 27, at 6; Fraire Response ¶ 27, at 7. Fraire did not inspect Padilla, III's repairs, see United States MSJ ¶ 25, at 6; Fraire Response ¶ 25, at 7, or 2121 Celeste following the execution of the December 3, 2009 search warrant, see United States MSJ ¶ 28, at 6; Fraire Response ¶ 28, at 7. These facts establish that Fraire was at best willfully blind to

Padilla, III, and Padilla, Jr.'s activities.  Thus, the Court concludes that there is no issue of triable fact whether Fraire knew of the illegal activity on his property.  The Court concludes, as a matter of law, that Fraire cannot establish that he did not know of the illegal activities taking place at 2121 Celeste.

Having concluded that Fraire was at best willfully blind to the illegal conduct giving rise to forfeiture, Fraire must show that he did "all that reasonably could be expected under the circumstances to terminate such use of the property."  18 U.S.C. § 983(2)(A).  See United States v. Property Identified as 1813 15th Street N.W., Washington D.C., 956 F. Supp. at 1029 ("[T]o avoid summary judgment, the claimant must supply evidence to allow a reasonable juror to conclude that, under the circumstances, all reasonable steps were taken to curtail the illegal activity . . . . [E]vidence to prove *some* reasonable steps were taken is insufficient to preclude summary judgment.")(emphasis in original).  Section 983(2)(B) provides further guidance on the meaning of the phrase "all that reasonably could be expected":

> **(B)(i)** For the purposes of this paragraph, ways in which a person may show that such person did all that reasonably could be expected may include demonstrating that such person, to the extent permitted by law --
>
> > **(I)** gave timely notice to an appropriate law enforcement agency of information that led the person to know the conduct giving rise to a forfeiture would occur or has occurred; and
> >
> > **(II)** in a timely fashion revoked or made a good faith attempt to revoke permission for those engaging in such conduct to use the property or took reasonable actions in consultation with a law enforcement agency to discourage or prevent the illegal use of the property.
>
> **(ii)** A person is not required by this subparagraph to take steps that the person reasonably believes would be likely to subject any person (other than the person whose conduct gave rise to the forfeiture) to physical danger.

18 U.S.C. § 983(2)(B).

- 106 -

Where law enforcement is already involved and a landlord has knowledge that his or her tenants have been taken into custody and that they are being supervised by the federal government, a landlord need not take additional steps to terminate the use of the property in order to receive the benefit of the innocent-owners defense set forth in § 983(2)(A).  In other words, the Court concludes that where a tenant has been incapacitated, a landlord need not contact law enforcement or evict his or her tenant in order to satisfy the requirement that he or she do "all that reasonably could be expected under the circumstances to terminate such use of the property."  18 U.S.C. § 983(2)(A).

At the January 6, 2016, hearing, the record reflects the following exchange between the Court and defense counsel:

> THE COURT:  Is there any evidence in the record in either motion that Mr. Fraire knew that Mr. Padilla was being supervised by the Federal Court.
>
> MR. GORENCE:  No, Your Honor not one way or the other and there was no discussion about that.

Tr. at 50:17-21.  Further, in his deposition, the following exchange took place between Fraire and Mr. Gorence:

> Q: But seeing the news, what did you learn when you saw the news?
>
> **A: They were at the house over there, that the agents were at the house over there.  Whatever they showed on the news.  They showed the picture on the news.**
>
> Q: Were you aware what they got arrested for?
>
> **A: I really didn't care.  That's none of my business.**
>
> Q: Were you aware, though, what they got arrested for after –
>
> **A: I'm still not aware.  That's not my business.**

Fraire Deposition at 136 (emphasis in original).

While Fraire may have been aware of Padilla, III's arrest, he did not know that Padilla, III had been taken into federal custody and that the federal government was supervising him. Fraire was required, at the very least, after seeing the live news coverage of the December 3, 2009, FBI raid, to take some additional steps to learn about Padilla, III's status, and whether he was incapacitated and under federal custody.  In fact, while Padilla, III and Padilla, Jr. were both taken into federal custody on December 3, 2009, see Padilla, Jr. Arrest Warrant at 1; Padilla, III Arrest Warrant at 1, Padilla, III was released pre-trial, see Padilla, III Conditions of Release at 1. On February 26, 2011, Padilla, III then sold approximately two ounces of heroin at 2121 Celeste for $1,500.00 to a confidential human source, see United States MSJ ¶ 3, at 3; Fraire Response ¶ 3, at 2; Email Stipulations at 2; Padilla, III Plea Agreement in CR. No. 11-0667 ¶ 6, at 3; Zamora Decl. ¶ 8, at 3, and on March 17, 2011, approximately three ounces or 83.6 grams of heroin were sold to a confidential human source at 2121 Celeste for $2,250.00, see United States MSJ ¶ 4, at 3; Fraire Response ¶ 4, at 3; Email Stipulations at 2; Zamora Decl. ¶ 9, at 3.  This conduct ultimately led to a second FBI raid on 2121 Celeste on March 28, 2011.  See United States MSJ ¶ 5, at 3; Fraire Response ¶ 5, at 3; Zamora Decl. ¶ 10, at 4.

Moreover, the record clearly shows that Fraire did little to deter Padilla, III from continuing to traffic drugs out of 2121 Celeste.  Fraire never came by to inspect whether or not Padilla, III made repairs to 2121 Celeste after the December 3, 2009, FBI raid.  See United States MSJ ¶ 25, at 6; Response ¶ 25, at 6-7.  He did not seek to evict Padilla, III from 2121 Celeste following the execution of the December 3, 2009, FBI search warrant, see United States MSJ ¶ 26, at 6; Fraire Response ¶ 26, at 7, and he never asked anyone why the police executed a search warrant at 2121 Celeste on December 3, 2009, see United States MSJ ¶ 27, at 6; Fraire Response ¶ 27, at 7.  Fraire did not inspect Padilla, III's repairs, see United States MSJ ¶ 25, at 6 Fraire

Response ¶ 25, at 7, or 2121 Celeste following the execution of the December 3, 2009 search warrant, see United States MSJ ¶ 28, at 6; Fraire Response ¶ 28, at 7.   While there is some dispute whether Fraire had a conversation with Padilla, III and warned him, that would have fallen short of what any reasonable landowner would undertake given his knowledge of the December 3, 2009, FBI raid.  Accordingly, even if the fact is disputed, it is not material.  At the very least, Fraire could have contacted appropriate law enforcement officials to find out what had occurred and whether Padilla, III and Padilla, Jr. were being supervised by the federal government, and he could have evicted Padilla, III.   "Congress has placed strict duties upon landowners to rid their property of drug activity."  United States v. 16328 South 43rd East Ave., Bixby, Tulsa Cty., Okla., 275 F.3d at 1286.  Fraire's decision not to investigate his property, his decision not to contact law enforcement, his decision not to evict Padilla, III, and his failure to take any comparable steps make it impossible for him to show by a preponderance of the evidence that he took *all reasonable steps to prevent the illegal activities from occurring*.  See United States v. 16328 South 43rd East Ave., Bixby, Tulsa Cty., Okla., 275 F.3d at 1286-87. Accordingly, the Court concludes that Fraire fails as a matter of law on the innocent prong of his innocent owner defense.

In conclusion, the Court concludes that there are triable issues of fact whether Fraire is an "owner" within the meaning of § 983(d)(2).  Because evidence points both towards and against Fraire being an owner, the Court will allow this issue to proceed to the jury.  The Court cannot, however, soundly find that Fraire is "innocent" within the meaning of § 983(d).  The Court therefore denies the Fraire MSJ, and grants the United States MSJ on Fraire's innocent owner defense.

III.   **THE FORFEITURE OF 2121 CELESTE WOULD NOT VIOLATE THE EIGHTH AMENDMENT'S EXCESSIVE FINES CLAUSE.**

Under Tenth Circuit law, as this Memorandum Opinion and Order's legal section explains, the Court conducts an Eighth Amendment proportionality analysis by considering the factors set forth in United States v. Bajakajian and in United States v. Wagoner County Real Estate.  The Court held an evidentiary hearing without a jury pursuant to 18 U.S.C. § 983(g)(3) on February 17, 2016.  The Court has considered the evidence, made factual findings that are set forth in this Memorandum Opinion and Order's procedural section, and concludes that, in light of the factors set forth in United States v. Bajakajian and in United States v. Wagoner County Real Estate, the forfeiture of 2121 Celeste would not violate the Eighth Amendment's Excessive Fines Clause.

A.   **THE HARSHNESS OF THE SANCTION IMPOSED WEIGHS AGAINST A FINDING THAT THE FORFEITURE OF 2121 CELESTE WOULD VIOLATE THE EIGHTH AMENDMENT'S EXCESSIVE FINES CLAUSE.**

In United States v. Wagoner County Real Estate, the Tenth Circuit explained that, in conducting an Eighth Amendment proportionality analysis, the Court should first assess the harshness of the sanction, considering "the value of the property forfeited, its function, and any other sanctions imposed upon the claimants by the sovereign seeking forfeiture."  278 F.3d at 1101.  Here, the United States is attempting to forfeit real property.  First, with respect to "the value of the property forfeited," United States v. Wagoner Cty. Real Estate, 278 F.3d at 1101, the current value of 2121 Celeste is $268,000.00, see Appraisal Report at 2.  Second, with respect to 2121 Celeste's function, it does not produce any income for Fraire, he does not live there, he does not receive rent payments, and he does not pay anything for its upkeep and maintenance.  See Finding of Fact 25, supra, at 69.  Third, in evaluating the harshness of the sanction imposed,

United States v. Wagoner Cty. Real Estate instructs the Court to consider "any other sanctions imposed upon the claimants by the sovereign seeking forfeiture."  278 F.3d at 1101.  Here, the United States has not imposed any other sanctions upon Fraire.

> **B.      THE SEVERITY OF THE OFFENSE WITH WHICH THE PROPERTY WAS INVOLVED WEIGHS AGAINST A FINDING THAT THE FORFEITURE OF 2121 CELESTE WOULD VIOLATE THE EIGHTH AMENDMENT'S EXCESSIVE FINES CLAUSE.**

In evaluating proportionality, United States v. Wagoner County Real Estate instructs the Court to weigh the harshness of the sanction imposed, discussed above, against the severity of the offense with which the property was involved.  See 278 F.3d at 1101.  The Tenth Circuit explained that the Court should

> tak[e] into account the extent of both the claimant's and the property's role in the offense, the nature and scope of the illegal operation at issue, the personal benefit reaped by the claimant, the value of any contraband involved in the offense, and the maximum sanction Congress has authorized for the offense.

278 F.3d at 1101.  First, with respect to Fraire's role in the offense, there is no evidence that Fraire had any role in the drug offenses that took place at 2121 Celeste.  See Finding of Fact 24, supra, at 68-69.  No documents belonging to Fraire were recovered during the execution of the December 3, 2009, search warrant at 2121 Celeste.  See Zamora Decl. ¶ 7, at 3.  No documents belonging to Fraire were recovered during the execution of the March 18, 2011, search warrant.  See Zamora Decl. ¶ 11, at 4.  The United States has no evidence that Fraire was involved in the February 26, 2011, heroin transaction at 2121 Celeste.  See Email Stipulations at 2.

The Court must also "tak[e] into account the extent of . . . the property's role in the offense [and] the nature and scope of the illegal operation at issue."  United States v. Wagoner Cty. Real Estate, 278 F.3d at 1101.  In this case, members of the Los Padillas gang used 2121 Celeste for cocaine and heroin transactions between 2009 and 2011.  See Zamora Decl. at 1-4;

Padilla, Jr. Plea Agreement ¶ 7, at 3; Padilla, III Plea Agreement in CR. No. 09-3598 ¶ 6, at 3; Padilla, III Plea Agreement in CR. No. 11-0667 ¶ 6, at 3.  On March 19, 2009, Padilla, Jr. directed a confidential human source to meet with Padilla, III at 2121 Celeste to consummate the sale of approximately 130 grams, or four ounces, of cocaine.  See Padilla, Jr. Plea Agreement ¶ 7, at 3; Padilla, III Plea Agreement in CR. No. 09-3598 ¶ 6, at 3; Zamora Decl. ¶ 5, at 2.  Padilla, III and the confidential human source met at 2121 Celeste, and Padilla, III handed the confidential human source approximately 131 grams of cocaine in exchange for $3,500.00.  See Padilla, Jr. Plea Agreement ¶ 7, at 3; Padilla, III Plea Agreement in CR. No. 09-3598 ¶ 6, at 3; Zamora Decl. ¶ 5, at 2.  On December 3, 2009, the FBI executed a search warrant at 2121 Celeste.  See Zamora Decl. ¶ 5, at 2.  Items recovered during the execution of that warrant on December 3, 2009, included: fourteen cellular telephones; a video surveillance system; a backpack with plastic ziplock bags; a money counter machine; packaging material buried outside in the backyard; $441,008.00 in United States currency buried outside in the backyard; several heat sealers; and documentation belonging to both Padilla, Jr. and Padilla, III.  See Zamora Decl. ¶ 6, at 2-3.

Additionally, on February 26, 2011 Padilla, III sold approximately two ounces of heroin at 2121 Celeste for $1,500.00 to a confidential human source.  See Email Stipulations at 2; Padilla, III Plea Agreement in CR. No. 11-0667 ¶ 6, at 3; Zamora Decl. ¶ 8, at 3.  On March 17, 2011, approximately three ounces or 83.6 grams of heroin were sold to a confidential human source at 2121 Celeste for $2,250.00.  See Email Stipulations at 2; Zamora Decl. ¶ 9, at 3.  On March 28, 2011, the FBI executed another federal search warrant at 2121 Celeste.  See Zamora Decl. ¶ 10, at 4.  Items recovered during the March 18, 2011, search of 2121 Celeste included: $19,777.00 in United States currency; thirteen cellular telephones; and driver licenses for Padilla,

III.  See Email Stipulations at 2; Zamora Decl. ¶ 10, at 4.  As a result of this conduct, Padilla, III, and Padilla, Jr., both entered into plea agreements.  See Padilla, Jr. Plea Agreement at 1; Padilla, III Plea Agreement in CR. No. 09-3598 at 1; Padilla, III Plea Agreement in CR. No. 11-0667 at 1.  In Padilla, III, and Padilla, Jr.'s plea agreements, each admitted that cocaine was sold out of 2121 Celeste.  See Padilla, Jr. Plea Agreement ¶ 7, at 3; Padilla, III Plea Agreement in CR. No. 09-3598 ¶ 6, at 3.  Padilla, III also admitted that heroin was sold out of 2121 Celeste.  See Padilla, III Plea Agreement in CR. No. 11-0667 ¶ 6, at 3.

Regarding "the personal benefit reaped" by Fraire, United States v. Wagoner County Real Estate, 278 F.3d at 1101, the United States has no evidence that Fraire received a tangible personal benefit in connection with the offense conduct, see Email Stipulations at 1.  Finally, United States v. Wagoner County Real Estate instructs the Court to look at the maximum sanction that Congress authorizes.  See 278 F.3d at 1101.  Here, Padilla, Jr., pled guilty to "Counts Two, Three and Four of the Indictment, charging a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), that being Distribution of Cocaine," and also pled guilty to "a Grade A violation of his term of Supervised Release with respect to a cause number 94-CR-618."  Padilla, Jr. Plea Agreement ¶ 3, at 2.  As the Padilla, Jr. Plea Agreement indicates, the maximum sanction the Court can impose for this offense is "imprisonment for a period of not more than 20 years," and "a fine not to exceed the greater of $1,000,000 or twice the pecuniary gain to the defendant or pecuniary loss to the victim."  Padilla, Jr. Plea Agreement ¶ 4, at 2.  See 21 U.S.C. § 841(b)(1)(C).  In the Padilla, III Plea Agreement in CR. No. 09-3598, Padilla, III, pled guilty to "Count Four of the indictment, charging a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), that being Distribution of Cocaine."  Padilla, III Plea Agreement in CR. No. 09-3598 ¶ 3, at 2.  The Padilla, III Plea Agreement in CR. No. 09-3598 indicates that the maximum sanction the Court

can impose for this offense is "imprisonment for a period of not more than 20 years," and "a fine not to exceed the greater of $1,000,000 or twice the pecuniary gain to the defendant or pecuniary loss to the victim."  Padilla, III Plea Agreement in CR. No. 09-3598 ¶ 4, at 2.  See 21 U.S.C. § 841(b)(1)(C).  Finally, in the Padilla, III Plea Agreement in CR. No. 11-0667, Padilla, III pled guilty to "the Indictment, charging a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), that being Distribution of Heroin."  Padilla, III Plea Agreement in CR. No. 11-0667 ¶ 3, at 2.  Like the other two plea agreements, the Padilla, III Plea Agreement in CR. No. 11-0667 indicates that the maximum sanction that the Court can impose for this offense is "imprisonment for a period of not more than 20 years," and "a fine not to exceed the greater of $1,000,000 or twice the pecuniary gain to the defendant or pecuniary loss to the victim."  Padilla, III Plea Agreement in CR. No. 11-0667 ¶ 4, at 2.  See 21 U.S.C. § 841(b)(1)(C).

In sum, weighing the harshness of the sanction imposed against the severity of the offense with which the property was involved, as United States v. Wagoner County Real Estate instructs, the Court concludes that the forfeiture of 2121 Celeste would not be grossly disproportionate.  The Eleventh Circuit explained in United States v. 817 Northeast 29th Drive, Wilton Manors, Florida, 175 F.3d 1304 (11th Cir. 1999): "[I]f the value of the property is less than the maximum statutory, a strong presumption arises that the forfeiture is constitutional."  175 F.3d at 1309-10.  Here, the maximum statutory fine for each offense was $1,000,000.00, well in excess of 2121 Celeste's value, $268,000.00.  The Los Padillas gang used 2121 Celeste over a two-year period for multiple cocaine and heroin transactions.  Although there is no evidence that Fraire played a role in the offense conduct, the Court concludes that forfeiture of 2121 Celeste would not be disproportionate under the Excessive Fines Clause of the Eighth Amendment.

**IV.    THE DELAYS PRESENT IN THIS CASE DO NOT VIOLATE FRAIRE'S DUE-PROCESS RIGHTS UNDER THE FIFTH AMENDMENT.**

"Once the government succeeds in demonstrating a substantial connection between seized property and a controlled substance, the burden is upon the claimant to prove a defense to the forfeiture."   United States v. One (1) 1984 Nissan 300 ZX, Georgia License No. VIN JN1HZ11452EX032749, 711 F. Supp. 1570, 1572 (N.D. Ga. 1989)(Forrester, J.).  Fraire opposes the United States' summary judgment motion, in part, on the ground that the more than five-year delay between the recording of the notice of lis pendens and the present has worked to deny him his due process rights under the Fifth Amendment.   See United States v. $8,850 in U.S. Currency, 461 U.S. at 555; United States v. One (1) 1983, Fifty-Seven Foot (57') Gulfstream Vessel, M/V Christy Lee, Official Documentation No. 643659, 640 F. Supp. 667, 672 (S.D. Fla. 1986)(Spellman, J.)(delay defense to forfeiture if due process violated); United States v. One 1978 Cadillac Sedan Deville, 490 F. Supp. 725, 732 (S.D.N.Y. 1980)(same); United States v. One (1) 1984 Nissan 300 ZX, Georgia License No. VIN JN1HZ11452EX032749, 711 F. Supp. at 1570 (concluding that the claimant defeated the United States' motion for summary judgment on the grounds that the United States' eighteen-month delay in instituting civil forfeiture proceedings was sufficient to raise due process concerns).  Fraire objects both to the more than three-year delay before the complaint was filed and to the more than two-year delay since the filing of the Complaint.  See Fraire Response at 12.

In Barker v. Wingo, the Supreme Court developed a balancing test to be used in determining whether the government has violated a defendant's right to a speedy trial under the Sixth Amendment to the Constitution of the United States.  See 407 U.S. at 514.  There, the Supreme Court identified four factors to be considered: (i) the length of the delay; (ii) the reason

for the delay; (iii) the claimant's assertion of his or her right; and (iv) any prejudice that the claimant suffered.  See 407 U.S. at 530-32.  The Supreme Court subsequently ruled in United States v. $8,850 in U.S. Currency, that Barker v. Wingo provides the appropriate test for determining whether a delay in initiating civil forfeiture proceedings has violated a claimant's due process rights under the Fifth Amendment.  See 461 U.S. at 564.  In United States v. $8,850 in U.S. Currency, a civil forfeiture claimant argued that an eighteen-month delay between the seizure of the defendant currency and the commencement of forfeiture proceedings violated her due process rights under the Fifth Amendment.  See 461 U.S. at 564.  The Supreme Court applied the Barker v. Wingo factors and determined that, while the delay was substantial, no other factor weighed in favor of the claimant's due-process argument under the Fifth Amendment.  See 461 U.S. at 564.  "[N]one of these factors is a necessary or sufficient condition for finding unreasonable delay.  Rather, these elements are guides in balancing the interests of the claimant and the Government to assess whether the basic due process requirement of fairness has been satisfied in a particular case."  United States v. $8,850 in U.S. Currency, 461 U.S. at 565.  "Although $8,850 pertained to the delay between the seizure and the filing of the forfeiture action, courts have applied the same principles to the delay between filing and the commencement of trial."  United States v. $131,551.03 Plus Accrued Interest from Sale of 10 Table Bluff Road, Loleta, CA, 2010 WL 1135743, at *2 (N.D. Cal. Mar. 22, 2010)(Illston, J.)(citing  United States v. Banco Cafetero Panama, 797 F.2d 1154, 1163 (2d Cir. 1986)(Newman, J.)("To require prompt filing of a forfeiture action but allow indefinite postponement of the trial would reduce the filing requirement to a nullity.")).

The Court, however, interprets United States v. $8,850 in U.S. Currency as standing for the proposition that "[d]ue process concerns are implicated where there is a delay between *the*

*seizure* of property and the postseizure filing of a judicial forfeiture action." United States v. A

Parcel of Land, Bldgs., Appurtenances, and Improvements, known as 92 Buena Vista Ave.,

Rumson, N.J., 738 F. Supp. 854, 861-62 (D.N.J. 1990)(Ackerman, J.)(emphasis added)(citing

United States v. $8,850 in U.S. Currency, 461 U.S. at 563).   The more than three-year delay

between the United States' filing of the lis pendens and its filing of the complaint for forfeiture

presents a distinguishable situation.   In the present action, the United States filed a lis pendens

but never *seized* 2121 Celeste.   The United States District Court for the District of New Jersey's

decision in United States v. A Parcel of Land, Buildings, Appurtenances, and Improvements,

known as 92 Buena Vista Ave., Rumson, New Jersey, 738 F. Supp. 854, is instructive here.

There, the claimants moved to dismiss the forfeiture action on the grounds that the United States

unduly delayed the seizure in violation of her due process rights.   See 738 F. Supp. 861.   The

United States countered that there could be no due process concerns "because forfeiture

proceedings were instituted before the seizure and the seizure was instituted immediately

thereafter."   738 F. Supp. 861.   In concluding that no due process concerns were implicated, the

District Court explained:

> Each of the cases relied upon by the claimant in support of her due process claim
> involved delays between the seizure of property and institution of forfeiture
> proceedings.   *See* Claimant's Brief at 22, *citing Calero-Toledo v. Pearson Yacht
> Leasing Co.*, 416 U.S. 663 (1974); *United States v. U.S. Treasury Bills Totalling
> $160,916.25*, 750 F.2d 900 (11th Cir. 1985), and *United States v. One Motor
> Yacht Named Mercury*, 527 F.2d 1112 (1st Cir. 1975).   Due process concerns
> arise in such a situation, because a property owner is entitled to be heard at a
> meaningful time after the deprivation of property that is caused by a seizure.   *See
> United States v. $8,850*, *supra*, 461 U.S. at 562.   Notably, there has been no real
> deprivation in this case, because Ms. Goodwin has been permitted to continue to
> reside at the premises under an arrangement with the government.   *See*
> Occupancy Agreement, Gallagher Aff. II, Exhibit D.
>
> Moreover, there is no dispute that this forfeiture proceeding was instituted before
> the seizure.   The claimant was afforded the opportunity to contest the forfeiture

and engage in discovery shortly after the seizure.  <u>Thus, under the cases cited by</u>
<u>the claimant, no due process concerns are implicated</u>.  To the extent there was any
delay between the events giving rise to the forfeiture and the institution of these
proceedings, the statute of limitations governs.

738 F. Supp. 862 (emphasis added).

Here, Fraire objects to: (i) the more than three-year delay between the United States filing

of the lis pendens and its filing of the Complaint; and (ii) the more than two-year delay since the

complaint was filed.  As in <u>United States v. A Parcel of Land, Buildings, Appurtenances, and</u>

<u>Improvements, known as 92 Buena Vista Ave., Rumson, New Jersey</u>, there has been no real

deprivation or seizure in this case.  <u>See</u> 738 F. Supp. 862.  While in <u>United States v. A Parcel of</u>

<u>Land, Buildings, Appurtenances, and Improvements, known as 92 Buena Vista Ave., Rumson,</u>

<u>New Jersey</u>, the claimant had been permitted to reside at the premises being forfeited under an

arrangement with the government, here, Fraire has continued to have complete access to and

control over 2121 Celeste.  The United States' filing of a notice lis pendens did not deprive

Fraire of 2121 Celeste.  Therefore, neither the three-year delay between the United States filing

of the lis pendens and its filing of the complaint nor the more than two-year delay since the

complaint was filed implicate the due process concerns expressed in <u>United States v. $8,850</u>, 461

U.S. at 555.  Some courts have, however, nonetheless applied the <u>Barker v. Wingo</u> factors in the

lis pendens context.  <u>See</u> <u>United States v. Dean</u>, 817 F. Supp. 947 (M.D. Fla.

1993)(Kavachevich, J.)(applying the <u>Barker v. Wingo</u> factors to determine whether a delay of

more than five years between the filing of the lis pendens and actual forfeiture hearings violated

the claimant's due process rights under the Fifth Amendment and concluding that the delay was

reasonable).  Although the Court does not think <u>Barker v. Wingo</u> applies to this case, it

nonetheless considers each of the Barker v. Wingo factors below, concluding that the delays in this case did not violate Fraire's Fifth Amendment due-process rights.

### A.      LENGTH OF THE DELAY.

The first prong in the Barker v. Wingo balancing test requires the Court to review the length of the delay.  As noted previously, more than three years elapsed between the time the lis pendens was filed and the complaint was filed.  See Fraire Response at 12.  Further, two years have passed since the filing of the complaint, meaning that there has been a delay of more than five years between when the notice of lis pendens was recorded and the present time.  See Fraire Response at 12.  Fraire specifically asserts:

> A notice of lis pendens was recorded on the Defendant Property on March 15, 2010. . . .  The Complaint was not filed until August 1, 2013 [Doc. 1].  This forfeiture action has been pending for more than two years.  More than five years have passed since the notice of lis pendens was recorded.

Fraire Response at 12.  In United States v. $8,850 in U.S. Currency, the Supreme Court noted that an eighteen month delay was "quite significant."  461 U.S. at 564.  "While no constitutional 'statute of limitations' has been established for forfeiture actions, the Court has noted that longer delays will require substantial justification to meet the reasonableness requirement of the due process clause."  United States v. One (1) 1984 Nissan 300 ZX, Georgia License No. VIN JN1HZ11452EX032749, 711 F. Supp. at 1570 (citing United States v. $8,850 in U.S. Currency, 461 U.S. at 564).  Indeed, the Supreme Court has stated that "short delays -- of perhaps a month or so -- need less justification than longer delays."  United States v. $8,850 in U.S. Currency, 461 U.S. 565.  Here, the length of delay in seeking forfeiture of 2121 Celeste following the filing of the notice of lis pendens was over three years, and the action has been pending for over five years.  See Fraire Response at 12.  In the end, the Court believes that the filing of the notice of lis

pendens is largely irrelevant and did not trigger a due process clock.  The property was not

seized by the filing of the notice of lis pendens and Fraire remained free to use the property as he

saw fit.  If Fraire sold 2121 Celeste, its value might have been damaged, but there is no

indication that he attempted to sell it, wanted to sell it, or even wants to sell it today.  Also, it

seems the time after the Complaint was filed is largely irrelevant.  Once the case was filed, Fraire

could have pushed the case and the Court as much as the United States.  The Court does not

believe that due process is implicated in this case.  But even if it is, and due-process analysis is

triggered, the remaining <u>Barker v. Wingo</u> factors weigh against a finding that Fraire's Fifth

Amendment due-process rights were violated.

### B.       REASON FOR THE DELAY.

The United States must provide justifications where there is a significant delay.  <u>See</u>

<u>United States v. One (1) 1984 Nissan 300 ZX, Georgia License No. VIN</u>

<u>JN1HZ11452EX032749</u>, 711 F. Supp. at 1573.  The United States, however, does not provide

any justification for the more than three year delay in filing the complaint for forfeiture and the

two-year delay between the filing of the forfeiture action and the present time.  With respect to

Fraire's contention that the forfeiture has been pending for an unreasonably long time, the United

States offers the following reply:

> Because real property cannot be forfeited administratively, a delay in
> commencing a forfeiture action will bar the forfeiture only if it violates Due
> Process.  *See United States v. $131,551.03 Plus Accrued Interest from the Sale of*
> *10 Table Bluff Road*, 2010 WL 1135743, *3 (N.D. Cal. Mar. 22, 2010)
> (Government's 7-month delay from time of defendant's arrest in filing civil
> forfeiture action against real property, and 3-year stay of the civil case while a
> criminal investigation was completed, did not violate claimant's due process
> rights under $8,850; claimant has no right to force Government to forfeit her
> property quickly to save her from having to make mortgage payments).  Claimant
> has failed to present any facts to support the notion that his Due Process rights

have been violated by a civil action filed well-within the applicable statute of limitations.

United States Reply at 5.   In United States v. $8,850 in U.S. Currency, the Supreme Court determined that ongoing remission proceedings combined with pending criminal proceedings justified the eighteen-month delay in instituting the forfeiture action.  See 461 U.S. at 564.  Here, however, the United States has failed to articulate any justification for the various delays present in this case.  Hence, this factor -- reason for the delay -- weighs slightly against the United States.

### C.    ASSERTION OF CLAIMANT'S RIGHTS.

The third element to be considered in the Barker v. Wingo due process-balance is the claimant's assertion of the right to a judicial hearing.  See United States v. $8,850 in U.S. Currency, 461 U.S. at 568-69.  On August 1, 2013, the United States filed its Complaint seeking forfeiture in rem against 2121 Celeste.  See Complaint at 1.  The claimant began his efforts to contest the forfeiture action by timely filing a claim of interest in 2121 Celeste on September 17, 2013, in which he contested forfeiture on a number of grounds.  See Answer at 1.  Unlike the claimant in United States v. $8,850 in U.S. Currency, there is no doubt that Fraire has at all times "vigorously asserted his right to a judicial hearing."  United States v. One (1) 1984 Nissan 300 ZX, Georgia License No. VIN JN1HZ11452EX032749, 711 F. Supp. at 1573.  This factor weighs in Fraire's favor.

### D.    PREJUDICE TO THE CLAIMANT.

The fourth and final element of the Barker v. Wingo due-process analysis is whether the claimant has suffered any prejudice by the delay.  See Barker v. Wingo, 407 U.S. at 530-32.

The primary inquiry here is whether the delay has hampered the claimant in presenting a defense on the merits, through, for example, the loss of witnesses or

other important evidence.  Such prejudice could be a weighty factor indicating
that the delay was unreasonable.

United States v. $8,850.00, 461 U.S. at 569.  In this case, Fraire has not offered any evidence on this factor or explained how any of the delays present in this case have "hampered [him] in presenting a defense on the merits, through, for example, the loss of witnesses or other important evidence."  United States v. $8,850.00, 461 U.S. at 569.  This factor therefore weighs strongly in favor of the United States.  As the United States District Court for the Northern District of Georgia noted in United States v. One (1) 1984 Nissan 300 ZX, Georgia License No. VIN JN1HZ11452EX032749, "the Supreme Court's four-factor test is designed only as a guide in balancing the interests of the claimant and the government in a particular case."  711 F. Supp. at 1565.  Here, the Court has concluded that because the United States never seized 2121 Celeste, the Barker v. Wingo four-factor balancing test is not triggered.  Even if it is, the Court concludes, after careful consideration of the Barker v. Wingo factors, particularly the lack of prejudice to Fraire, that the delays in this case do not violate Fraire's Fifth Amendment due-process rights.  Accordingly, the Court grants the United States' MSJ, forfeiting to the United States all right, title, and interest, including that of Fraire, in 2121 Celeste.

**IT IS ORDERED** that: (i) Claimant Cruz J. Fraire's Motion for Summary Judgment, filed July 29, 2015 (Doc. 43), is denied; and (ii) the United States' Motion for Summary Judgment and Memorandum Brief in Support, filed November 11, 2015 (Doc. 57), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Stephen R. Kotz
Joel R. Meyers
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Jason Bowles
Bowles Law Firm
Albuquerque, New Mexico

-- and --

Robert J. Gorence
Gorence & Oliveros PC
Albuquerque, New Mexico

      *Attorneys for the Defendant*